DV-18-04

1   Mark D. Parker
    Samantha A. Howard
2   **PARKER, HEITZ & COSGROVE, PLLC**
    401 N. 31st Street, Suite 805
3   P.O. Box 7212
    Billings, Montana 59103-7212
4   (406) 245-9991
    (406) 245-0971 facsimile
5   email: markdparker@parker-law.com
           samanthahoward@parker-law.com
6
7   Attorneys for Plaintiff

8         **MONTANA FOURTEENTH JUDICIAL DISTRICT COURT,**
                    **MUSSELSHELL COUNTY**
9

10  **GENERON IGS, INC.,**                  )        Cause No. DV-18-04
                                            )
11                          Plaintiff,      )        Judge Ronald I. Spaulding
                                            )
12      vs.                                 )
                                            )
13  **CRUM & FORSTER SPECIALTY**            )        **SUMMONS**
    **INSURANCE COMPANY,**                  )
14                                          )
                          Defendant.        )
15              * * * * * * * * * * * * * * * * * *
16

17          **THE STATE OF MONTANA SENDS GREETINGS TO**

18      **CRUM & FORSTER SPECIALTY INSURANCE COMPANY**

19          You are hereby summoned to respond to the Complaint in this action which is

20  filed in the office of the Clerk of this Court, a copy of which is herewith served upon you,

21  and to file your answer and serve a copy thereof upon the Plaintiff's attorney within

22  thirty (30) days after the service of this summons, exclusive of the day of service.  IN

23  CASE OF YOUR FAILURE TO APPEAR OR RESPOND, JUDGMENT WILL BE TAKEN

24  AGAINST YOU BY DEFAULT, FOR THE RELIEF DEMANDED IN THE COMPLAINT.

25

26  **Summons**                                              **Page 1 of 2**

                                                    Exhibit A  2

WITNESS my hand and the seal of said Court this _____5_____ day of January, 2018.

(COURT SEAL)



BARB HALVERSON
Clerk of District Court
Musselshell County

By: _____
~~Barb Halverson~~
~~Deputy~~ Clerk

**Summons**

**Page 2 of 2**

1   Mark D. Parker
    Samantha A. Howard
2   **PARKER, HEITZ & COSGROVE, PLLC**
    401 N. 31st Street, Suite 805
3   P.O. Box 7212
    Billings, Montana 59103-7212
4   (406) 245-9991
    (406) 245-0971 facsimile
5   email: markdparker@parker-law.com
    samanthahoward@parker-law.com
6
7   Attorneys for Plaintiff

CLERK OF THE
DISTRICT COURT
BARB HALVERSON

2018 JAN 5 AM 11 46

FILED

BY   Barb Halverson

CLERK/DEPUTY

*COPY*

8   **MONTANA FOURTEENTH JUDICIAL DISTRICT COURT,**
    **MUSSELSHELL COUNTY**
9

10  **GENERON IGS, INC.,**                )    Cause No. DV-18-04
                                          )
11                         Plaintiff,     )    Judge Ronald I. Spaulding
                                          )
12  vs.                                   )
                                          )    **COMPLAINT FOR DECLARATORY**
13  **CRUM & FORSTER SPECIALTY**          )              **RELIEF**
    **INSURANCE COMPANY,**                )
14                                        )
                           Defendant.     )
15                                   * * * * * * * * * * * * * * * * *

16      COMES NOW, Plaintiff, Generon IGS, Inc. ("Generon"), by and through its

17  attorney of record, and alleges as follows:

18                  **PARTIES AND GENERAL ALLEGATIONS**

19      1.      Plaintiff Generon is a corporation organized under the laws of Delaware,

20  with its principal place of business in Houston, Texas.

21      2.      Defendant, Crum & Forster Specialty Insurance Company ("Defendant") is

22  a corporation organized under the laws of Delaware, with its principal place of business

23  in Morristown, New Jersey.

24      3.      Personal jurisdiction over the Defendant is proper because the fire that

25  triggered the necessity for this action occurred near Roundup, Montana.

26  **Complaint for Declaratory Relief**                              **Page 1 of 7**

4.     At the time of the loss, Defendant was the insurance provider of Generon. Defendant provided Generon with an inclusive insurance policy. *See*, Exhibit 1. During a policy period when Defendant insured Generon, Generon entered into contract with Signal Peak Energy of Roundup, Montana.  Pursuant to Generon's contract with Signal Peak, Generon provided various components for a containerized nitrogen generating plant in a coalmine owned by Signal Peak, located at 100 Portal Drive, Roundup, Montana.

5.     According to Signal Peak's Complaint, following the plant's installation and commissioning, on November 24, 2014, at approximately 9:30 A.M., a Signal Peak employee turned on the plant, which had been idle for three weeks.  At approximately 11:25 A.M., smoke was discovered escaping from one of the plant's compressor units. Upon further inspection, a fire was discovered within the compressor unit, a nitrogen production unit, and the motor control center.  The fire was extinguished shortly after its discovery.  Although quickly extinguished, the fire is alleged to have caused significant damage to the compressor unit, the nitrogen production unit, the motor control center and other property.  Damages from the fire totaled $2,355,271.00. *See*, Exhibit 2.

6.     Following the fire and subsequent damage claims, Generon turned the damages over to its insurance carrier, the Defendant.  In response, Defendant disregarded the parties' insurance policy and refused to cover any of the associated costs of defending the claims against Generon.

7.     Following the fire and Defendant's improper refusal to cover Generon, on August 16, 2016, Signal Peak filed suit against Generon IGS Inc.; Sullair, LLC; Power Service, Inc.; and John Does 1-10. *See*, Exhibit 2.  Signal Peak seeks damages and bases its claims against Generon in theories of negligence, gross negligence, breach of express

**Complaint for Declaratory Relief**                                    **Page 2 of 7**

warranty, breach of implied warranty, breach of contract, and strict products liability. *Id.*

8.     Upon obtaining notice of Signal Peak's action against Generon, Defendant sent Generon a letter on January 13, 2017 outlining bases for denial of coverage. *See,* Exhibit 3.  Counsel for Generon and Defendant have continued to exchange letters regarding Defendant's duty to defend Generon.  *See,* Exhibits 4-7.

9.     Generon is an insured under Defendant's policy, it is entitled to a defense against the claims asserted by Signal Peak, and indemnity for any judgment awarded against it.

### DECLARATORY RELIEF

### COUNT I

10.     Generon incorporates Paragraphs 1 through 9 above into this Count.

11.     Currently there is a dispute between Generon and Defendant as to the rights and duties of the parties as they pertain to the insurance policy.  The dispute of whether the facts alleged in Signal Peak's complaint are sufficient to trigger Defendant's duty to defend Generon entitles Generon to declaratory relief under § 27-8-202, M.C.A.

**A.     SIGNAL PEAK'S COMPLAINT ALLEGES FACTS SUFFICIENT TO INVOKE DEFENDANT'S DUTY TO DEFEND GENERON.**

12.     Signal Peak's complaint alleges facts that are sufficient to invoke Defendant's duty to defend Generon.  The duty of insurers to defend their insured arises when a complaint against the insured alleges facts, which if proved, would result in coverage. *Tidyman's Management Serv., Inc. v. Davis*, 2014 MT 205, ¶ 22, Mont. 80, 330 P.3d 1139.  In determining whether the insurer has a duty to defend pursuant to the complaint, the Court is to resolve in favor of the insured any doubts about whether allegations of the complaint state a cause of action within the coverage of the insurance policy. *J & C Moodie Properties, LLC v. Deck*, 2016 MT 301, ¶ 20, 385 Mont. 382, 389,

384 P.3d 466, 472.  Furthermore, any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage.  *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 14, 315 Mont. 107, 112, 67 P.3d 892, 896.

13.     Here, the complaint alleges damages to a broad category of property, including the installed and commissioned Generon product, Signal Peak property, and miscellaneous extra expense incurred by third parties and subcontractors.  *See*, Exhibit 2.  The complaint alleges the damages occurred out of negligence, as opposed to intentional misconduct.  *Id.*  The implicated policy provides that Defendant has "the right and duty to defend the insured against any 'suit' seeking 'damages' to which this insurance policy applies.  [Defendant] will pay 'defense expenses' with respect to any 'suit' against an insured that we defend.  *See*, Exhibit 1.  The policy also provides both a $2,000,000.00 policy limit for products and completed operations and a $1,000,000.00 policy limit for each occurrence on the Environmental Package Policy Declarations page.  *Id.*  The policy defines occurrence as an "accident".  Generon's product and completed operations were damaged by the fire, allegedly due to an accidental occurrence.  Thus, this is just one example of a portion of Signal Peak's complaint that alleges facts sufficient to invoke Defendant's duty to defend Generon.  *Tidyman's Management Serv., Inc. v. Davis*, 2014 MT 205, ¶ 22, Mont. 80, 330 P.3d 1139; *J & C Moodie Properties, LLC v. Deck*, 2016 MT 301, ¶ 20, 385 Mont. 382, 389, 384 P.3d 466, 472.  Furthermore, any fact alleged in Signal Peak's complaint that leads to a potentially ambiguous debate of coverage pursuant to the policy, which Defendant attempted to delineate in its letters to Generon, should be viewed in a light most favor of Generon.  *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 14, 315 Mont. 107, 112, 67 P.3d 892, 896.  When the above described heavy burden imposed upon the Defendant is combined with the facts alleged by Signal Peak, it becomes clear that there

**Complaint for Declaratory Relief**                                    **Page 4 of 7**

are facts sufficient to trigger Defendant's duty and obligation to defend its insured, Generon.

**B.    DEFENDANT LACKS AN UNEQUIVOCAL DEMONSTRATION THAT GENERON DOES NOT FALL WITHIN THE INSURANCE POLICY'S COVERAGE.**

14.    Because the Defendant lacks an unequivocal demonstration that Generon does not fall within the insurance policy's coverage, it has a clear and undeniable duty to defend Generon.  The Court has articulated a clear duty to defend that is weighted heavily in favor of the insured.  *J & C Moodie Properties* illustrates that point by holding, "[u]nless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defendant.  *J & C Moodie Properties, LLC v. Deck*, 2016 MT 301, ¶ 20, 385 Mont. 382, 389, 384 P.3d 466, 472.  Furthermore, one insurable count in a complaint triggers the insurer's obligation to defend the insured on all other counts.  *Id.*  The above described example of coverage demonstrates that Defendant lacks an unequivocal demonstration that Generon does not fall within the insurance policy's coverage.  As a result, Generon's ability to show that Defendant is obligated to defend pursuant to just one of Signal Peak's counts, specifically negligence, is sufficient to trigger Defendant's duty to defend on all remaining counts.  Thus, Defendant is obligated to defend Generon on each and every count of Signal Peak's complaint.

**C.    IF EACH OF DEFENDANT'S CLAIMS IN THEIR DENIAL LETTERS DISALLOWED COVERAGE, DEFENDANT'S COVERAGE OF GENERON WOULD BE FRAUDULENT AND ILLUSORY AND CONSEQUENTLY DISALLOWED.**

15.    If each of Defendant's claims in their denial letters disallowed coverage of Generon under these circumstances, Defendant's coverage of Generon would be fraudulent and illusory and consequently disallowed under Montana law.  Montana law prohibits insurers from providing their insured with fraudulent and illusory coverage.

**Complaint for Declaratory Relief**

§ 33-1-1202, M.C.A.  Insurance coverage is deemed illusory when it appears that if any actual coverage does exist it is extremely minimal and affords no realistic protection to any group or class of injured persons.  *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 48, 315 Mont. 107, 119, 67 P.3d 892, 900.  Specifically in this case, allowing the "your products" exception as an exception to declared products/completed operations coverage would create illusory coverage.  *Cook's Fabrication & Welding, Inc. v. Mid-Continent Cas. Co.*, 364 S.W.3d 639, 644 (Mo.App. E.D. 2012).  Here, Signal Peak's sixteen (16) page complaint alleges numerous facts, four (4) counts, and utilizes six (6) legal theories of liability (negligence; gross negligence; breach of express warranty; breach of implied warranty; breach of contract; strict products liability).  *See*, Exhibit 2.  Signal Peak's complaint is detailed and far reaching.  Defendant's coverage of Generon would be illegally fraudulent and illusory if not one fact, count or legal theory was covered within the thirty (30) plus pages of coverage detailed in the insurance policy.  Because such fraudulent and illusory coverage is disallowed under Montana law, the Defendant is obligated to honor its duty to defend Generon.

## COUNT II

16.     Generon incorporates Paragraphs 1 through 15 above into this Count.

17.     Although the "your products" exclusion described above does not bar coverage, additionally, this Complaint also seeks relief for claims against Generon alleging damages incurred to personal property other than "your products" as defined in the policy.

## CONCLUSION

18.     Pursuant to controlling law, Defendant faces a lofty burden in denying coverage to Generon.  Defendant must: (1) prove that no fact in Signal Peak's complaint implicates no part of the insurance policy; (2) overcome the Court's duty to resolve in

**Complaint for Declaratory Relief**                                      **Page 6 of 7**

favor of the insured any doubts about whether allegations of the complaint state a cause of action within the coverage of the insurance policy; (3) prove there is no ambiguity in the insurance policy that could be construed in favor of the insured and in favor of extending coverage; (4) unequivocally demonstrate that Generon does not fall within the insurance policy's coverage; (5) prove that not one of Signal Peak's counts can trigger Defendant's obligation to defend the insured on all other counts; (6) prove that denying coverage under Signal Peak's long and detailed complaint does not result in providing Generon with fraudulent and illusory coverage.  Under the facts this case and the heavy burden placed upon the Defendant, it becomes clear that Defendant is obligated to defend and indemnify Generon in the Signal Peak action.

WHEREFORE Plaintiff Generon seeks declaratory relief in the following manner:

1)    That Defendant defends and indemnifies Generon in *Signal Peak Energy v. Generon IGS Inc.; Sullair, LLC; Power Service, Inc.; and John Does 1-10*, pursuant to the terms of the insurance and applicable case law;

2)    Attorney fees pursuant to § 27-8-313, M.C.A. or other applicable Montana law;

3)    For such other declaratory relief as the Court deems just and equitable under the circumstances.

DATED this 4th day of January, 2018.

**PARKER, HEITZ & COSGROVE, PLLC**
401 N. 31st Street, Suite 805
P.O. Box 7212
Billings, Montana  59103-7212

Mark D. Parker
Samantha A. Howard
Attorneys for Plaintiff

**Complaint for Declaratory Relief**                                        **Page 7 of 7**

**EXHIBIT**
**1**



Crum&Forster
part of the FAIRFAX group

## ENVIRONMENTAL PACKAGE POLICY DECLARATIONS

**POLICY NUMBER: EPK-103197**
**RENEWAL OF: EPK-101101**

| ITEM | | |
|---|---|---|
| 1. | **NAMED INSURED & ADDRESS:** Generon IGS, Inc.<br>16250 Tomball Parkway<br>Houston, TX 77086 | |
| | Named Insured's Business: Oxygen and Nitrogen System Manufacturer | Form of Business: Corporation |
| 2. | **POLICY PERIOD: FROM:** 02/15/14 | **TO:** 02/15/15 |
| | 12:01 a.m. Standard Time at the Named Insured's address stated above | |
| 3. | **COVERAGE IS PROVIDED BY:**<br><br>Crum & Forster Specialty Insurance Company<br>( A Stock Company)<br>305 Madison Avenue<br>Morristown, NJ 07960 | **REPRESENTATIVE:**<br>Producer Number: 95735<br>CRC Insurance Services, Inc.<br>(205) 870-7790<br>1 Metroplex Drive, Suite 400<br>Birmingham, AL 35259 |

**IN RETURN FOR THE PAYMENT OF PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| 4. | **LIMITS OF INSURANCE:** (The Limits of Insurance are the amounts shown below.) | |
|---|---|---|
| | GENERAL AGGREGATE LIMIT (Other Than Products/Completed Operations) | $2,000,000 |
| | PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $2,000,000 |
| | PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 |
| | EACH OCCURRENCE LIMIT | $1,000,000 |
| | DAMAGE TO PREMISES RENTED TO YOU LIMIT | $50,000 |
| | MEDICAL EXPENSE LIMIT | $5,000 |
| | CONTRACTORS POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | Not Covered |
| | ERRORS AND OMISSIONS EACH CLAIM LIMIT | Not Covered |
| | THIRD PARTY POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | $1,000,000 |
| | ONSITE CLEANUP POLLUTION LIABILITY EACH POLLUTION CONDITION LIMIT | $1,000,000 |
| 5. | **RETROACTIVE DATE APPLICABLE TO:** Third Party Pollution Liability: 02/15/12<br>Onsite Cleanup Pollution Liability: 02/15/12 | |
| 6. | **DEDUCTIBLE/SELF INSURED RETENTION:** See Deductible Endorsement EN0009 | |
| 7. | **FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY:**<br>See Schedule of Forms and Endorsements EN0002 | |
| 8. | **PREMIUM:** | $71,924 |
| | **TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION ACT (TRIPRA):** | Excluded |
| | **TOTAL ANNUAL PREMIUM:** | $71,924 |
| 9. | **AUDIT PERIOD: FLAT PREMIUM:** X **AUDITABLE PREMIUM:** | |

Tax: $3488.31
State: TX
Policy: O
Other: $43.15 Stamping fee

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of _____ (insert appropriate tax rate) percent tax on gross premium.

Authorized Representative

THESE DECLARATIONS, TOGETHER WITH POLICY JACKET, MASTER FORMS LIST, SCHEDULES AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART OF, AND IN THE COMPLETION OF THE ABOVE NUMBERED POLICY.

EN0001-0214



Insured: Generon IGS, Inc.
Policy Number: EPK-103197

## SCHEDULE OF FORMS AND ENDORSEMENTS

Forms and Endorsements applying to and made part of this policy at the time of issuance:

| FORM NUMBER | TITLE |
|---|---|
| EN0001-0211 | Environmental Package Policy Declarations |
| EN0002-0211 | Schedule of Forms and Endorsements |
| EN0003-0211 | Crum & Forster Specialty Insurance Company Signature Page |
| EN0020-1212 | Common Provisions |
| EN0021-0211 | Commercial General Liability Occurrence Coverage Part |
| EN0026-0611 | Third Party Pollution Liability Coverage Part |
| EN0027-0211 | Onsite Cleanup Coverage Part |
| EN0004-0211 | Claims Reporting |
| EN0005-0211 | Service of Process Clause |
| EN0007-0211 | Certified Acts of Terrorism and Other Acts of Terrorism Exclusion |
| EN0009-0211 | Deductible Schedule Endorsement |
| EN0010-0211 | Minimum Premium and Minimum Retained Premium |
| EN0011-0211 | Crum & Forster Privacy Principles |
| EN0050-1011 | Emergency Response Hotline |
| EN0051-1011 | Spill Letter |
| EN0101-0211 | Aggregate Limits of Insurance Per Location |
| EN0109-0211 | Amended Waiver of Transfer of Rights of Recovery Against Others To Us |
| EN0111-0211 | Additional Insured – Owners, Lessees Or Contractors |
| EN0118-0211 | Primary and Non-Contributory Additional Insured with Waiver of Subrogation |
| EN0127-0211 | Total Mold Exclusion |
| EN0134-0211 | Cancellation By Us |
| EN0136-0211 | Notice of Cancellation – Certificate Holder(s) |
| EN0137-0211 | General Change Endorsement |
| EN0301-0211 | Aggregate Limits of Insurance Per Project |
| EN0302-0211 | Employee Benefits Liability Coverage |
| EN0307-0211 | Amendment of Coverage Territory – Worldwide Coverage |
| EN0308-0211 | Gulf of Mexico Extension |
| EN0311-0511 | Products Pollution Liability Coverage Extension |
| EN0318-0211 | Additional Insured – Mortgagee, Assignee Or Receiver |
| EN0320-0211 | Additional Insured – Owners, Lessees Or Contractors – Completed Operations |
| EN0346-0313 | Amendment to Damage to Your Work Exclusion |
| EN0615-0211 | Covered Locations Endorsement |
| EN0645-0211 | Onsite Cleanup Coverage Restriction to Release From Aboveground Storage Tank |
| EN0650-0611 | Loading or Unloading of Watercraft and Automobiles at Covered Location(s) |
| EN0651-0211 | Transportation Pollution Cleanup Including Loading and Unloading – Third Party |

**Crum & Forster Specialty Insurance Company**
**An Arizona Corporation**
**Home Office: Phoenix, AZ**

(A Capital Stock Company)

SIGNATURE

Mary Jane Robertson
President

SIGNATURE

James Kraus
Secretary

EN0003-0211



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT

Policy Change
Number 001

| POLICY NUMBER<br>EPK-103197 | POLICY CHANGES<br>EFFECTIVE<br>03/04/14 | COMPANY<br>Crum and Forster Specialty<br>Insurance Company |
|---|---|---|

| NAMED INSURED<br>Generon IGS, Inc. |
|---|

| COVERAGE PARTS AFFECTED<br>COMMERCIAL GENERAL LIABILITY COVERAGE PART |
|---|

| CHANGES |
|---|
| It is hereby agreed upon the Additional Insured- Owners, Lessees or Contractors Endorsement EN0111-0211 has been added to the policy as per the attached. |

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

Authorized Representative Signature:



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART

## SCHEDULE

**Name Of Additional Insured Person(s) or Organization(s)**
Pacific Gas and Electric Company, its affiliates, subsidiaries, parent company, directors, officers, agents and employees with respect to liability arising out of the work performed by or for the Contractor are additional insured's under a blanket endorsement.

**SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but only with respect to liability caused, in whole or in part, by "your work" for that insured which is performed by you or by those acting on your behalf.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**



**THIS POLICY MAY CONTAIN BOTH CLAIMS-MADE AND OCCURRENCE COVERAGE. PLEASE READ THE ENTIRE FORM CAREFULLY.**

# COMMON PROVISIONS

This Policy consists of: (1) these Common Provisions; (2) one or more Coverage Parts that have been purchased by one or more Named Insured(s); and (3) the Declarations Page(s) associated with such Coverage Part(s). Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered by this Policy.

There are separate Coverage Parts that you may purchase separately. They are subject to these Common Provisions. Some of the Coverage Parts provide occurrence based coverage and others provide claims made coverage. Some Coverage Parts have defense expenses within limits, some do not. Some Coverage Parts do not provide for any defense obligation. Each Coverage Part has a section setting forth its own exclusions and conditions. The Common Provisions also contain definitions, exclusions and conditions that apply to all Coverage Parts. The Common Provisions also provide for defense obligations, where applicable, limits of liability, who is insured and, with respect to claims made coverage parts, extended reporting period provisions. With respect to definitions, any word or phrase in quotes is a defined term that will appear in the definitions section of the Common Provisions. Certain words (such as, but not limited to, Policy, Declarations, Deductible and Self Insured Retention) are used with initial capitalization. Such words are not defined terms and do not appear in the definitions section of the Common Provisions.

Throughout this Policy the words "you" and "your" refer to the First Named Insured

shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Policy. The words "we", "us" and "our" refer to the Company providing this insurance. The word "insured" means any person or organization qualifying as such under Section III Who Is An Insured.

In consideration of payment of the premium, in reliance upon the statements in the application for this insurance and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, you agree with us as follows:

## SECTION I - DEFENSE

1. **Commercial General Liability**

   If either of the following Coverage Parts: Commercial General Liability Occurrence or Commercial General Liability Claims Made, is purchased and is attached to these Common Provisions, then the following provisions apply to Insuring Agreement **A** - Bodily Injury And Property Damage and Insuring Agreement **B** - Personal And Advertising Injury:

   a. We have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies. We will pay "defense expenses" with respect to any "suit" against an insured that we defend. However, we have no duty to defend the insured against any "suit" seeking "damages" for "bodily injury", "property damage" or

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

"personal and advertising injury" to which this insurance does not apply.

b. Our right and duty to defend end when we have used up the applicable limit of liability in the payment of judgments or settlements and "defense expenses" included within your Deductible Amount under Insuring Agreements **A** and **B** or medical expenses under Insuring Agreement **C**. "defense expenses" incurred by us under the Commercial General Liability Occurrence Coverage Part or the Commercial General Liability Claims Made Coverage Part will not reduce the Limits of Insurance, except for "defense expenses" which are included within your Deductible Amount.

2. **Contractors Pollution Liability, Errors And Omissions Liability And Third Party Pollution Liability**

If one or more of the following Coverage Parts: Contractors Pollution Liability Occurrence Coverage, Contractors Pollution Liability Claims Made Coverage, Errors And Omissions Liability Coverage or Third Party Pollution Liability Coverage are purchased and the corresponding Coverage Part is attached to these Common Provisions, then the following provisions will apply to the Insuring Agreement under the Coverage Part. :

a. We have the right and duty to defend the insured against any "suit" seeking "damages" to which this insurance applies. We will pay "defense expenses" with respect to any "suit" against an insured that we defend. However, we have no duty to defend the insured against any "suit" seeking:  (1) "damages" for "bodily injury" or "property damage" to which this insurance does not apply; or (2) "cleanup costs" to which

this insurance does not apply.

b. Our right and duty to defend end when we have used up the applicable Limits of Insurance in the payment of any combination of judgments, settlements or "defense expenses".

c. "Defense expenses" applicable to the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts, the Errors and Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part  are included within the Limits of Insurance and will reduce the Limits of Insurance provided by each such Coverage Part.

3. **Claims Arising Out Of The Same or Related Acts or Events**

The following provision applies only to the Commercial General Liability Claims Made Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and the Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part:

Two or more "claims" arising out of the same or related acts, errors, omissions, circumstances, transactions or events shall be deemed to be first made and reported on the earliest date on which any such "claim" was first made and reported. Such "claims" shall be deemed to be a single "claim".

**SECTION II – DEFENSE EXPENSES**

If one or more of the following Coverage Parts: Commercial General Liability Occurrence or Claims Made, Contractors Pollution Liability Occurrence or Claims Made, Errors and

© 2011 United States Fire Insurance Company, all rights reserved.

Omissions Liability or Third Party Pollution Liability Coverage Parts are purchased, then the following provisions apply to all Coverage Parts except the Onsite Cleanup Coverage Part:

1. We will pay "defense expenses" with respect to any "claim", "occurrence", "wrongful act" or "pollution condition" that we investigate or settle, or any "suit" against an insured we defend. We do not have any duty to defend or pay "defense expenses" under the Onsite Cleanup Coverage Part.

2. If we defend an insured against a "suit" and an indemnitee of that insured is also named as a party to the "suit", we will defend that indemnitee and pay "defense expenses" on behalf of that indemnitee if all of the following conditions are met:

   a. the "suit" against the indemnitee seeks "damages" for which such insured has assumed the liability of the indemnitee in an "insured contract";

   b. this insurance applies to the liability assumed by such insured;

   c. the obligation to defend, or the cost of the defense of that indemnitee, has also been assumed by such insured in the same "insured contract";

   d. the allegations in the "suit' and the information we know about the "occurrence", offense, "wrongful act" or "pollution condition" are such that no conflict appears to exist between the interests of such insured and the interests of the indemnitee;

   e. the indemnitee and such insured ask us to conduct and control the defense of that indemnitee against such "suit' and agree that we can assign the same counsel to defend

such insured and the indemnitee; and

   f. the indemnitee:

      (1) agrees in writing to:

         (a) cooperate with us in the investigation, settlement or defense of the "suit";

         (b) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) promptly notify any other insurer whose coverage is available to the indemnitee; and

         (d) cooperate with us with respect to obtaining other applicable insurance that may be available to the indemnitee; and

      (2) provides us with written authorization to:

         (a) obtain records and other information related to the "suit"; and

         (b) conduct and control the defense of the indemnitee in such "suit".

3. The "defense expenses" in **2a.** through **2f.**: (i) will not reduce the Limits of Insurance for the Commercial General Liability Occurrence Coverage Part and the Commercial General Liability Claims Made Coverage Part, except for "defense expenses" included within your Deductible Amount; but (ii) will reduce the Limits of Insurance for the Contractors Pollution Liability Occurrence Coverage Part, the Contractors Pollution Liability Claims

© 2011 United States Fire Insurance Company, all rights reserved.

Made Coverage Part, the Errors and Omissions Liability Coverage Part, and the Third Party Pollution Liability Coverage Part.

4. Our obligation to pay "defense expenses" on behalf of that indemnitee ends when either:

  a. we have used up the applicable limit of insurance in the payment of judgments or settlements and "defense expenses" included within your Deductible Amount under the Commercial General Liability Occurrence or Claims Made Coverage Part; or

  b. we have used up the applicable limit of insurance in the payment of any combination of "defense expenses" or judgments or settlements, or any of them, under the Contractors Pollution Liability Occurrence or Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part, or the Third Party Pollution Liability Coverage Part; or

  c. the conditions set forth above, or the terms of the agreement described in Paragraph **2.f.** above, are no longer met.

## SECTION III - WHO IS AN INSURED

1. If you are designated in the Declarations as:

  a. an individual, then you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

  b. a partnership or joint venture, then you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

  c. a limited liability company, then you

are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

  d. an organization other than a partnership, joint venture or limited liability company, then you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

  e. a trust, then you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

  a. your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

    (1) "bodily injury" or "personal and advertising injury":

      (a) to you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the

© 2011 United States Fire Insurance Company, all rights reserved.

course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** to the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** for which there is any obligation to share "damages" with or repay someone else who must pay "damages" because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** owned, occupied or used by; or

**(b)** rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as

your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However, with respect to such organization:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the "policy period", whichever is earlier;

**b.** Insuring Agreement **A** of the Commercial General Liability Coverage Part does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization;

**c.** Insuring Agreement **B** of the Commercial General Liability Coverage Part does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization;

**d.** The Insuring Agreement of the

© 2011 United States Fire Insurance Company, all rights reserved.

Contractors Pollution Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" that occurred before you acquired or formed the organization;

e.  The Insuring Agreement of the Errors and Omissions Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "wrongful act" committed before you acquired or formed the organization;

f.  The Insuring Agreement of the Third Party Pollution Liability Coverage Part does not apply to "bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" that occurred before you acquired or formed the organization; and

g.  The Insuring Agreement of the Onsite Cleanup Coverage Part does not apply to "pollution conditions" existing before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION IV - LIMITS OF INSURANCE AND DEDUCTIBLE

1.  The Limits of Insurance shown below fix the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "claims" made or "suits" brought; or

    c.  Persons or organizations making "claims" or bringing "suits".

2.  The General Aggregate Limit stated in the Declarations is the most we will pay under this Policy for the sum of all:

    a.  "Damages" for "bodily injury", "property damage" and "personal and advertising injury" under all Coverage Parts, except "bodily injury" and "property damage" under the Commercial General Liability Occurrence or Claims Made Coverage Parts, that fall within the "products-completed operations hazard";

    b.  Medical Expenses and "cleanup costs"

    c.  "Defense expenses" under all Coverage Parts except the Commercial General Liability Occurrence or Claims Made Coverage Parts and the Onsite Cleanup Coverage Part, other than "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

3.  The Products-Completed Operations Aggregate Limit is the most we will pay under Insuring Agreement **A** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for "damages" because of "bodily injury" and "property damage" included in the "products-completed operations hazard" and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

4.  Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under the Insuring Agreement **B** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for the sum of all "damages" because of all "personal and advertising injury" arising out of any one

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

offense and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

5. Subject to Paragraph **2.** or **3.** above, whichever is applicable, the Each Occurrence Limit is the most we will pay under the Commercial General Liability Occurrence or Claims Made Coverage Parts for the sum of all:

    a. "Damages" for "bodily injury" and "property damage" under Insuring Agreement **A**; and

    b. Medical Expenses under Insuring Agreement **C**

    because of all "bodily injury" and "property damage" arising out of any one "occurrence" and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under the Insuring Agreement **A** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for "damages" because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner and for related "defense expenses" included within the Deductible Amounts applicable to the Commercial General Liability Coverage Parts.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under the Insuring Agreement **C** of the Commercial General Liability Occurrence or Claims Made Coverage Parts for all medical expenses because

of "bodily injury" sustained by any one person.

8. Subject to Paragraph **2.** above, the Each Pollution Condition Limit is the most we will pay under the Insuring Agreement of the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts for the sum of all:

    a. "damages", because of "bodily injury" and "property damage";

    b. "cleanup costs"; and

    c. "defense expenses"

    arising out of any one "pollution condition".

9. Subject to Paragraph **2.** above, the Errors and Omissions Liability Each Claim Limit is the most we will pay under the Insuring Agreement of the Errors and Omissions Liability Coverage Part for the sum of all:

    a. "damages" because of "bodily injury" and "property damage";

    b. "cleanup costs"; and

    c. "defense expenses"

    arising out of any one "wrongful act" or series of related "wrongful acts".

10. Subject to Paragraph **2.** above the Third Party Pollution Liability Each Pollution Condition Limit is the most we will pay under the Insuring Agreement of the Third Party Pollution Liability Coverage Part for the sum of all:

    a. "damages" because of "bodily injury" and "property damage";

    b. "cleanup costs"; and

    c. "defense expenses"

EN0020-1212

Page 7 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

arising out of any one "pollution condition".

11. Subject to Paragraph **2.**, Onsite Cleanup Coverage Each Pollution Condition Limit is the most we will pay under the Onsite Cleanup Coverage Part for the sum of all "cleanup costs" arising out of any one "pollution condition".

12. The Limits of Insurance of this policy apply while this policy is in effect.

13. Subject to the terms and conditions of any separate deductible endorsement(s), which, if inconsistent with the provisions of this section, shall control, the Deductible Amount as stated in the Declarations shall apply as follows:

   a. With respect to the Commercial General Liability Coverage Parts:

      (1) if the Deductible Amount is on an each "claim" basis, the Deductible Amount shall apply to all payments for  "damages", medical expenses and "defense expenses" made because of "bodily injury" sustained by any one person or "property damage" sustained by any one person or organization, as a result of any one "occurrence", or, in the case of medical payments, arising out of any one accident; and, with respect to "personal and advertising injury", to all payments for "damages" and "defense expenses" made because of "personal and advertising injury" sustained by any one person or organization;

      (2) if the Deductible Amount is on an each "occurrence" basis, the deductible amount shall apply to all payments for "damages", medical expenses and "defense expenses" made because of all "bodily injury" or "property

damage" as a result of any one "occurrence", or, in the case of medical expenses, arising out of any accident; and with respect to "personal and advertising injury", to all payments for "damages" and "defense expenses" made because of "personal and advertising injury" sustained by any one person or organization; and

      (3) The Deductible Amount shall first be applied to "defense expenses". Any remaining amount of the Deductible after payment of "defense expenses" shall be applied to "damages" and medical expenses.

   b. With respect to the Insuring Agreement(s) of the Contractors Pollution Liability Occurrence  or Claims Made Coverage Parts, and the Third Party Pollution Liability Coverage Part :

      (1) the Deductible Amount applies to all payments for "damages" because of "bodily injury" or "property damage", "cleanup costs" and "defense expenses" made because of each "pollution condition"; and

      (2) the Deductible Amount can be applied, at our option, to any combination of "defense expenses", "cleanup costs" or "damages" arising out of such "pollution condition".

   c. With respect to the Insuring Agreement of the Errors and Omissions Liability Coverage Part;

      (1) the Deductible Amount applies to all payments for "damages" because of "bodily injury" or "property damage", "cleanup costs" and "defense expenses"

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

made because of each "wrongful act" or series of related "wrongful acts";

**(2)** the Deductible Amount can be applied, at our option, to any combination of "defense expenses", "cleanup costs" or "damages" arising out of such "pollution condition".

**d.** With respect to the Insuring Agreement of the Onsite Cleanup Coverage Part, the Deductible Amount applies to all payments for "cleanup costs" because of each "pollution condition".

**e.** All Deductible Amounts, including any "defense expense" component, are included within and reduce the Limits of Insurance set forth above. With respect to the Commercial General Liability Coverage Parts, "defense expenses" are included within and reduce the Deductible Amount, but once the Deductible Amount has been exhausted, "defense expenses" thereafter incurred are no longer within and do not reduce the Limits of Insurance.

With respect to any of the Deductible Amounts described above, we, at our sole election and option, may:

**(1)** Pay any part or all of the Deductible Amount to effect settlement of any "claim" or "suit", and upon notification of the action taken, you shall promptly reimburse us for such the Deductible Amount that has been paid by us; and

**(2)** Upon receipt of notice of any "claim" or at any time thereafter, call upon you to pay or deposit with us all or any part of the Deductible Amount, to be held

and applied by us as herein provided.

## SECTION V - COMMON EXCLUSIONS

The following exclusions apply to all Coverage Parts attached to this Policy except where specifically noted:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

**1. Aircraft, Auto Or Watercraft**

Based upon or arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the "claim" against any insured alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of another by that insured, or if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**a.** A watercraft while ashore on premises you own or rent;

**b.** A watercraft you do not own that is:

**(1)** Less than twenty-six (26) feet long; and

**(2)** Not being used to carry persons or property for a charge;

**c.** Parking an "auto" on, or on the

© 2011 United States Fire Insurance Company, all rights reserved.

roadway near premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**d.** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**e.** "Bodily injury" or "property damage" arising out of:

  **(1)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment' if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

  **(2)** The operation of any of the machinery or equipment listed In Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**2. Contractual Liability**

Based upon or arising out of any liability for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

**a.** That the insured would have in the absence of the contract or agreement; or

**b.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable

attorney's fees and necessary litigation expenses incurred by or for a party other than an insured shall be deemed to be "damages" because of "bodily injury" or "property damage", and not "defense expenses" if:

  **(1)** Liability to such party for, or for the cost of, that party's defense has also been assumed by the insured in the same "insured contract"; and

  **(2)** Such attorney's fees and litigation expenses are: (i) for defense of that party against a "suit"; and (ii) recovered in a "suit" by that party against the insured.

**3. Criminal, Fraudulent Or Dishonest Acts**

Based upon or arising out of:

**a.** Any criminal, fraudulent, or dishonest act, omission or offense committed by the insured. But with respect to only the Errors and Omissions Liability Coverage Part, we shall defend any allegations concerning this item **a.**, against the insured, if such allegations involve a "claim" to which this insurance otherwise applies, until judgment or other final adjudication establishes, or if such insured admits, that such act, omission or offense was committed, or personally acquiesced in, by such insured;

**b.** Any act, omission or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage;

**c.** The obtaining by the insured of any profit, gain or advantage to which the insured is not legally entitled; or

**d.** Violation of the provisions of the

© 2011 United States Fire Insurance Company, all rights reserved.

Racketeer Influenced and Corrupt Organization Act 18 U.S.C. Sections 1961 et seq. by the insured.

**4. Capital Expenditure**

Based upon or arising out of any expenditure or improvement that would qualify as a "capital expenditure".

**5. Expected Or Intended Injury**

Except as provided in **3.** above, based upon or arising out of "bodily injury" or "property damage" or any "pollution condition" that was expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**6. Cross Suits**

Brought by any Named Insured against any other Named Insured.

**7. Employer's Liability**

Based upon or arising out of "bodily injury" to:

**a.** An "employee" of the insured arising out of and in the course of:

**(1)** Employment by the insured; or

**(2)** Performing duties related to the conduct of the insured's business; or

**b.** The spouse, child, parent, brother or sister of that "employee" identified in Paragraph **a.** above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and this exclusion also applies to any obligation to share "damages" with or repay another who may be liable to pay "damages"

because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**8. Employment-Related Practices**

Based upon or arising out of any:

**a.** Refusal to employ a person;

**b.** Termination of a person's employment; or

**c.** Employment-related practices, policies, acts or omissions, including, but not limited to, allegations of discrimination by any insured against any person on the basis of age, color, race, sex, creed, national origin, marital status, handicap, physical disability, sexual preference, or allegations of coercion, demotion, negative performance evaluation, reassignment, discipline, defamation, harassment, humiliation, assault, or battery; or

**d.** Liability to the spouse, child, parent, brother or sister of that person as a consequence of an injury to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and this exclusion also applies to any obligation to share "damages" with or repay another who may be liable to pay "damages" because of the injury.

**9. Executive Officer**

Based upon or arising out of the serving by any insured as an "executive officer", director, partner, trustee or "employee"

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

of an organization, partnership, joint venture, limited liability company, trust or other business enterprise that is not named in the Declarations.

**10. Nuclear Energy Liability**

a.  Involving any insured who is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

b.  Involving the "hazardous properties" of "nuclear material" and with respect to which:

    (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

    (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

c.  Under any medical payments coverage, involving expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

d.  Under any liability coverage, involving "bodily injury" or "property damage" resulting from "hazardous

properties" of "nuclear material", if:

(1) The "nuclear material":

    (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or

    (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this item c. applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion only, "property damage" includes all forms of radioactive contamination of property.

**11. Other Enterprises**

Against any organization, partnership, joint venture, limited liability company, trust or other business enterprise that is not named in the Declarations, or included Section III – Who Is An Insured, or otherwise included by endorsement to this policy.

© 2011 United States Fire Insurance Company, all rights reserved.

## 12. Workers Compensation And Similar Laws

a. Based upon or arising out of any obligation of any insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law, including without limitation, "bodily injury" to any person, whether or not an "employee" of any insured.

Exclusions 1., 7. and 12. above, do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions and indicated in the Declarations.

## 13. Distribution or Disclosure of Material in Violation of Statutes

Based upon or arising out of any act or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information;

d. The Fair and Accurate Credit Transactions Act of 2003 (FACTA), including any amendment of or addition to such law; or

e. Any statute, ordinance or regulation other than FACTA that prohibits,

restricts or governs the disclosure of material to prevent or minimize identity theft.

## 14. Punitive or Multiplied Damages

For punitive damages or the multiplied portion of treble or other multiplied damages, or that arise out of that portion of any "claim" or "suit" seeking or awarding punitive damages or the multiplied portion of treble or other multiplied damages.

## SECTION VI -COMMON CONDITIONS

## 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Policy, but in no event shall such bankruptcy or insolvency obligate us to pay any part or all of any applicable Deductible or Self Insured Retention, or otherwise impose any obligation on us under this Policy before the Deductible or any Self Insured Retention is satisfied.

## 2. Cancellation And Nonrenewal

The following provisions regarding cancellation and nonrenewal apply except to the extent that they, or any of them, are inconsistent with state laws or regulations applicable to surplus lines insurers, in which event, they will be deemed amended to be in conformity with such laws or regulations.  This Policy may be cancelled by the First Named Insured by surrender thereof to us or by mailing to us written notice stating when thereafter the cancellation shall be effective.  We may cancel or decide not to renew this Policy by mailing a written notice to the First Named Insured at the address shown in the Declarations of this Policy. The mailing of notice of cancellation shall be sufficient notice, and the effective date of cancellation stated in such notice

EN0020-1212

Page 13 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

shall be deemed to constitute the end of the "policy period". The effective dates of such cancellation shall be not less than thirty (30) days (ten (10) days for non-payment of premium) following mailing of the notice of cancellation to the First Named Insured.

Hand delivery of such written notice either by the First Named Insured or by us (or by either's designee) shall be equivalent to mailing. If this Policy is issued to comply with any law or regulation that requires notice of cancellation or nonrenewal to any governmental body, cancellation or nonrenewal shall not be effective until the required notice has been provided by you or us.

This Policy is subject to a ten percent (10%) short rate penalty if you cancel the Policy or if we cancel the Policy because of your non-payment of premium. We will treat your failure to timely reimburse us for any Deductible Amount to constitute non-payment of premium. Subject to such short-rate penalty, the applicable unearned premium shall be returned to the First Named Insured as soon as practicable following the effective date of the cancellation. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of the effective date of the cancellation. If we cancel this Policy for any reason other than for non-payment of premium, we will return to you the pro rata amount of the unearned premium.

**3.  Changes**

This Policy contains all the agreements between you and us concerning the insurance afforded. The First Named Insured shown in the Declarations is the only insured authorized to request

changes in the terms of this Policy. Any changes in the terms of this Policy must be made with our consent. This Policy's terms can be amended or waived only by an endorsement issued by us and made a part of this Policy.

**4.  Duties In The Event Of An Occurrence, Offense, Wrongful Act Or Pollution Condition**

You and any other involved insured must see to it that we are notified, in writing, as soon as practicable of an "occurrence", offense, "wrongful act" or "pollution condition" which may result in a "claim" or "suit" against any insured. To the extent possible, such written notice to us should include:

(1) How, when and where the "occurrence", offense, "wrongful act" or "pollution condition" took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence", offense, "wrongful act" or "pollution condition".

**5.  Duties In The Event Of A Claim Or Suit**

The duties outlined in this Condition apply only to the following Coverage Parts: Commercial General Liability Occurrence, Commercial General Liability Claims Made, Contractors Pollution Liability Occurrence, Contractors Pollution Liability Claims Made, Errors and Omissions Liability, and Third Party Pollution Liability, respectively:

a. If a "claim" is received by, or "suit" is brought against, any insured, you and any other involved insured must:

© 2011 United States Fire Insurance Company, all rights reserved.

**(1)** Immediately record the specifics of the "claim" or "suit" and the date received;

**(2)** Notify us, in writing, as soon as practicable of the receipt of the "claim" or the bringing of the "suit";

**(3)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

**(4)** Authorize us to obtain records and other information;

**(5)** Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

**(6)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to any insured.

**b.** No insured may, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**6. Duties In The Event Of A Potential Claim**

If: (1) during the "policy period" you first become aware of an "occurrence", offense, "wrongful act" or "pollution condition" that reasonably may result in a "claim" against you; and (2) such "occurrence", offense, "wrongful act" or "pollution condition" did not occur before the Retroactive Date, then you must provide written notice to us about that "occurrence", offense, "wrongful act" or "pollution condition" during the "policy period". If such notice is received by us during the "policy period", and this Policy has not been renewed upon

expiration of the "policy period", then any "claim" made against you after the "policy period" resulting from that "occurrence", offense, "wrongful act" or "pollution condition" shall be deemed, for the purposes of the Commercial General Liability Claims Made Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part and the Third Party Pollution Liability Coverage Part, to have been made on the date such written notice is received by us. This provision shall not apply to "occurrences", offenses, "wrongful acts", "pollution conditions" or potential "claims" of which you or any insured first became aware or reported during any Extended Reporting Period.

If you notify us of that "occurrence", offense, "wrongful act" or "pollution condition", then such notice must include:

**a.** A description of the "occurrence", offense, "wrongful act" or "pollution condition" that took place including the date and where it occurred;

**b.** The names and addresses of any persons involved and any witnesses;

**c.** The nature and location of any damage that has or may result from the "occurrence", offense, "wrongful act" or "pollution condition"; and

**d.** Why any insured believes that the "occurrence", offense, "wrongful act" or "pollution condition" may result in a "claim".

**7. Headings**

The description contained within the headings and subheadings of this Policy are provided solely for convenience. The headings form no part of the terms and conditions of coverage provided hereunder.

EN0020-1212                                                      **Page 15 of 30**

© 2011 United States Fire Insurance Company, all rights reserved.

### 8. Inspections And Surveys

a. We have the right to:

(1) Make inspections and surveys at any time;

(2) Give you reports on the conditions we find; and

(3) Recommend changes.

b. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to our assessment of insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(1) Are safe or healthful; or

(2) Comply with laws, regulations, codes or standards.

### 9. Legal Action Against Us

No person or organization has a right under this Policy:

a. To join us as a party or otherwise bring us into a "suit" asking for "damages" from an insured; or

b. To sue us on this Policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement, or on a final judgment against an insured; but we will not be liable for "damages" that are not payable under the terms of this Policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 10. Multiple Coverages Limitation

If one or more of the Contractors Pollution Liability Occurrence Coverage Part, the Contractors Pollution Liability Claims Made Coverage Part, the Errors and Omissions Liability Coverage Part, the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part of this Policy apply to an "occurrence", offense, "wrongful act" or "pollution condition" or related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the Commercial General Liability Occurrence or Claims Made Coverage Part shall not apply to the same or related "occurrences", offenses, "wrongful acts" or "pollution conditions".

If more than one Coverage Part of this Policy, or any other policy issued to any insured by us or any of our affiliated companies, applies to the same "occurrence", offense, "wrongful act" or "pollution condition", or applies to related "occurrences", offenses, "wrongful acts" or "pollution conditions", then the maximum limit of insurance under all such Coverage Parts and policies shall not exceed the highest applicable limit of insurance available under any one applicable Coverage Part and the corresponding deductible for that Coverage Part.

This condition does not apply to any insurance policy or Coverage Part issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Part.

Subject to the terms, conditions and limits of individual Coverage Parts or policies, if we provide coverage to you under successive or overlapping Coverage Parts or policies that apply to

EN0020-1212

**Page 16 of 30**

© 2011 United States Fire Insurance Company, all rights reserved.

more than one policy period, under no circumstances will we or any affiliated company be liable for coverage under more than one such Coverage Part or policy with respect to any continuous, progressive, repeated, intermittent or related "occurrence", offense, "wrongful act" or "pollution condition".

## 11. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under one or more of the Commercial General Liability Occurrence or Claims Made Coverage Parts, the Contractors Pollution Liability Occurrence or Claims Made Coverage Parts, the Errors and Omissions Liability Coverage Part, the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part, our obligations are limited as follows:

### a. Primary Insurance

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

### b. Excess Insurance

(1) Where any Coverage Part or coverage form attached hereto provides coverage on a claims-made and reported basis, such coverage is excess over, and shall not contribute with, any other insurance, whether primary, excess, contingent or on any other basis:

(a) That is effective prior to the beginning of the "policy period" shown in the Declarations of this

insurance and applies to "bodily injury" or "property damage" on other than a claims-made basis, if:

(i) No Retroactive Date is shown in the Declarations of this insurance; or

(ii) The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance;

(b) That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

(c) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(d) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(e) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **1**.

(2) Where any Coverage Part or coverage form attached hereto provides coverage on other than a claims-made and reported basis, such coverage is excess over, and shall not contribute with, any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Coverage, Builders' Risk, Installation Risk or similar coverage for "your work";

**(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(d)** If the loss arises out of the maintenance or use if aircraft, "autos" or watercraft to the extent not subject to Exclusion **1**.

**(3)** Any other primary insurance available to you covering liability for "damages" arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty, under any Coverage Part, to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit".  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Policy.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**12. Premium Audit**

**a.** We will compute all premiums for this Policy in accordance with our rules and rates.

**b.** Premium shown in this Policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the First Named

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

Insured. The due date for audit premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the "policy period" is greater than the earned premium, we will return the excess to the First Named Insured.

**c.** Audits will not reduce the minimum retained premium. The due date for audit premiums is the date shown as the due date on the bill.

**d.** The First Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

## 13. Premiums

This policy is subject to a minimum retained premium. The First Named Insured shown in the Declarations:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

## 14. Representations

By accepting this Policy, you agree that:

**a.** All of the information and statements provided to us by you are true, accurate and complete. This Policy has been issued in reliance upon the truth and accuracy of those representations;

**b.** No concealment, misrepresentation or fraud in the procurement of this Policy shall avoid or defeat recovery under this Policy unless such concealment, misrepresentation or fraud was material. Concealment, misrepresentation or fraud in the procurement of this Policy which, if

known by us, would have led us to refuse to enter into this contract with its current terms, conditions or pricing, or to provide coverage for a "claim" hereunder, will be deemed material; and

**c.** Material concealment, misrepresentation or fraud may result in the denial of all insurance benefits under this Policy.

## 15. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Policy to the First Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured who becomes legally obligated to pay "cleanup costs" or against whom "claim" is made or "suit" is brought.

## 16. Transfer Of Rights And Duties Under This Policy

The insured's rights and duties under this Policy may not be transferred without our written consent except in the case of death of an individual named insured.

If any insured dies, that insured's rights and duties will be transferred to that insured's legal representative but only while acting within the scope of duties as legal representative. Until that insured's legal representative is appointed, any one having proper temporary custody of that insured's property will have that insured's rights and duties but only with respect to that property.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

## 17. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover from others all or part of any payment we have made under this Policy, those rights are transferred to us, and may, at our discretion, be enforced by us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them, but we do not have any obligation to enforce those rights.

## 18. Fraudulent Acts

If the insured commits fraud in proffering any "claim", this insurance shall become void from the date such fraudulent "claim" is proffered.

## 19. Assignment of Interest Limitation

Assignment of interest under this Policy shall not bind us unless we agree and endorse the assignment onto this Policy.

## SECTION VII-COMMON DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or the specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   a. Notices that are published include material placed on the Internet or electronic means of communication; and

   b. Only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters are considered an "advertisement".

2. "Applicable laws" means the Comprehensive Environmental Response, Compensation and Liability Act, commonly known as CERCLA, (42 U.S.C. § 9601 et seq.); the Resource Conservation and Recovery Act, commonly known as RCRA, (42 U.S.C. § 6901 et seq.); the Federal Water Pollution Control Act, (33 US.C. § 1251 et seq.); the Clean Air Act, (42 U.S.C. § 7401 et seq.), the Occupational Safety and Health Act of 1970, (29 U.S.C. § 651 et seq.), and all other federal, state and local laws that regulate "pollution conditions" or the handling of "pollutants".

3. "Auto" means:

   a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; and

   b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

4. "Bodily injury" means physical injury, sickness or disease sustained by a person, including mental anguish and death resulting from any of these at any time.

5. "Capital expenditure" means either money voluntarily spent or a charge voluntarily incurred, for additions or improvements to, or equipment for, your "location" or any part thereof. "Capital expenditure" includes, but is not limited to, money spent or a charge incurred for the purpose of complying with any order or request of any regulatory agency that is intended, in whole or in part, to prevent or mitigate future "pollution conditions".

EN0020-1212

Page 20 of 30

© 2011 United States Fire Insurance Company, all rights reserved.

6. "Claim":

   a. With respect to the Commercial General Liability Occurrence Coverage Part, the Commercial General Liability Claims Made Coverage Part and the Errors and Omissions Liability Coverage Part, means a demand for "damages".

   b. With respect to the Contractors Pollution Liability Occurrence and Claims Made Coverage Parts and the Third Party Pollution Liability Coverage Part, means a request or a demand for "damages" or "cleanup costs". "Claim" also includes any directive, order, or requirement of, court order issued by, or "suit" brought by the Government of the United States, Canada, or any local, State or Provincial Government entity of the United States of America or Canada duly acting under the authority of any law related to the protection of the environment.

7. "Cleanup costs" means expenses incurred in the investigation, evaluation, monitoring, testing, removal, containment, treatment, response, disposal, remediation, detoxification or neutralization of any "pollutants".

   The cleanup is deemed to be complete, and we will have no further obligation to pay for "cleanup costs" upon final approval from the supervising governmental authority or upon satisfaction of the requirements identified within the American Society of Testing and Materials Guide For Risk Based Corrective Action, which ever first occurs.

   "Cleanup costs" does not include a "capital expenditure".

8. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

      provided the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

9. "Damages" means the monetary amount of any judgment, award or settlement that an insured becomes legally obligated to pay as a result of a "claim" or "suit". "Damages" does not include "cleanup costs", equitable or non-pecuniary relief, disgorgement of profits, sanctions, fines or penalties.

10. "Defense expenses" means, with respect to any "claim", "occurrence", "wrongful act" or "pollution condition" that we investigate or settle, or any "suit" against an insured we defend:

    a. all expenses we incur;

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

b. the cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds;

c. all reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work;

d. all costs taxed against the insured in the "suit";

e. prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer;

f. all interest on the amount of any judgment that we pay which accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

g. those amounts paid by us under **2a.** through **2f.** of Section **II** – Defense Expenses.

"Defense expenses" do not include:

a. Any fines or penalties whether administrative, civil or criminal;

b. Salary costs of our employees; or

c. Those sums that are deemed to be "damages" because of "bodily injury" or "property damage", and not "defense expenses" under Section **V**- Common Exclusions, paragraph **2.** – Contractual Liability.

11. "Electronic data" means information,

facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CDROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

12. "Employee":

a. With respect to the Commercial General Liability Occurrence and Claims Made Coverage Parts, the Contractors Pollution Liability Occurrence and Claims Made Coverage Parts and the Third Party Pollution Liability Coverage Part, "employee" includes "leased workers". "Employee" does not include "temporary workers".

b. With respect to the Errors and Omissions Liability Coverage Part, "employee" includes "leased workers" and "temporary workers" but solely for "professional services" performed on your behalf and under your direct supervision.

13. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

14. "Hazardous properties" includes radioactive, toxic or explosive properties.

15. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

16. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or suspected to be defective, deficient, inadequate or dangerous; or

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

17. "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the lease that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within fifty (50) feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that

part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within fifty (50) feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, opinions, reports, surveys, field orders, change orders, or drawings or specifications; or

    **(b)** Giving directions or instructions, or failing to give them; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render "professional services", including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

18. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

19. "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

© 2011 United States Fire Insurance Company, all rights reserved.

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

20. "Location(s)" means the specific location(s) designated in an endorsement to the Third Party Pollution Liability Coverage Part or the Onsite Cleanup Coverage Part.

21. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   (1) Power cranes, shovels, loaders, diggers or drills; or

   (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical explorations, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:

      (a) Snow removal;

      (b) Road maintenance, but not construction or resurfacing; or

      (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

law or other motor vehicle insurance law are considered "autos".

22. "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents, or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

23. "Nuclear facility" means:

   a. Any "nuclear reactor";

   b. Any equipment or device designed or used for:

     (1) Separating the isotopes of uranium or plutonium;

     (2) Processing or utilizing "spent fuel"; or

     (3) Handling, processing or packaging "waste";

   c. Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

   d. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

24. "Nuclear material" means "source material", "special nuclear material" or "by-product material".

25. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

26. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

27. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

28. "Policy period" means the period shown in the Declarations, unless cancelled, in which event, the "policy period" ends on the date that such cancellation is effective.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

29. "Pollutants" mean any solid, liquid, gaseous, thermal or biological irritant or contaminant, including, without limitation, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste and any matter that by its presence, corrupts, defiles, contaminates or is harmful to the soil, air, or water, living things or the environment. Waste includes materials to be recycled, reconditioned or reclaimed.

It is understood that any substance or matter that is a "pollutant" does not lose its status as a "pollutant" because:  (1) such substance or matter has, or may have, a useful function or purpose; or (2) the release, threatened release or presence of such substance or matter in any locale is not regulated, prohibited, remedied by, or the subject of, one or more "applicable laws".

30. "Pollution condition" means the discharge, dispersal, seepage, migration, release, escape, presence or movement of "pollutants".

Two or more "pollution conditions" arising out of the same or related acts of discharge, dispersal, seepage, migration, release, escape or movement of "pollutants" shall be deemed to be a single "pollution condition".

31. "Products-completed operations hazard":

    a.  With respect to the Commercial General Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"; or

    b.  With respect to the Contractors Pollution Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and caused by "pollution conditions" arising out of "your product" or "your work";

Except:

    (1)  Products that are still in your physical possession; or

    (2)  Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a)  When all of the work called for in your contract has been completed.

        (b)  When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    c.  Does not include "bodily injury" or "property damage" arising out of:

    (1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2)  The existence of tools, uninstalled equipment or abandoned or unused materials:

    (3)  Products or operations for which

© 2011 United States Fire Insurance Company, all rights reserved.

the classification, listed in the Declarations or in a policy schedule, states that products-- completed operations are subject to the Policy Aggregate limit.

32. "Professional services" means those functions performed for others by you or by others on your behalf that are related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager.

33. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

34. "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any amendment thereof.

35. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

36. "Suit" means a civil proceeding in a court of a state or the United States in which the person instituting such proceeding seeks "cleanup costs" or "damages" for "bodily injury", "property damage", or "personal and advertising injury". "Suit" includes:

a. An arbitration proceeding in which such "damages" or "cleanup costs"

are sought and to which the insured submits with our consent; or

b. Any other alternative dispute resolution proceeding in which such "damages" or "cleanup costs" are sought and to which the insured submits with our consent.

Solely as it relates to the Third Party Pollution Liability Coverage Part, "suit" does not include:

a. Any request or demand that is not presented in the course of a civil proceeding before a court acting as an adjudicatory body; or

b. Any notice from any governmental agency stating that any insured is or may be a party responsible for "damages" or "cleanup costs".

37. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

38. "Your Product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

   (2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

39. "Your work":

a. Means:

   (1) Work or operations performed by you or on your behalf; and

   (2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   (2) The providing of or failure to provide warnings or instructions.

40. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for such person's work performed for you.

41. "Waste" means any waste material:

a. Containing "by-product material" other than the tailings or wastes produced by the extraction or

concentration of uranium or thorium from any are processed primarily for its "source material" content; and

b. Resulting from the operation by any person or organization of any "nuclear facility" included under subparts (a) and (b) of the definition of "nuclear facility".

42. "Wrap-up or Owner Controlled Insurance Plan" means a single insurance and loss control program for parties involved in a project, including the owners, administrators, contractors and subcontractors, which is controlled and authorized by the owner, construction manager, general contractor or financing administrator, and is applicable to one or more defined work sites. Such program includes, but is not limited to, workers' compensation and employers' liability, commercial general liability, umbrella and excess liability, builders' risk, architects' and engineers' errors and omissions liability, and environmental liability.

43. "Wrongful act" means an act, error or omission in the rendering or failure to render "professional services" by any insured covered under the Insuring Agreement of the Errors and Omissions Liability Coverage Part (EN0025).

**SECTION VIII - EXTENDED REPORTING PERIODS**

The following provisions apply only to the following Claims Made Coverage Parts: Commercial General Liability Claims Made, Contractors Pollution Liability Claims Made, Errors and Omissions Liability, and Third Party Pollution Liability:

1. We will provide one or more Extended Reporting Periods, as described below, if:

a. This insurance is canceled or not renewed by us for any reason except non-payment of premium; or

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

**b.** We renew or replace this Coverage Part with other insurance that:

**(1)** Has a Retroactive Date later than the date shown in the Declarations applicable to this Coverage Part; and

**(2)** Provides claims-made coverage for "bodily injury", "property damage" and "personal and advertising injury"; or

**c.** We replace this Coverage Part with other insurance that applies to "bodily injury", "property damage", "personal and advertising injury", or "cleanup costs" on other than a claims-made basis.

However, there shall be no entitlement to this extension if cancellation or non-renewal is due to your:

**a.** Failure to comply with the terms and conditions of this Policy; or

**b.** Misrepresentation, concealment or fraud.

**2.** Extended Reporting Periods do not extend the "policy period", or change the scope of coverage provided, or reinstate or increase the Limits of Insurance. Extended Reporting Periods apply only to "claims" for:

**a.** "Bodily injury" or "property damage" that occurs before the end of the "policy period", but not before the Retroactive Date, if any, and shown in the Declarations;

**b.** "Personal and advertising injury" caused by an offense committed before the end of the "policy period", but not before the Retroactive Date, if any, and shown in the Declarations; or

**c.** "Cleanup costs" caused by a

"pollution condition" existing before the end of the "policy period", but not existing before the Retroactive Date, if any, and shown in the Declarations.

Once in effect, Extended Reporting Periods may not be canceled.

**3.** A ninety (90) day Basic Extended Reporting Period is automatically provided without additional charge. The Basic Extended Reporting Period starts with the end of the "policy period". In order to benefit from the Basic Extended Reporting Period or the Supplemental Extended Reporting Period, if purchased, all "claims" must be duly reported to us, in writing, in accordance with Section **VI** – Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions, and reported to us within the Basic Extended Reporting Period or the Supplemental Extended Reporting Period, if purchased.

The Basic Extended Reporting Period does not apply to "claims" for "damages" or "cleanup costs" that are covered under any subsequent insurance you purchase, or that would apply but for exhaustion of the amount of insurance applicable to such "claims".

**4.** A Supplemental Extended Reporting Period is available, but only by endorsement and for an extra charge. We will determine the additional premium in accordance with our rules and rates. In doing so we may take into account, without limitation, the following:

**a.** The risks to be insured;

**b.** Previous types and amounts of insurance;

**c.** Amounts paid or reserved under this Policy;

EN0020-1212

© 2011 United States Fire Insurance Company, all rights reserved.

d. Your "claims" history; and

e. Other factors that, in our judgment, may be appropriate.

The additional premium will not exceed two hundred percent (200%) of the total annual premium for this Coverage Part to which the Endorsement for the Supplemental Extended Reporting Period would be attached and will be fully earned and non-refundable when the Endorsement takes effect.

5. This Supplemental Extended Reporting Period starts when the Basic Extended Reporting Period, set forth in Paragraph **3.** above, ends, and terminates twenty-four (24) months after the end of the Basic Extended Reporting Period.

You must give us a written request for the Supplemental Extended Reporting Period Endorsement prior to the end of the "policy period". The Supplemental Extended Reporting Period will not go into effect unless you pay the additional premium within thirty (30) days of making your request for the Supplemental Extended Reporting Period Endorsement.

6. The Supplemental Extended Reporting Period endorsement shall set forth the terms, not inconsistent with this section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectable insurance available to the insured, whether primary, excess, contingent or on any other basis whose policy period begins or continues after the Supplemental Extended Reporting Period starts.

7. Once purchased, we are not obligated to extend or renew any Supplemental Extended Reporting Period.

Neither the Basic Extended Reporting Period nor the Supplemental Extended Reporting Period, if purchased, reinstates or increases the Limits of Insurance.

EN0020-1212

Page 30 of 30

© 2011 United States Fire Insurance Company, all rights reserved.



# COMMERCIAL GENERAL LIABILITY
# OCCURRENCE COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

## SECTION I - INSURING AGREEMENTS

1. **Insuring Agreement A - Bodily Injury And Property Damage**

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies. We may, at our discretion, investigate any "occurrence" and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I – Defense or Section II – Defense Expenses within the Common Provisions.

   b. This insurance applies to "bodily injury" and "property damage" only if all of the following conditions are met:

   (1) Before the "policy period", no insured had knowledge of any "occurrence" that could reasonably give rise to a "claim" under this Policy;

   (2) Neither the "claim" for that "bodily injury" or "property damage", nor the "occurrence" resulting in that "bodily injury" or "property damage" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

   (3) No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "bodily injury" or "property damage" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

   (4) That "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

© 2011 United States Fire Insurance Company, all rights reserved.

(5) That "bodily injury" or "property damage" first occurs during the "policy period"; and

(6) A "claim" for "damages" for that "bodily injury" or "property damage" is made against any insured and reported to us in accordance with the provisions set forth in Section **VI** Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions.

2. **Insuring Agreement B - Personal And Advertising Injury**

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "personal and advertising injury" to which this insurance applies. We may, at our discretion, investigate any offense and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section **IV** -Limits Of Insurance And Deductible within the Common Provisions.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section **I** – Defense or Section **II** – Defense Expenses within the Common Provisions.

   b. This insurance applies to "personal and advertising injury" only if all of the following conditions are met:

      (1) Before the "policy period", no insured had knowledge of any offense that could reasonably give rise to a "claim" under this Policy;

      (2) The "claim" for that "personal and advertising injury" was not reported under any policy in

effect before the "policy period" or disclosed in the application for this Policy;

(3) No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "personal and advertising injury" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4) The offense out of which the "claim" arises first took place during the "policy period";

(5) The "personal and advertising injury" is caused by an offense committed in the "coverage territory"; and

(6) A "claim" for "damages" for the "personal and advertising injury" is made against any insured and reported to us in accordance with the provisions set forth in Section **VI** -Common Conditions, **5.** Duties In The Event Of A Claim Or Suit within the Common Provisions.

3. **Insuring Agreement C - Medical Payments**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      Provided that:

      (a) The accident takes place in the "coverage territory" and during the "policy period";

© 2011 United States Fire Insurance Company, all rights reserved.

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the limits of insurance stated in the Declarations. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

Medical Payments do not apply to any medical expenses for patients, clients, or residents of the Named Insured.

## SECTION II - ADDITIONAL EXCLUSIONS

1. The following additional exclusions apply to Insuring Agreement **A** - Bodily Injury And Property Damage and Insuring Agreement **B** - Personal And Advertising Injury in addition to those contained within the Common Provisions:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

a. **Mold**

(1) Based upon or arising out of any actual, alleged or threatened

contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal seepage, migration, release, escape, presence, growth or reproduction of "mold";

(2) Involving any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, abate, mitigate, remediate, dispose of, contain, treat, detoxify or neutralize, or in any way respond to, or assess the concentration or effects of "mold"; or

(b) Testing for, monitoring, cleaning up, removing, abating, mitigating, remediating, disposing of, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the concentration or effects of "mold".

Items **(2)(a)** and **(2)(b)** above apply, without limitation, to any actual or alleged supervision, instructions, recommendations, warnings or advice given or which should have been given by any insured or others with respect to the actions described in **(2)(a)** and **(2)(b)** above.

This Exclusion applies to:

(a) "Bodily injury", "property damage" and "personal and advertising injury" regardless of whether such coverage is included within the "products-completed operations hazard";

(b) Any obligation to share "damages" with or repay

© 2011 United States Fire Insurance Company, all rights reserved.

someone else who must pay "damages"; and

(c) "Mold" existing, emanating from or moving anywhere indoors or outdoors.

**b. Recall Of Products, Work or Impaired Property**

Based upon or arising out of the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property"

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition therein.

This Exclusion does not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section **IV** - Limits Of Insurance And Deductible within the Common Provisions and indicated in the Declarations.

**c. Professional Services**

Based upon or arising out of any insured's rendering or failure to render "professional services".

**d. Electronic Data**

Based upon or arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic

data".

**e. Pollution-Related**

(1) For "bodily injury", "property damage" or "personal and advertising injury" based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured, However, this subparagraph does not apply to:

i "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

ii "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured,

© 2011 United States Fire Insurance Company, all rights reserved.

other than that additional insured; or

iii "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

i   Any insured; or

ii  Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

i   "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them, This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

ii  "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

iii "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(e) At or from any premises, site or location on which any insured or any contractors or

© 2011 United States Fire Insurance Company, all rights reserved.

subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Based upon or arising out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(3)** By or on behalf of a governmental authority for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

Paragraphs **(2)** and **(3)** do not apply to liability for "damages" because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such "claim" or "suit" by or on behalf of a governmental authority.

**2.** The following additional exclusions apply to Insuring Agreement **A** - Bodily Injury And Property Damage in addition to those contained within the Common Provisions:

Insuring Agreement **A** does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit" for:

**a. Asbestos**

"bodily injury" or "property damage" based upon or arising out of:

**(1)** Asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc, or exposure to asbestos, asbestos fibers or asbestiform talc in any form, or any asbestos related injury, including but not limited to, asbestosis mesothelioma and bronchogenic carcinoma; or

**(2)** The use, exposure, presence, existence, detection, removal, elimination or avoidance, in any building or structure, the atmosphere or any other part of the environment, building or structure of asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc.

**b. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or any one acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

© 2011 United States Fire Insurance Company, all rights reserved.

c. **Damage To Property**

"Property damage" arising out of:

(1) Property you own, rent, or occupy, including, without limitation, any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, or the prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of such premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven (7) or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section IV - Limits Of Insurance And Deductible within the

Common Provisions and stated in the Declarations.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

d. **Damage To Your Product**

"Property damage" to "your product", or any part of it.

e. **Damage To Your Work**

"Property damage" to "your work" or any part of it and included in the "products-completed operations hazard".

f. **Lead Contamination**

(1) Bodily injury" arising out of the ingestion, inhalation or absorption of lead;

(2) "Property damage" arising out of lead;

(3) Any loss, cost or expense arising out of any request, demand or order that any insured or any person test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

(4) Any loss, cost or expense arising out of any "claim" or "suit" for "damages" because of testing for, monitoring, cleaning up,

© 2011 United States Fire Insurance Company, all rights reserved.

removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

**g. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**h. Personal And Advertising Injury**

"Personal and advertising injury".

**i. War**

"Bodily injury" or "property damage", however caused, arising out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Wrap-up**

"Bodily injury" or "property damage" arising out of any project in which the insured participated for which a

"Wrap-up or Owner Controlled Insurance Plan" was provided.

**3.** The following additional exclusions apply to Insuring Agreement **B** - Personal And Advertising Injury in addition to those contained within the Common Provisions:

Insuring Agreement **B** does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit":

**a. Breach Of Contract**

Based upon or arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**b. Electronic Chatrooms Or Bulletin Boards**

Based upon or arising out of electronic chatroom or bulletin board that the insured hosts, owns, or over which the insured exercises control.

**c. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

Based upon or arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights, including, without limitation, false patent marking and provisional or royalty rights from or during any period from the date of filing of the application for patent to the date of issuance as a patent.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**d. Insureds In Media And Internet Type Businesses**

Committed by an insured whose

© 2011 United States Fire Insurance Company, all rights reserved.

business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content or websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to paragraphs **a.**, **b.** and **c.** of the definition of "personal and advertising injury".

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**e. Knowing Violation Of Rights Of Another**

Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**f. Material Published Prior To Policy Period**

Based upon or arising out of oral or written publication of material whose first publication took place before the "policy period".

**g. Material Published With Knowledge Of Falsity**

Based upon or arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**h. Quality Or Performance Of Goods - Failure To Conform To Statements**

Based upon or arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**i. Unauthorized Use Of Another's Name Or Product**

Based upon or arising out of the unauthorized use of another's name, product or designation of origin in your e-mail address, domain name or metatag, or any other similar acts to mislead another's potential customers.

**j. Wrong Description Of Prices**

Based upon or arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**4.** The following exclusions apply to Insuring Agreement **C** - Medical Payments in addition to those contained within the Common Provisions:

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**c. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

EN0021-0211

Page 9 of 10

© 2011 United States Fire Insurance Company, all rights reserved.

### d. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

### e. Insuring Agreement A Exclusions

Excluded under Insuring Agreement A.

### f. Lead Contamination

To any person injured in any way by lead in any form.

### g. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

### h. War

However caused, arising out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## SECTION III - ADDITIONAL CONDITIONS

### 1. Non-Stacking Of Limits Of Insurance

If the Limits of Insurance of more than one Commercial General Liability Occurrence Coverage Part issued by us or any of our affiliated companies applies to the same or related "occurrence" or offense, then the maximum Limit of Insurance under all such Commercial General Liability Occurrence Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Commercial General Liability Occurrence Part and the corresponding deductible for that Coverage Parts.

### 2. Continuous or Progressive Damage or Injury

"Bodily injury" or "property damage" occurring or existing partly before and partly during the "policy period", or "personal and advertising injury" arising out of an offense, or arising out of the first of related offenses, committed partly before and partly during the "policy period", will be deemed to have occurred, existed or been committed before the "policy period".

If the date cannot be determined upon which such "bodily injury" or "property damage" first occurred or existed, or the date cannot be determined upon which such offense, or the first of related offenses was first committed, then, for the purposes of policies issued by us, such "bodily injury" or "property damage" will be deemed to have occurred or existed, and such offense or the first of related offenses will be deemed to have been committed before the "policy period".

© 2011 United States Fire Insurance Company, all rights reserved.



**THIS COVERAGE PART PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS. PLEASE READ THE ENTIRE FORM CAREFULLY.**

# THIRD PARTY POLLUTION LIABILITY COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

### SECTION I -INSURING AGREEMENT

1. **Third Party Pollution Liability**

   a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:

      (1) As "damages" because of "bodily injury" or "property damage", and

      (2) For "cleanup costs";

      resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies. We may, at our discretion, investigate any "occurrence" or "pollution condition" incident and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section **IV** -

Limits of Insurance And Deductible within the Common Provisions.

   b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:

      (1) Before the "policy period", no insured had knowledge of any "occurrence" or "pollution condition" that could reasonably give rise to a "claim" under this Policy;

      (2) Neither the "claim" against you for that "bodily injury", "property damage" or "pollution condition", nor the "occurrence" resulting in that "bodily injury", "property damage" or that "pollution condition" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

      (3) No fact, incident or circumstance involving an "occurrence" or "pollution condition" that reasonably would have resulted in a "claim" against you for that "bodily injury" or "property damage" or those "cleanup costs" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

© 2011 United States Fire Insurance Company, all rights reserved.

(4) That "bodily injury" or "property damage" resulted from a "pollution condition" at, on or emanating from your "location(s)" within the "coverage territory";

(5) The "cleanup costs" result from a "pollution condition" at, on or emanating from your "location(s)" within the "coverage territory";

(6) The "pollution condition" begins on or after the earlier of either this Policy's effective date, or Retroactive Date, if any, shown in the Declarations, and before the end of the "policy period"; and

(7) The "bodily injury" or "property damage" first occurs during the "policy period" and is caused by a "pollution condition" at, on or emanating from your "location(s)"

(8) A "claim" for "damages" for that "bodily injury" or "property damage", or for "cleanup costs" for that "pollution condition" is first made against any insured and reported to us in accordance with the provisions set forth in Section **VI** - Common Conditions, **5.** Duties In the Event Of A Claim Or Suit within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section **VIII** - Extended Reporting Periods.

**c.** A "claim" by a person or organization seeking "damages" will be deemed to have been made at the earlier of the following times:

(1) When written notice of such "claim" is received and recorded by us; or

(2) When we make settlement in accordance with paragraph **1. a.** above.

**d.** All "claims" for "damages" for "bodily injury" to the same person, including "damages" claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

**e.** All "claims" for "damages" for "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

**f.** All claims for "cleanup costs" incurred by the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any insured and reported to us.

**g.** All "claims" which arise out of the same or a related "pollution condition" shall be deemed to have been made at the time at which the earliest "claim" arising out of such "pollution condition" was made, and all such "claims" shall be subject to the same Limit of Liability.

## SECTION II - ADDITIONAL EXCLUSIONS

The following additional exclusions apply to the Third Party Pollution Liability Coverage Part in addition to those contained within the Common Provisions:

This Policy does not apply to "damages",

© 2011 United States Fire Insurance Company, all rights reserved.

"defense expenses", or any loss, cost or expense, or any "claim" or "suit":

1. **Asbestos**

   Based upon or arising out of:

   a. Asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc, or exposure to asbestos, asbestos fibers or asbestiform talc in any form, or any asbestos related injury, including but not limited to, asbestosis mesothelioma and bronchogenic carcinoma; or

   b. The use, exposure, presence, existence, detection, removal, elimination or avoidance, in any building or structure, the atmosphere or any other part of the environment, building or structure of asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc.

2. **Divested Property**

   Based upon or arising out of any "pollution condition" that first occurs on any "location": (a) after the insured has sold or transferred ownership of, or abandoned such "location"; or (b) after condemnation proceedings have been instituted for such "location".

3. **Insured's Property Damage Or Cleanup Costs**

   For "property damage" to or "cleanup costs" on property owned, leased, occupied or operated by any insured, or property in the care, custody or control of any insured, whether or not any cost is incurred or expended to avoid or mitigate further damage or "claims".

4. **Intentional Acts**

   Based upon or arising out of any "pollution conditions" that result, in whole or in part, from:

   a. The intentional, willful or deliberate injury, by any insured or at the direction of any insured, to person or property; or

   b. The non-compliance by any insured with any request, demand, order or statutory or regulatory requirement, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental or public agency or body.

5. **Known Conditions**

   Based upon or arising out of "pollution conditions" that were known to be present, by any insured at any time before the beginning of this "policy period", or that were disclosed in the application for this insurance or any of the accompanying information provided to us.

6. **Lead Contamination**

   For:

   a. "Bodily injury" of any kind arising out of the ingestion, inhalation or absorption of lead in any form;

   b. "Property damage" of any kind arising out of lead in any form;

   c. Any loss, cost or expense arising out of any request, demand or order that any insured or any person test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

EN0026-0611

Page 3 of 4

© 2011 United States Fire Insurance Company, all rights reserved.

d. Any loss, cost or expense arising out of any "claim" or "suit" for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

### 7. Non-Designated Locations

Based upon or arising out of any location(s) not designated or scheduled as a "location" on the Declarations Page or by endorsement to this Coverage Part.

### 8. Underground Storage Tanks

Based upon or arising out of any underground storage tank(s) or associated underground piping at any "location", but only if the insured knew of the existence of such underground storage tank(s) or associated underground piping before a "claim" involving the same was first made against any insured. This exclusion does not apply to underground storage tank(s) or associated underground piping when endorsed onto this Policy.

### 9. Your Product And Your Work

Based upon or arising out of "your product" or "your work", unless the "claim" results from "your work" performed on, or "your product" disposed or handled on, your "location(s)".

## SECTION III – ADDITIONAL CONDITIONS

### 1. Non-Stacking Of Limits Of Insurance

If the Limits of Insurance of more than one Third Party Pollution Liability Coverage Part issued by us or any of our affiliated companies applies to the same or related "occurrence" or "pollution condition", then the maximum Limit of Insurance under all such Third Party Pollution Liability Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Third Party Pollution Liability Coverage Part and the corresponding deductible for that Coverage Part.

© 2011 United States Fire Insurance Company, all rights reserved.



# ONSITE CLEANUP COVERAGE PART

## PROVISIONS

Various provisions in this Policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

All exclusions, conditions or definitions contained within this Coverage Part are provided in addition to any applicable exclusions, conditions and definitions provided within the Common Provisions which are incorporated in this Coverage Part and to which this Coverage Part is attached.

### SECTION I - INSURING AGREEMENT

#### 1. Onsite Cleanup

We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay as "cleanup costs" arising out of a "pollution condition" that was caused by an "occurrence" and to which this insurance applies, but we do not have any duty to defend the insured or pay "defense expenses". The amount we will pay for "cleanup costs" is limited as described in Section IV -Limits Of Insurance And Deductible within the Common Provisions.

    **a.** This insurance applies to "cleanup costs" only if all of the following conditions are met:

        **(1)** Before the "policy period", no insured had knowledge of any "pollution condition";

        **(2)** No fact, incident or circumstance involving a "pollution condition"

was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

        **(3)** The "cleanup costs" result from a "pollution condition" at or on your "location(s)" within the "coverage territory";

        **(4)** The "pollution condition" begins on or after the earlier of either this Policy's effective date, or Retroactive Date, if any, shown in the Declarations, and before the end of the "policy period"; and

        **(5)** The request for "cleanup costs" is made to us in writing, in accordance with the provisions set forth in Section III -Additional Conditions within this Coverage Part, during the "policy period".

### SECTION II -ADDITIONAL EXCLUSIONS

The following additional exclusions apply to the Onsite Cleanup Coverage Part:

This Policy does not apply to "cleanup costs":

#### 1. Asbestos

based upon or arising out of:

    **a.** Asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc, or exposure to asbestos, asbestos

© 2011 United States Fire Insurance Company, all rights reserved.

fibers or asbestiform talc in any form, or any asbestos related injury, including but not limited to, asbestosis mesothelioma and bronchogenic carcinoma; or

b. The use, exposure, presence, existence, detection, removal, elimination or avoidance, in any building or structure, the atmosphere or any other part of the environment, building or structure of asbestos, asbestos fibers, asbestiform talc or any material or substances containing asbestos, asbestos fibers or asbestiform talc.

**2. Divested Property**

Based upon or arising out of any "pollution condition" that first occurs on any "location": (a) after the insured has sold or transferred ownership of, or abandoned such "location"; or (b) after condemnation proceedings have been instituted for such "location".

**3. Cleanup Costs For Third Party Property**

Incurred on or for any property that is not designated as a "location" regardless of whether any "pollutants" escape from your "location" onto or into any such property and regardless of whether any cost is incurred or expended to avoid or mitigate further damage to such property or "claims".

**4. Intentional Acts**

Based upon or arising out of any "pollution conditions" that result, in whole or in part, from:

a. The intentional, willful or deliberate injury, by any insured or at the direction of any insured, to person or property; or

b. The non-compliance by any insured with any request, demand, order or

statutory or regulatory requirement, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental or public agency or body.

**5. Known Conditions**

Based upon or arising out of "pollution conditions" that were known to be present by any insured at any time before the beginning of this "policy period", or that were disclosed in the application for this insurance or any of the accompanying information provided to us.

**6. Lead Contamination**

a. For any loss, cost or expense arising out of any request, demand or order that any insured or any person test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

b. For any loss, cost or expense arising out of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead.

**7. Mold**

a. Based upon or arising out of any actual, alleged or threatened contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal seepage, migration, release, escape, presence, growth or reproduction of "mold";

b. Involving any:

(1) request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up,

© 2011 United States Fire Insurance Company, all rights reserved.

remove, abate, mitigate, remediate, dispose of, contain, treat, detoxify or neutralize, or in any way respond to, or assess the concentration or effects of "mold"; or

**(2)** testing for, monitoring, cleaning up, removing, abating, mitigating, remediating, disposing of, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the concentration or effects of "mold".

Items **(b)(1)** and **(b)(2)** above apply, without limitation, to any actual or alleged supervision, instructions, recommendations, warnings or advice given or which should have been given by any insured or others with respect to the actions described in **(b)(1)** and **(b)(2)** above.

This Exclusion applies to:

**(a)** Any obligation to share "damages" with or repay someone else who must pay "damages"; and

**(b)** "Mold" existing, emanating from or moving anywhere indoors or outdoors.

## 8. Non-Designated Locations

Based upon or arising out of any location(s) not designated or scheduled as a "location" on the Declarations Page or by endorsement to this Coverage Part.

## 9. Underground Storage Tanks

Based upon or arising out of any underground storage tank(s) or associated underground piping at any "location", but only if the insured knew of the existence of such underground storage tank(s) or associated

underground piping before a "claim" involving the same was first made against any insured. This exclusion does not apply to underground storage tank(s) or associated underground piping when endorsed onto this Policy.

## 10. Your Product and Your Work

Arising out of "your product" or "your work", unless the "claim" results from "your work" performed on, or "your product" disposed or handled on, your "location(s)".

## SECTION III - ADDITIONAL CONDITIONS

### 1. Duties In The Event Of A Pollution Condition

In the event of a "pollution condition", you must immediately record the specifics of the "pollution condition" including how and when it took place.

If there are "cleanup costs" arising from the "pollution condition" at your "location(s)", you must immediately record a detailed description of the nature, scope and amount of the "cleanup costs" and notify us in writing as soon as practicable, but in no event after the end of the "policy period".

No insured may, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, without our consent.

### 2. Non-Stacking Of Limits Of Insurance

If the Limits of Insurance of more than one Onsite Cleanup Coverage Part issued by us or any of our affiliated companies applies to the same or related "pollution condition", then the maximum Limit of Insurance under all such Onsite Cleanup Coverage Parts shall not exceed the highest applicable Limits of Insurance available under any one Onsite Cleanup Coverage Part and

© 2011 United States Fire Insurance Company, all rights reserved.

the corresponding deductible for that Coverage Part.

### 3. Continuous or Progressive Damage or Injury

A "pollution condition" occurring or existing partly before and partly on or after the Retroactive Date will be deemed to have occurred or existed before the Retroactive Date.

If the date cannot be determined upon which such "pollution condition" first occurred or existed then, for the purposes of policies issued by us, such "pollution condition" will be deemed to have occurred or existed before the Retroactive Date.

© 2011 United States Fire Insurance Company, all rights reserved.



# CLAIMS REPORTING

Notice of a Claim or circumstances to the Insurer shall be given in writing to:

> Crum & Forster
> Claims Department
> 305 Madison Avenue
> Morristown, New Jersey 07960
> 305_Liability@cfins.com

Notice given in writing to the Insurer's agent will be considered notice to the Insurer.

## SURPLUS LINES FILING AND POLICY ISSUANCE CRITERIA

### SERVICE OF PROCESS CLAUSE

The Commissioner, Director, or Superintendent of Insurance of the State (or other office specified for the following purpose) in the State of Texas is hereby designated as the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy. The Company further designates:

| | |
|---|---|
| Name: | Mary Jane Robertson |
| Name of Company or Firm: | Crum & Forster Specialty Insurance Co. |
| Mailing Address: | 305 Madison Avenue<br>Morristown, NJ 07960 |

As its agent in New Jersey to whom such process shall be forwarded by the Commissioner, Director, or Superintendent of Insurance.

ALL STAMPS PLACED ON POLICY OR OTHER DOCUMENTS MUST BE IN RED INK

EN0005-0211



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

A. The following exclusion is added:

**TERRORISM AND PUNITIVE DAMAGES**

This insurance does not apply to any "claim" arising out of or resulting, directly or indirectly, from:

1. "Certified acts of terrorism" or "other acts of terrorism" including any action taken in hindering or defending against an actual or expected incident of a "certified act of terrorism" or "other acts of terrorism"; or

2. Any act of terrorism:
   a. that involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or
   b. that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or
   c. in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials;

   regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage to of 1. or 2. above, including

3. Damages arising out of or resulting, directly or indirectly, from 1. or 2. above that are awarded as punitive damages.

B. In the event of an act of terrorism, a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Policy.

C. The **DEFINITIONS** section is amended and the following added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. The act is a violent act or an act that is dangerous to human life, property, or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

"Other act of terrorism" means a violent act or an act that is dangerous to human life, property, or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of the any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance

Act of 2002. Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DEDUCTIBLE SCHEDULE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

The Deductible shown in the Schedule below applies as stated under the Common Provisions, **SECTION IV – LIMITS OF INSURANCE AND DEDUCTIBLE**, Item **13**.

The terms of the policy, including with respect to (a) our rights and duties with respect to the defense of suits and (b) your duties in the event of an occurrence, apply irrespective of the application of the deductible amount.

In the event that you do not promptly reimburse us for the deductible amount demanded, then any cost incurred by us in collection of the deductible amount shall be added to and applied in addition to the applicable deductible amount without limitation to such costs. These costs shall include but not be limited to collection agency fees, attorneys fees and interest.

## SCHEDULE

| COVERAGE | AMOUNT & BASIS OF DEDUCTIBLE | |
|---|---|---|
| **I. COMMERCIAL GENERAL LIABILITY:** | Each Claim | Each Occurrence |
| **A.** Bodily Injury | N/A | N/A |
| **B.** Property Damage | N/A | N/A |
| **C.** Bodily Injury & Property Damage Combined | N/A | $10,000 |
| **D.** Bodily Injury & Property Damage Combined: | | |
| with Separate Commercial General Liability and Products/Completed Operations Liability Deductibles | | |
| **1.** General Liability | N/A | N/A |
| **2.** Products/Completed Operations Liability | N/A | N/A |
| **II.** MONOLINE PRODUCTS COMPLETED OPERATIONS LIABILITY: | Each Claim<br>N/A | Each Occurrence<br>N/A |
| **III. CONTRACTORS POLLUTION LIABILITY:** | Each Pollution Condition<br>N/A | |
| **IV. ERRORS AND OMISSIONS LIABILITY:** | Each Claim<br>N/A | |
| **V. THIRD PARTY POLLUTION LIABILITY:** | Each Pollution Condition<br>$10,000 | |
| **VI. ONSITE CLEANUP:** | Each Pollution Condition<br>$10,000 | |

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MINIMUM PREMIUM AND
# MINIMUM RETAINED PREMIUM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

A. Under the Common Provisions, **SECTION VI – COMMON CONDITIONS,** item **2.Cancellation And Nonrenewal** is amended by the addition of the following:

This Policy is subject to both a "minimum premium" and a "minimum retained premium".

In the event the audit premium is found by us to be greater than the premium stated in the Declarations, the additional premium is due and payable upon notice by us to the First Named Insured. If the audit premium is found to be less than the premium stated in the Declarations, we will retain the "minimum premium".

In the event of cancellation by the First Named Insured, a "minimum retained premium" will apply.

Cancellation for non-payment of premium after the effective date of this Policy shall be deemed a request by the First Named Insured for cancellation of this Policy, thereby activating the "minimum retained premium" provision.

B. Under the Common Provisions, **SECTION VII – COMMON DEFINITIONS** is amended by the addition of the following:

1. "Minimum premium" means 100% of the premium stated in the Declarations plus any additional premium generated by:

   a. Subsequent endorsement; and

   b. Audit, if applicable.

2. "Minimum retained premium" means the amount of premium retained by us should you cancel this Policy prior to the end of the "policy period". "Minimum retained premium" is calculated as the great of:

   a. 25% of the premium stated in the Declarations:

   b. A short rate or pro-rata of the premium stated in the Declarations; or

   c. The audit premium.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



Crum & Forster Specialty Insurance Company

## Crum & Forster[1] Privacy Principles

Crum & Forster's Privacy Principles guide our conduct in the collection, use, release and security of personal and confidential information we obtain as part of our business of providing and servicing commercial insurance products, including underwriting, policy administration, insurance claims adjusting, appraisal and loss control services. These principles define Crum & Forster's commitment to the privacy and integrity of the information we accumulate, manage and store.

## Who collects and has access to non-public personal information?

Personal information may be collected by and/ or shared with employees of Crum & Forster or by any of Crum & Forster's authorized representatives, attorneys, or others who provide services to Crum & Forster in connection with providing and servicing its commercial insurance products, such as claims administrators, independent appraisers, managed care providers, systems vendors, or similar service providers. Crum & Forster requires service providers to honor the privacy principles in the handling of non-public personal information obtained through its business relationship with Crum & Forster. Additionally, Crum & Forster may disclose information to third parties as allowed by law. For example, in response to a subpoena or other order or inquiry of a court, regulator or governmental agency or to its insurers.

## Why does Crum & Forster need personal information and what do we do with it?

Crum & Forster limits the collection, disclosure, and use of customer information to only what is needed to properly underwrite and service its insurance products, and/ or to fulfill legal or regulatory requirements.

Crum & Forster collects personal information solely for conducting its business of underwriting and servicing and administering its insurance products including, but not limited to:

Underwriting and renewal of its commercial insurance products;
Claims Handling and adjusting, including investigation and payment of claims;
Claims administration and reporting;
Fraud detection and prevention;
Loss Control;
Complying with the law and reporting requirements;
Business activities that Crum & Forster may legally undertake.

Crum & Forster does not sell information to any third parties, and does not use it for marketing any of its insurance products.

---

1 The Crum & Forster family of companies includes:
United States Fire Insurance Company, The North River Insurance Company, Crum & Forster Indemnity Company, Crum & Forster Insurance Company, Crum & Forster Underwriters Co. of Ohio, Crum & Forster Specialty Insurance Company, and Seneca Insurance Company

**What types of information are collected?**

The type of information that Crum & Forster collects varies according to the insurance product involved, and may include information we receive from you on applications and other forms; information we receive from your employer; information we receive from other sources such as motor vehicle reports.

**Safeguarding Your Privacy**

Access to non-public personal information is limited to those employees who specifically need such information to conduct their business responsibilities.

If you conclude your relationship with us, we will continue to safeguard your privacy in accordance with the standards described in this notice.

We maintain physical, electronic and procedural safeguards to protect non-public personal information.

Our employees have been provided with a copy of this policy and receive annual training on safeguarding non-public personal information. Employees who violate these standards are subject to disciplinary measures.

**About Our Website**

Our website is used only to disseminate information. Crum & Forster does not place electronic "cookies" in the browser files of any guests. We do not collect any individual information as a result of the public visiting the site. In other words, we may count how many times our site has been visited, but do not gather any personal information about the visitors. If you send us an email, your communication will identify you to us. However, we will only use the information you provide to respond to your inquiry. The privacy of communication over the Internet cannot be guaranteed. Crum & Forster does not assume any responsibility any loss or damage you may experience or incur by the sending of personal information over the Internet by or to Crum & Forster.

**Questions?**

If you have any questions concerning our Privacy Principles, please contact our Privacy Compliance Officer at:

> Crum & Forster
> Attn: Privacy Compliance Officer
> 305 Madison Avenue
> Morristown, New Jersey 07960

EN0011-0211



# EMERGENCY RESPONSE HOTLINE

## 1-800-690-5520
## "Program Name is Crum & Forster Spill"

Crum and Forster has established an emergency response hotline for immediate reporting of pollution events or other events requiring emergency response.

Immediate reporting of such events ensures timely notice to us of pollution claims as well as other claims that may require immediate response.

The number is: 1-800-690-5520
Say- "Program Name is Crum & Forster Spill"

Please use the hotline to notify us immediately of any situation you encounter that may lead to a pollution claim.

Using the hotline may help you to fulfill some of your responsibilities to us.  Reimbursement of "emergency response costs" is conditioned on timely reporting by use of the emergency response hotline.

 **Crum&Forster** part of the FAIRFAX group    **Crum & Forster Specialty Insurance Company**

## Welcome to *Crum & Forster*!

As a policyholder of the *Crum & Forster* companies, we are pleased to enclose the following:

- ➢ A copy of your insurance policy. Please read your policy thoroughly and call your broker if you should have any questions.
- ➢ A **Loss Reporting Procedures Letter**
- ➢ A **Spill Response Kit** – (Available by Request)

The **Loss Reporting Procedures is attached and** will assist you with reporting a claim. Please review the contents at this time so that you are familiar with the information that will be requested. When completed, immediately report the claim to us by:

- ❖ EMAIL to: **liabilitynol@cfins.com**
- ❖ FAX to: **Liability Claims, 877-622-6204** and your broker
- ❖ PHONE: **800-690-5520**

The **Spill Response Kit (AVAILABLE BY REQUEST)** is designed for job sites and/or glove boxes of vehicles. The kit is ideal for policyholders having Transportation Pollution Liability, and/or job-site coverage such as Contractors Pollution Liability or Professional Liability. Included in this kit are:

- ✓ **Incident Report Cards**, which provide a simple format to record the facts and circumstances of the event.
- ✓ **Witness Cards**, which can be distributed to any individual who may have witnessed the event.
- ✓ **Accident Notification Cards**, which can be used when you might be working alone when an event occurs and you cannot leave the site. This card provides key information for you to solicit assistance from a passer-by.

---

### REPORT ALL SPILLS AND/OR RELEASES TO THE ENVIRONMENT TO:

#### 1-800-690-5520

### SAY *"PROGRAM NAME IS CRUM&FORSTER SPILL"*

---

Stickers are provided in both kits with the 800 number. Please post these stickers in high-visibility locations around your business operation. This number is available to you **24-hours, 7-days a week, 365 days a year** to respond to a spill or accident. Please call as soon as you are aware of a release.

*Please note that the Loss Reporting Procedures and the Spill Response Kit are tools to aid you in gathering the necessary claim information. By providing these tools, we do not guarantee coverage under the policy or relieve you of any of your duties or obligations under the policy. Please read and understand your policy to better understand the coverage available and your duties and obligations.*

EN0051-1011



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AGGREGATE LIMITS OF
# INSURANCE PER LOCATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

A. Under the Common Provisions, **SECTION IV – LIMITS OF INSURANCE AND DEDUCTIBLE,** item **3.** is amended by the addition of the following:

The General Aggregate Limit applies separately to each of your "locations" owned by or rented to you.

B. Solely as respect the coverage afforded by this Endorsement, "location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDED WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

## SCHEDULE

| Name of Person(s) or Organization(s) |
|---|
| Where Required by Written Contract |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**SECTION VI – COMMON CONDITIONS, Item 17. Transfer Of Rights of Recovery Against Others To Us** within the Common Provisions is amended by the addition of the following:

Solely as respects the person(s) or organization(s) indicated in the Schedule shown above, we waive any right of recovery we may have against the person(s) or organization(s) indicated in the Schedule shown above because of payments we make for "damages" arising out of your ongoing operations or "your work" performed under a written contract with that person(s) or organization(s) and included in the "products-completed operations hazard".

However, this waiver shall not apply to "damages" resulting from the sole negligence of the person(s) or organization(s) indicated in the Schedule shown above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) or Organization(s) |
| --- |
| Where Required By Written Contract |

**SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but only with respect to liability caused, in whole or in part, by "your work" for that insured which is performed by you or by those acting on your behalf.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIMARY AND NON-CONTRIBUTORY ADDITIONAL INSURED WITH WAIVER OF SUBROGATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART

## SCHEDULE

| Name of Additional Insured Person(s) or Organization(s) |
|---|
| Where Required by Written Contract |
|  |
|  |
|  |

A. **SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but solely with respect to "claims" caused in whole or in part, by "your work" for that person or organization performed by you, or by those acting on your behalf.

This insurance shall be primary and non-contributory, but only in the event of a named insured's sole negligence.

B. We waive any right of recovery we may have against the person(s) or organization(s) indicated in the Schedule shown above because of payments we make for "damages" arising out of "your work" performed under a designated project or contract with that person(s) or organization(s).

C. This Endorsement does not reinstate or increase the Limits of Insurance applicable to any "claim" to which the coverage afforded by this Endorsement applies.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL MOLD EXCLUSION

This endorsement modifies insurance provided under the following:

CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART

A. **SECTION II – ADDITIONAL EXCLUSIONS** is amended by the addition of the following:

This Policy does not apply to any "claim" based upon or arising out "mold".

B. As stated under the Common Provisions, **SECTION VII- COMMON DEFINITIONS, Item 22:**

"Mold" means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents, or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CANCELLATION BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

Under the Common Provisions, **SECTION VI – COMMON CONDITIONS,** the first paragraph of item **2. Cancellation And Nonrenewal** is deleted in its entirety and replaced by the following:

This Policy may be cancelled by the First Named Insured by surrender thereof to us or by mailing to us written notice stating when thereafter the cancellation shall be effective. We may cancel or nonrenew this Policy by mailing a written notice to the First Named Insured at the address shown in the Declarations of this Policy. The mailing of notice of cancellation shall be sufficient notice and the effective date of cancellation stated in such notice shall become the end of the "policy period".

The effective dates of such cancellation shall not be less than 60 days (ten (10) days for non-payment of premium) following mailing of the notice of cancellation to the First Named Insured. The time of surrender or the effective date of cancellation stated in the notice shall become the end of the "policy period".

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NOTICE OF CANCELLATION – CERTIFICATE HOLDER(S)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

### SCHEDULE

**Certificate Holder(s)**
IGS Investments, LLC
16250 Tomball Parkway
Houston, TX 77086

Under the Common Provisions, **SECTION VI – COMMON CONDITIONS, item** 2. **Cancellation And Nonrenewal** is amended by the addition of the following:

If we cancel this Policy before the expiration date thereof, we will mail a 30 days written notice (ten (10) days for non-payment of premium) to the Certificate Holder(s) indicated in the Schedule shown above.

### ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NOTICE OF CANCELLATION –
# CERTIFICATE HOLDER(S)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART
ERRORS AND OMISSIONS LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

**SCHEDULE**

| Certificate Holder(s) |
|---|
| Comerica Bank<br>Attn:  Insurance Service Center PO Box 863299<br>Plano, TX 75086-3329 |

Under the Common Provisions, **SECTION VI – COMMON CONDITIONS, item** 2. **Cancellation And Nonrenewal** is amended by the addition of the following:

If we cancel this Policy before the expiration date thereof, we will mail a 30 days written notice (ten (10) days for non-payment of premium) to the Certificate Holder(s) indicated in the Schedule shown above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT

Policy Change
Number

| POLICY NUMBER<br>EPK-103197 | POLICY CHANGES<br>EFFECTIVE<br>02/15/14 | COMPANY<br>**Crum and Forster Specialty<br>Insurance Company** |
|---|---|---|

NAMED INSURED
Generon IGS, Inc.

COVERAGE PARTS AFFECTED
COMMERCIAL GENERAL LIABILITY COVERAGE PART

CHANGES

## BROAD NAMED INSURED

It is agreed that:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any business entity incorporated or organized under the laws of the United States of America (including any State thereof), its territories or possessions or Canada (including any Province thereof) in which the Named Insured shown in the Declarations owns, during the policy period, an interest of more than 50 percent. If other valid and collectible insurance is available to any business entity covered by this policy solely by reason of ownership by the Named Insured shown in the Declarations in excess of 50 percent, this insurance is excess over the other insurance, whether primary, excess, contingent, or on any other basis.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

_____
Authorized Representative Signature



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT

Policy Change Number

| POLICY NUMBER<br>EPK-103197 | POLICY CHANGES<br>EFFECTIVE<br>02/15/14 | COMPANY<br>**Crum and Forster Specialty<br>Insurance Company** |
|---|---|---|

NAMED INSURED
Generon IGS, Inc.

COVERAGE PARTS AFFECTED
COMMERCIAL GENERAL LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP POLLUTION LIABILITY COVERAGE PART

CHANGES

Named Insured Schedule:
Generon IGS, Inc.
MG Generon Corp.
Innovative Gas Systems, Inc.
IGS Investments, LLC
Houston Vessel Manufacturing, LLC
Global Nitrogen Services, LLC
Houston Compression & Services
ACFM Inc.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

_____
Authorized Representative Signature



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT

Policy Change
Number

| POLICY NUMBER<br>EPK-103197 | POLICY CHANGES<br>EFFECTIVE<br>02/15/14 | COMPANY<br>**Crum and Forster Specialty**<br>**Insurance Company** |
|---|---|---|

NAMED INSURED
Generon IGS, Inc

COVERAGE PARTS AFFECTED
COMMERCIAL GENERAL LIABILITY COVERAGE PART
THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

CHANGES

# AMENDED WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

### SCHEDULE

**Name of Person(s) or Organization(s)**

Marine Systems, Inc.
P.O. Box 201825
Houston, TX 77216-1825

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**SECTION VI – COMMON CONDITIONS, item 17. Transfer Of Rights of Recovery Against Others To Us** within the Common Provisions is amended by the addition of the following:

Solely as respects the person(s) or organization(s) indicated in the Schedule shown above, we waive any right of recovery we may have against the person(s) or organization(s) indicated in the Schedule shown above because of payments we make for "damages" arising out of your ongoing operations or "your work" performed under a written contract with that person(s) or organization(s) and included in the "products-completed operations hazard".

However, this waiver shall not apply to "damages" resulting from the sole negligence of the person(s) or organization(s) indicated in the Schedule shown above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

_____
Authorized Representative Signature



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GENERAL CHANGE ENDORSEMENT

Policy Change
Number

| POLICY NUMBER<br>EPK-103197 | POLICY CHANGES<br>EFFECTIVE<br>02/15/14 | COMPANY<br>**Crum and Forster Specialty<br>Insurance Company** |
|---|---|---|

NAMED INSURED
Generon IGS, Inc

COVERAGE PARTS AFFECTED
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLLUTION LIABILITY COVERAGE PART

CHANGES

## ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS

### SCHEDULE

**Name Of Additional Insured Person(s) or Organization(s)**
EPCO Holdings Inc.; Enterprise Products Partners LP; Enterprise Products Operating LLC; Enterprise Products Company; Enterprise Products Pipeline Company LLC; and each of thier parent, subsidiary and affiliated companies, partners and joint ventures, and each owner or joint owner of any equipment or facility owned by them.

**SECTION III – WHO IS AN INSURED** within the Common Provisions is amended to include as an additional insured the person(s) or organization(s) indicated in the Schedule shown above, but only with respect to liability caused, in whole or in part, by "your work" for that insured which is performed by you or by those acting on your behalf.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED

_____
Authorized Representative Signature



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AGGREGATE LIMITS OF INSURANCE PER PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Under the Common Provisions, **Section IV – LIMITS OF INSURANCE AND DEDUCTIBLE**, item **3.** is amended by the addition of the following:

The General Aggregate Limit applies separately to each of your projects away from premises owned by or rented to you.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYEE BENEFITS LIABILITY COVERAGE
### THIS ENDORSEMENT PROVIDES CLAIMS-MADE AND REPORTED COVERAGE.
### PLEASE READ THE ENTIRE ENDORSEMENT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Limit of Insurance | | Deductible Each Occurrence |
|---|---|---|---|
| Employee Benefits Programs | $1,000,000 | Employee Benefits Liability Each occurrence Limit | $5,000 |
| | $1,000,000 | Employee Benefits Liability Aggregate Limit | |

Retroactive Date:02/15/12

A. The following is added to **SECTION 1 – INSURING AGREEMENTS** within the Commercial General Liability Part:

### INSURING AGREEMENT – EMPLOYEE BENEFITS LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of any act, error or omission, of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those "damages". However, we will have no duty to defend the insured against any "suit" seeking "damages" to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any "claim" or "suit" that may result. But:

      (1) The amount we will pay for "damages" is limited as described in Section E. of this Endorsement; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements and supplementary payments.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SECTION II – SUPPLEMENTARY PAYMENTS** within Section C of this Endorsement. This insurance applies to "damages" only if:

      (3) The act, error or omission, is negligently committed in the "administration" of your "employee benefit program";

      (4) The act, error or omission, did not take place before the Retroactive Date shown in the Schedule nor after the end of the "policy period"; and

      (5) A "claim" for "damages", because of an act, error or omission, is first made against any insured, in accordance with Paragraph **C.** below, and reported to us during the "policy period" or an Extended Reporting Period we provide under Paragraph G. of this Endorsement.

   b. A "claim" seeking "damages" will be deemed to have been made at the earlier of the following times:

(1) When notice of such "claim" is received and recorded by us, whichever comes first; or

(2) When we make settlement in accordance with Paragraph **1.a.** above.

A "claim" received and recorded by us within thirty (30) days after the end of the "policy period" will be considered to have been received within the "policy period", if no subsequent policy is available to cover the "claim".

c. All "claims" for "damages" made by an "employee" because of any act, error or omission, or a series of related acts, errors or omissions, including "damages" claimed by such "employee's" dependents and beneficiaries, will be deemed to have been made at the time the first of those "claims" is made against any insured.

2. **Exclusions**

The coverage afforded by this Endorsement does not apply to any "claim":

a. **Dishonest, Fraudulent, Criminal Or Malicious Act**

Based upon or arising out of "damages" arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.

b. **Bodily Injury, Property Damage, Personal Injury or Advertising Injury**

Based upon or arising out of "bodily injury", "property damage" or "personal and advertising injury".

c. **Failure to Perform A Contract**

Based upon or arising out of "damages" arising out of failure of performance of contract by any insurer.

d. **Insufficiency Of Funds**

Based upon or arising out of "damages" arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

e. **Inadequacy Of Performance Of Investment/Advice Given with Respect To Participation**

Based upon or arising out of:

(1) Failure of any investment to perform;

(2) Errors in providing information on past performance of investment vehicles; or

(3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

f. **Workers' Compensation And Similar Laws**

Based upon or arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

g. **ERISA**

Based upon or arising out of "damages" for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

h. **Available Benefits**

Based upon or arising out of any "claim" for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

i. **Taxes, Fines Or Penalties**

Based upon or arising out of taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

**j.  Employment-Related Practices**

Based upon or arising out of "damages" arising out of wrongful termination of employment, discrimination, or other employment-related practices.

B.  Solely, for the purposes of coverage afforded by this Endorsement, **SECTION II – SUPPLEMENTARY PAYMENTS** within the Common Provisions is deleted in its entirety and replaced by the following:

**SECTION II – SUPPLEMENTARY PAYMENTS**

We will pay, with respect to any "claim" we investigate or settle, or any "suit" against an insured we defend":

1.  All expenses we incur.

2.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

3.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

4.  All costs taxed against the insured in the "suit".

5.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

6.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will reduce the limits of insurance.

C.  Solely, for the purposes of coverage afforded by this Endorsement, item **2.** of **SECTION III – WHO IS AN INSURED** within the Common Provisions is deleted in its entirety and replaced by the following:

2.  Each of the following is also an insured:

a.  Each of your "employees" who is or was authorized to administer your "employee benefit program".

b.  Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

c.  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Endorsement.

D.  Solely, for the purposes of coverage afforded by this Endorsement, item **3.** of **SECTION III – WHO IS AN INSURED** within the Common Provisions does not apply.

E.  Solely, for the purposes of coverage afforded by this Endorsement, **SECTION IV – LIMITS OF INSURANCE AND DEDUCTIBLE** within the Common Provisions is deleted in its entirety and is replaced by the following:

**1.  Limits Of Insurance**

a.  The Limits of Insurance shown in the Schedule and the rules below fix the most we will pay regardless of the number of:

(1)  Insureds;

(2)  "Claims" made or "suits" brought';

(3) Persons or organizations making "claims" or brining "suits";

(4) Acts, errors or omissions; or

(5) Benefits included in your "employee benefit program".

b. The Employee Benefits Liability Aggregate Limit is the most we will pay for all "damages", including supplementary payments, because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program". This Aggregate Limit of Insurance is part of and not in addition to the Policy Aggregate limit of Insurance shown in the Declarations of the policy.

c. Subject to the Employee Benefits Liability Aggregate Limit, the Employee Benefits Liability Each Occurrence Limit is the most we will pay for any one "claim" for all "damages" sustained by any one or more "employees", including "damages" sustained by such "employee's" dependents and beneficiaries, as a result of:

(1) Any act, error or omission; or

(2) A series of related acts, errors or omissions

negligently committed in the "administration" of your "employee benefit program".

All "claims" for "damages" made by one or more "employees" because of any one act, error or omission, or a series of related acts, errors or omissions, including "damages" claimed by such "employee's" dependents and beneficiaries, will be deemed to be one "claim".

However, the amount paid under this Endorsement shall not exceed, and will be subject to, the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program".

The Limits of Insurance of this Endorsement apply separately to each consecutive annual period and to any remaining period of less than twelve (12) months, starting with the beginning of the "policy period" shown in the Declarations of the policy to which this Endorsement is attached, unless the "policy period" is extended after issuance for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Payments under these Limits of Insurance are part of and erode the Policy Aggregate Limit of Insurance shown in the Declarations.

## 2. Deductible

Our obligation to pay "damages" on behalf of the insured applies only to the amount of "damages" in excess of the deductible amount stated in the Schedule shown above as applicable to Employee Benefits Liability Each Occurrence. The limits of insurance shall not be reduced by the amount of this deductible.

a. The deductible amount stated in the Schedule shown above applies to all "damages" sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

b. The terms of this insurance, including those with respect to:

(1) Our right and duty to defend any "suits" seeking those "damages"; and

(2) Your duties, and the duties of ay other involved insured, in the event of an act, error or omission, or "claim";

apply irrespective of the application of the deductible amount.

c.  We may pay any part or all of the deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

F.  Solely, for the purposes of coverage afforded by this Endorsement, Conditions **5., 6. and 11.** of **SECTION VI – COMMON CONDITIONS** within the Common Provisions are deleted in their entirety and replaced by the following:

**Duties In The Event Of An Act, Error Or Omission, Or Claim Or Suit**

a.  You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a "claim". To the extent possible, notice should include:

(1)  What the act, error or omission was and when it occurred; and

(2)  The names and addresses of anyone who may suffer "damages" as a result of the act, error or omission.

b.  If a "claim" is made or "suit" is brought against any insured, you must:

(1)  Immediately record the specifics of the "claim" or "suit" and the date received; and

(2)  Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" or "suit" as soon as practicable.

c.  You and any other involved insured must:

(1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or "suit";

(2)  Authorize us to obtain records and other information;

(3)  Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation or incur any expense without or consent.

**Other Insurance**

This insurance is excess over any other valid and collectible insurance that is available to the insured for a loss we cover under this Endorsement.

G.  Solely, for the purposes of coverage afforded by this Endorsement, **Section VIII  - EXTENDED REPORTING PERIODS** within the Common Provisions is deleted in its entirety and is replaced by the following:

**EXTENDED REPORTING PERIOD**

The following provision applies only to Employee Benefits Liability Coverage:

1.  You will have the right to purchase an Extended Reporting Period, as described below, if this endorsement is canceled or not renewed by you or by us.

2.  The Extended Reporting Period does not extend the "policy period" or change the scope of coverage provided. It applies only to "claims" for acts, errors or omissions that were first committed before the end of the "policy period" but not before the Retroactive Date, if any, shown in the Schedule. Once in effect, the Extended Reporting Period may not be canceled.

3. An Extended Reporting Period of one (1) year is available, but only by an endorsement and for an extra charge.

   You must give us a written request for the endorsement within thirty (30) days after the end of the "policy period". The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

   We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

   a. The "employee benefit programs" insured;

   b. Previous types and amounts of insurance;

   c. Limits of insurance available under this Endorsement for future payment of "damages"; and

   d. Other related factors.

   The Extended Reporting Period Endorsement applicable to this coverage shall set forth the terms, not inconsistent with this Section, applicable to the Extending Reporting Period provided hereunder, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other valid and collectible insurance available under policies in force after the Extended Reporting Period starts.

4. If the Extended Reporting Period is in effect, we will provide an extended reporting period aggregate limit of insurance described below, but only for "claims" first received and recorded during the Extended Reporting Period.

   The extended reporting period aggregate limit of insurance will be the dollar amount of the Limits of Insurance not exhausted by payments of judgments, settlements and supplementary payments under this coverage, and shown in the Schedule of this endorsement under Limits of Insurance, subject to the available Policy Aggregate Limit of Insurance not exhausted by the payment of judgments, settlements and supplementary payments under the policy.

   Paragraph E. **1.b.** of this endorsement will be amended accordingly.

H. Solely, for the purposes of coverage afforded by this Endorsement, the following definitions are added to **SECTION VII – COMMON DEFINITIONS** within the Common Provisions:

   "Administration" means:

   a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or scope of "employee benefit programs"';

   b. Handling records in connection with the "employee benefit program"; or

   c. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

   "Cafeteria plans" means plans authorized by applicable law to allow employees to elect to pay for certain benefits with pre-tax dollars.

   "Employee benefit program" means a program providing some or all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

   d. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who satisfy the plan's eligibility requirements;

   e. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such

benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

   **f.** Unemployment insurance, social security benefits, workers' compensation and disability benefits;

   **g.** Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies; and

   **h.** Any other similar benefits designated in the Schedule or added thereto by endorsement.

**I.** Solely, for the purposes of coverage afforded by this Endorsement, Definitions **6. 12. and 36.** in **SECTION VII – COMMON DEFINITIONS** within the Common Provisions are deleted in their entirety and replaced by the following:

   **6.** "Claim" means any written demand, or "suit", made by an "employee" or an "employee's" dependents and beneficiaries, for "damages" as the result of an act, error or omission.

   **12.** "Employee" means a person actively employed, formerly employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

   **36.** "Suit" means a civil proceeding in which "damages" because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

   **a.** An arbitration proceeding in which such "damages" are claimed and to which the insured must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such "damages" are claimed and to which the insured submits with our consent.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF COVERAGE TERRITORY – WORLDWIDE COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following is added to **Section VI – Common Conditions** within the Common Provisions:

**Expanded Coverage Territory**

1. If a "suit is brought in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the "suit". We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a "suit" seeking "damages" to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

   If the insured becomes legally obligated to pay sums because of "damages" to which this insurance applies in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

2. All payments or reimbursements we make for "damages" because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

3. Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Puerto Rico or Canada.

   Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in effect.

**B.** Solely as respects the coverage provided by this Endorsement, under the Common Provisions, **Section VI – Common Conditions**, item 11, **Other Insurance** is amended as follows: **Section VI – Common Conditions,** within the Common Provisions:

   Paragraph **b.**, Excess Insurance is amended to add the following under items **(1)** and **(2)**:

   > If the insured's liability to pay "damages" is determined in a "suit" brought outside the United States of America (including its territories and possessions), Puerto Rico or Canada; or

   > That is coverage required by law, regulation or other governmental authority in a part of the "coverage territory" that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada.

**C.** Solely as respects the coverage provided by this Endorsement, under the Common Provisions, **Section VII –Common Definitions,** item 8. is replaced by the following:

   **8.** "Coverage territory" means anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other

economic sanction or embargo by the United
Sates of America.

EN0307-0211



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GULF OF MEXICO EXTENSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Solely as respects the coverage afforded by this Endorsement, under the Common Provisions, **SECTION VII – COMMON DEFINITIONS, Item 8.** "Coverage territory" is deleted in its entirety and replaced by the following:

    **8.** "Coverage territory" means:

        **a.** The United Sates of America (including its territories and possessions), the Gulf of Mexico, Puerto Rico and Canada;

        **b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

        **c.** All other parts of the world if the injury or damage arises out of:

            **(1)** Goods or products made or sold by you in the territory described in **a.** above;

            **(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

            **(3)** One or more offenses within the definition of "personal and advertising injury" that take place through the Internet or similar electronic means of communication;

        provided the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

    Coverage shall not be denied solely on the ground that the "claim" or "suit" against you is based on an in rem proceeding.

B. Under the Common Provisions, **SECTION V – COMMON EXCLUSIONS,** item **1. Aircraft, Auto Or Watercraft,** sub-item **b.** is deleted in its entirety and replaced by the following:

    **b.** A watercraft you do not own that is not being used to carry persons or property for a charge.

C. Under the Common Provisions, **SECTION III – WHO IS AN INSURED** is amended by the addition of the following:

    Any person or organization is an insured if you are required by contract to name that person or organization as an additional insured. However, this provision applies only as respects the operations of the Named Insured indicated in this Policy's Declarations.

D. Under the Common Provisions, **SECTION IV – COMMON CONDITIONS, Item 17. Transfer Of Rights Of Recovery Against Others To Us** is amended by the addition of the following:

    This condition applies as respects any person or organization for whom you are required by contract to provide a waiver of subrogation.

E. Under the Common Provisions, **SECTION VI – COMMON CONDITIONS, item 2. Cancellation And Nonrenewal** is amended by the addition of the following:

    Thirty (30) days notice of cancellation will be given to any person or organization whom you are required by contact to name as an additional insured and where such notice is required by contract. However, this provision will not apply if we cancel this Policy for non-payment of premium.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRODUCTS POLLUTION LIABILITY COVERAGE EXTENSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| Products Pollution Liability – Each Occurrence Limit: | $ |
| Products Pollution Liability – Aggregate Limit: | $ |
| Products Pollution Liability – Deductible Amount: | $ |

(If no entry appears above, the Limits of Insurance shown in the Declarations will
apply and the deductible shown in the Deductible Liability endorsement will apply.)

A. The Products Pollution Liability – Each Occurrence Limit and the Products Pollution Liability – Aggregate Limit indicated in the Schedule shown above are subject to and not in addition to the Products-Completed Operations Aggregate Limit stated in the Declarations.

Payments under the Products Pollution Liability – Each Occurrence Limit and Products Pollution Liability – Aggregate Limit indicated in the Schedule shown above are part of and erode the Products-Completed Operations Aggregate Limit stated in the Declarations.

B. Solely as respects the coverage afforded by this Endorsement, the Products Pollution Liability Deductible Amount indicated in the Schedule shown above applies once to each products pollution liability "claim" and can be applied either for "defense expenses", settlement, payment of judgment(s) or any combination thereof, if applicable.

C. **SECTION II – ADDITIONAL EXCLUSIONS,** item **1. e., Pollution-Related,** is amended by the addition of the following:

**(4)** With the exception of products that are still in your physical possession, Exclusion **e. (1)** and **e. (2)** do not apply to "bodily injury" or "property damage" occurring away from premises you own or rent and arising out of "your products".

However, the coverage afforded by this Endorsement does not include "bodily injury" or "property damage" arising out of:

a. The transportation of property, unless the "damages" arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

b. The existence of tools, uninstalled equipment or abandoned or unused materials;

c. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" or waste material prior to inception of this Policy;

d. Any insured's intentional, willful or deliberate non-compliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order or instructions of any governmental body or agency;

e. The rendering of or failure to render "professional services" by any insured;

f. The actual, alleged or threatened exposure to any radioactive matter, or based upon or attributable to acid rain conditions;

g. "Your product" performing as it was intended to perform; or

h. "Your product" or your waste which were disposed, unless specifically scheduled onto the Policy.

D. Only with respect to the coverage provided by this endorsement, under the Common Provisions, **SECTION VII – COMMON DEFINITIONS,** the following is added to the definition of "Property Damage" under item 33:

c. "Cleanup costs".

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – MORTGAGEE, ASSIGNEE, OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**
Comerica Bank


**Designated Premises:**
16250 Tomball Parkway
Houston, TX 77086


(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1. **Section III – Who Is An Insured** within the Common Provisions is amended to include as an insured the person(s) or organization(s) shown in the Schedule but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.
2. This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

EN0318-0211



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name of Additional Person(s) or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| Where Required by Written Contract | Where Required by Written Contract |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Section III – Who Is An Insured** within the Common Provisions is amended to include as an insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT TO DAMAGE TO YOUR WORK EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Under the Commercial General Liability Coverage Form, **Section II – ADDITIONAL EXCLUSIONS,** Paragraph **2,** Item **e. Damage to Your Work** is deleted in its entirety and is replaced with the following:

   **e.  Damage to Your Work**

   "Property damage" to "your work" or any part of it and included in the "products-completed operations hazard".

   However, this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COVERED LOCATIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

## SCHEDULE

| Covered "Location(s)": | Retroactive Date(s): |
|---|---|
| 1. 16250 Tomball Parkway, Houston, TX 77086 | 02/15/12 |
| 2. 982 Foot of Arcy Lane, Pittsburg, CA 94565 | 02/15/12 |
| 3. 992 Foot of Arcy Lane, Pittsburg, CA 94565 | 02/15/12 |
| 4. 1061 Foot of Arcy Lane, Pittsburg, CA 94565 | 02/15/12 |

A.  The Retroactive Date(s) indicated in the Schedule shown above applies only to the corresponding location indicated in the Schedule shown above.

B.  **SECTION I – INSURING AGREEMENT, 1. Insuring Agreement – Third Party Pollution Liability** is amended by the addition of the following:

This Policy applies to "claim(s)" for "bodily injury", "property damage" or "cleanup costs" resulting from "pollution conditions" that:

1.  Exist at, on or emanate from the Covered "Location(s)" indicated in the Schedule shown above; and

2.  Begin after this Policy's effective date or the Retroactive Date indicated in the Schedule shown above, and before the end of the "policy period".

C.  **SECTION I – INSURING AGREEMENT, 1. Insuring Agreement – Onsite Cleanup** is amended by the addition of the following:

This Policy applies to "cleanup costs" resulting from "pollution conditions" that:

1.  Exist at, on or emanate from the Covered "Location(s)" indicated in the Schedule shown above; and

2.  Begin after this Policy's effective date or the Retroactive Date indicated in the Schedule shown above, and before the end of the "policy period".

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ONSITE CLEANUP COVERAGE RESTRICTION TO RELEASE FROM ABOVEGROUND STORAGE TANKS

This endorsement modifies insurance provided under the following:

ONSITE CLEANUP COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| Aboveground Storage Tank – Each Pollution Condition Limit: | $1,000,000 |
| Aboveground Storage Tank – Aggregate Limit: | $2,000,000 |
| Aboveground Storage Tank Deductible Amount: | $10,000 |

A. **SECTION 1 – INSURING AGREEMENT within the Onsite Cleanup Coverage Part** is deleted in its entirety and replaced with the following:

   1. We will pay, in excess of the Deductible as scheduled to which this insurance applies to the onsite cleanup coverage part indicated in the Schedule shown above, those sums the insured becomes obligated to pay as "cleanup costs" arising out of a "pollution condition" to which this insurance applies. The amount we will pay for "cleanup costs" is limited as described in B. below.

   2. This insurance applies to "cleanup costs" only if all of the following conditions are met:

      a. No common fact, incident, circumstance, or "pollution condition" was reported under any prior policy or disclosed in the application for this Policy;

      b. The "pollution conditions" result from a release of contents from any of the aboveground storage tanks at, on or within your specified "location(s)" scheduled on an endorsement attached to this Policy; or named on the declarations page.

      c. The "cleanup costs" arise out of a "pollution condition" that exists at, on, or within your "location(s)" within the "coverage territory";

      d. The "pollution condition" begins after this Policy's effective date or Retroactive Date, if applicable, and before the end of the "policy period"; and

      e. The request for "cleanup costs" is made to us in writing in accordance with the provisions set forth in **SECTION III – ADDITIONAL CONDITIONS** within this Coverage Part, during the "policy period".

B. The Aboveground Storage Tank – Each Pollution condition Limit and the Aboveground Storage Tank – Aggregate Limit indicated in the Schedule shown above are subject to and not in addition to the General Aggregate Limit shown in the Declarations.

   Payments under the Aboveground Storage Tank – Each Pollution Condition Limit and Aboveground Storage Tank – Aggregate Limit indicated in the Schedule shown above are part of and erode the General Aggregate Limit shown in the Declarations.



C.  Solely as respects the coverage afforded by this endorsement, the Aboveground Storage Tank Deductible Amount indicated in the Schedule shown above applies once to each "pollution condition" and can be

Applied either for "defense expenses", where applicable, settlement, payment of judgment(s) or any combination thereof, if applicable.


ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LOADING OR UNLOADING OF WATERCRAFT AND AUTOMOBILES AT COVERED LOCATION(S)

This endorsement modifies insurance provided under the following:

THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

### SCHEDULE

| $10,000 | Each Pollution Condition |
|---------|--------------------------|

A.  The Deductible Amount indicated in the above Schedule applies to the coverage afforded by this Endorsement.

B.  Solely as respects the coverage afforded by this Endorsement, under the Common Provisions, **SECTION V – COMMON EXCLUSIONS**, item **1. Aircraft, Auto Or Watercraft** is deleted in its entirety and replaced with the following:

### 1. Aircraft, Auto Or Watercraft

Based upon or arising out of any liability arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

This exclusion applies even if the "claim" against any insured alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of another by that insured, or if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:
    a. A watercraft while ashore on premises you own or rent;
    b. A watercraft you do not own that is:
        (1) Less than twenty-six (26) feet long; and
        (2) Not being used to carry persons or property for a charge;
    c. Parking an "auto" on, or on the roadway near premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;
    d. Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or
    e. "Bodily injury" or "property damage" arising out of:
        (1) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment' if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or
        (2) The operation of any of the machinery or equipment listed In Paragraph f.(2) or f.(3) of the definition of "mobile equipment"; or
    f. With respect to watercraft and "autos" only, "claims" arising from "pollution conditions" caused by, arising out of, or in any way related to "loading or unloading" operations performed within the legal boundaries of the specified "location(s)" scheduled by endorsement to this Policy.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRANSPORTATION POLLUTION CLEANUP INCLUDING LOADING AND UNLOADING- THIRD PARTY

This endorsement modifies insurance provided under the following:

THIRD PARTY POLLUTION LIABILITY COVERAGE PART
ONSITE CLEANUP COVERAGE PART

### SCHEDULE

| | |
|---|---|
| Transportation Pollution – Each Pollution Condition Limit: | $ |
| Transportation Pollution Aggregate Limit: | $ |
| Transportation Pollution Deductible Amount: | $ |

A. As respects the coverage afforded by this Endorsement, the maximum amounts for which we are liable for "claims" relating to transportation pollution is indicated in the Schedule shown above.

The Transportation Pollution – Each Pollution Condition Limit and the Transportation Pollution Aggregate Limit indicated in the Schedule shown above are subject to and not in addition to the Third Party Pollution Liability Each Pollution Condition Limit or the Onsite Cleanup Each Pollution Condition Limit, as applicable, and the General Aggregate Limit stated in the Declarations.

Payments under the Transportation Pollution – Each Pollution Condition Limit and Transportation Pollution Aggregate Limit indicated in the Schedule shown above are part of and erode the Third Party Pollution Liability Each Pollution Condition Limit or the Onsite Cleanup Each Pollution Condition Limit, as applicable, and the General Aggregate Limit stated in the Declarations.

If no limit option is indicated in the Schedule shown above, then the limits of insurance stated in the Declarations of the applicable Coverage Part(s) will apply.

B. Solely as respects the coverage afforded by this Endorsement, the Transportation Pollution Deductible Amount indicated in the Schedule shown above applies once to each "pollution condition" and can be applied either for "defense expenses", where applicable, settlement, payment of judgment(s) or any combination thereof, if applicable.

C. Solely as respects **Insuring Agreement – Third Party Pollution Liability** and **Insuring Agreement – Onsite Cleanup Coverage Part,** under the Common Provisions, **SECTION V – COMMON EXCLUSIONS, item 1. Aircraft, Auto Or Watercraft** is deleted in its entirety and replaced by the following:

This Policy does not apply to any "claim":

**1. Aircraft, Auto or Watercraft**

Based upon or arising out of any liability arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.

This exclusion applies even if the "claim" against any insured alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of another by that insured, or if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership,

maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:
    a. A watercraft while ashore on premises you own or rent;
    b. A watercraft you do not own that is:
      (1) Less than twenty-six (26) feet long; and
      (2) Not being used to carry persons or property for a charge;
    c. Parking an "auto" on, or on the roadway near premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;
    d. Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or
    e. "Bodily injury" or "property damage" arising out of:
      (1) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or
      (2) The operation of any of the machinery or equipment listed In Paragraph f.(2) or f.(3) of the definition of "mobile equipment";
    f. "Pollution conditions" based upon or arising out of the "loading or unloading" of "autos", watercraft or rolling stock at your "location(s)"; or
    g. "Pollution Conditions" which:
      **(1)** Commence during the transportation by a "carrier" of "your product" or "waste";
      **(2)** Result in "bodily injury", "property damage" or "cleanup costs" during the transportation of "your product" or "waste"; and
      **(3)** Commence on or after this Policy's inception date.

Under the Common Provisions, SECTION VII **COMMON DEFINITIONS,** the following definition is added:

"Carrier" means a person or entity, other than the insured's entity or any subsidiary or affiliated company of the insured, engaged in the business of transporting property for hire by "auto", rolling stock or vessel.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

**Figure: 28 TAC §1.601(a)(3):**

| | |
|---|---|
| 1 **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |

To obtain information or make a complaint:

Para obtener informacion o para someter una queja:

2 You may contact your (title) at (telephone number).

Puede comunicarse con su (title) al (telephone number).

3 You may call (company)'s toll-free telephone number for information or to make a complaint at:

Usted puede llamar al numero de telefono gratis de (company)'s para informacion o para someter una queja al:

**1-XXX-XXX-XXXX**

**1-XXX-XXX-XXXX**

4 You may also write to (company) at:

Usted tambien puede escribir a (company):

5 You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

**1-800-252-3439**

6 You may write the Texas Department of Insurance:
 P. O. Box 149104
Austin, TX 78714-9104
Fax: (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

Puede escribir al Departamento de Seguros de Texas:
 P. O. Box 149104
Austin, TX 78714-9104
Fax: (512) 475-1771
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

7 **PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the (agent) (company) (agent or the company) first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el (agente) (la compania) (agente o la compania) primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

8 **ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

**Guaranty Fund Nonparticipation Notice**

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code.   Chapter 225, Insurance Code, requires payment of a ___4.85___ percent tax on gross premium.

2/Dv-16-43

1  Glenn W. Mattar #13228
   Denenberg Tuffley, PLLC
2  28411 Northwestern Hwy.
   Suite 600
3  Southfield, MI 48034
   Phone:   (248) 549-3900
4  Fax:     (248) 593-5808
   E-mail:gmattar@dt-law.com
5
   And
6
   Jack Slavik #5962
7  Cozen O'Connor
   999 Third Avenue, Suite 1900
8  Seattle, WA 89104
   Phone:   (206) 373-7238
9  Fax:     (866) 229-5685
   Email: jslavik@cozen.com
10
   *Attorneys for Plaintiff*
11



12        MONTANA FOURTEENTH JUDICIAL DISTRICT COURT
                    MUSSELSHELL COUNTY
13

14  SIGNAL PEAK ENERGY, LLC                Cause No. OV-16-43
                                           Judge
15               Plaintiff,                      Randal I. Spaulding

    vs.                                    SUMMONS
16
    GENERON IGS, INC.; SULLAIR, LLC; POWER
17  SERVICE, INC. and JOHN DOES 1-10.

18               Defendants.

19
        THE STATE OF MONTANA SENDS GREETINGS TO THE ABOVE-NAMED
20  DEFENDANT: GENERON IGS, INC.

21        YOU, THE DEFENDANT, ARE HEREBY SUMMONED to answer the Complaint in
    this action which is filed in the office of the above-named Court, a copy of which is herewith
22  served upon you, and to file your answer and serve a copy thereof upon Plaintiffs' attorneys
    within 21 days after the service of this summons, exclusive of the day of service; and in case of
23  your failure to appear or answer, judgment will be taken against you by default, for the relief
    demanded in the Complaint.
24
                                                              Page 1 of 2

    SUMMONS

2

GIVEN under my hand this ___15ᵗʰ___ day of ___August___ , 20_16_ at the hour of ___3:00___ o'clock, ___P___ .m.

_Connie Mattfield_
**CLERK OF COURT**

By: _____

SUMMONS

CLERK OF THE
DISTRICT COURT
CONNIE MATTFIELD

2016 AUG 15  PM 3:16

FILED

BY _Connie Mattfield_
DE(Deborah)

1  Glenn W. Mattar #13228
   Denenberg Tuffley, PLLC
2  28411 Northwestern Hwy.
   Suite 600
3  Southfield, MI 48034
   Phone:   (248) 549-3900
4  Fax:     (248) 593-5808
   E-mail:gmattar@dt-law.com
5
   And
6
   Jack Slavik #5962
7  Cozen O'Connor
   999 Third Avenue, Suite 1900
8  Seattle, WA 89104
   Phone:   (206) 373-7238
9  Fax:     (866) 229-5685
   Email: jslavik@cozen.com
10
   *Attorneys for Plaintiff*
11

12          MONTANA FOURTEENTH JUDICIAL DISTRICT COURT
                         MUSSELSHELL COUNTY
13

   SIGNAL PEAK ENERGY, LLC                    Cause No. DV-16-43
14                                            Judge   Randal I. Spaulding
                   Plaintiff,
15  vs.                                       COMPLAINT AND
                                              DEMAND FOR TRIAL BY JURY
16  GENERON IGS, INC.; SULLAIR, LLC; POWER
    SERVICE, INC. and JOHN DOES 1-10.
17
                   Defendants.
18

19       COMES NOW Plaintiff, Signal Peak Energy, LLC by and through its undersigned

20  counsel, and for its Complaint and Demand for Trial by Jury states and alleges as follows:

21                          PARTIES AND JURISDICTION

22       1.     Plaintiff Signal Peak Energy, LLC ("Signal Peak") is a Delaware corporation with

23  its principal place of business in Columbus, Ohio.

24       2.     Upon information and belief, Defendant Generon IGS, Inc. ("Generon") is a

Page 1 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1 Delaware corporation with its principal place of business in Houston Texas.

2     3.     Upon information and belief, Defendant Sullair, LLC ("Sullair") is an Indiana
3 limited liability company with its principal place of business in Michigan City, Indiana.

4     4.     Upon information and belief, Defendant Power Service, Inc. ("Power Service") is
5 a Wyoming Corporation with its principal place of business in Casper, Wyoming.

6     5.     Upon information and belief, John Does 1-10 are individuals and/or companies,
7 including subcontractors and manufacturers, who participated in and/or provided products used
8 in the construction, manufacture, installation, maintenance, service, commissioning, and/or
9 inspection of the nitrogen generating plant, including but not limited to the subject compressor
10 unit.

11     6.     The amount in controversy exceeds the jurisdictional minimum of this Court.

12     7.     Venue is proper in this Court as the events giving rise to Plaintiff's claims
13 occurred in the Town of Roundup, County of Musselshell, State of Montana.

14                             **FACTS**

15     8.     At all times relevant herein, Signal Peak owned a coal mine located at 100 Portal
16 Drive in Roundup, Montana (the "Mine").

17     9.     The Mine has a containerized nitrogen generating plant that was supplied by
18 Defendant Generon and installed/commissioned in various stages from August, 2012 through
19 April 2013 (the "Plant").

20     10.     Generon installed and commissioned the various components of the Plant, which
21 included nitrogen generating and compressor units (among other components).

22     11.     On November 24, 2014, at approximately 9:30 A.M., a Signal Peak employee
23 turned on the Plant (it has previously been idle for three weeks).

24

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1   12.   At approximately 11:25 A.M., smoke was discovered escaping from one of the

2   plant's compressor units (C9) (the "Compressor Unit").

3   13.   Upon further inspection a fire was discovered within the Compressor Unit and the

4   fire had spread to a nitrogen production unit (NPU2) and the motor control center (the "Fire").

5   14.   The Fire was extinguished shortly after its discovery.

6   15.   However, Fire caused extensive damage to the Compressor Unit, the nitrogen

7   production unit, and the motor control center.

8   16.   The Fire also caused Signal Peak significant extra expenses in renting a temporary

9   nitrogen generator when repairs to the plant were ongoing.

10   17.   Damages from the Fire totaled $2,355,271.00.

11   18.   Subsequent expert investigations revealed the Fire originated in the oil/air

12   separator in the Compressor Unit.

13   19.   The oil/air separator was manufactured by Defendant Sullair.

14   20.   The Plant was maintained and serviced by Defendant Power Service.

15   21.   Expert investigations also revealed that Generon improperly installed the

16   Compressor Unit.

17   22.   Specifically, Generon installed the Compressor Unit's oil pressure switch and

18   temperature switch (safety devices) with the incorrect setting.

19   23.   The incorrect setting caused the Compressor Unit to shut down shortly after start-

20   up during Generon's commissioning process.

21   24.   Instead of setting the switches to the correct setting, Generon employees simply

22   wired ("jumped") around them, thereby rendering them totally ineffective.

23   25.   The failure of these switches to be installed correctly caused and/or contributed to

24   

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1   the aforementioned damage.

2   **COUNT I – NEGLIGENCE/GROSS NEGLIGENCE (GENERON)**

3   26.   Plaintiff restates and re-alleges all paragraphs above.

4   27.   At all times relevant herein Generon had a duty to exercise reasonable care when

5   designing, manufacturing, installing, commissioning, inspecting, and or servicing the Plant,

6   including the Compressor Unit, so as to avoid damage to Signal Peak's property.

7   28.   Generon breached its duty through the following acts and/or omissions

8   constituting negligence and/or gross negligence, including but not limited to:

9           a.   Failing to install the Compressor Unit with the oil pressure and
             temperature safety switches on the correct setting;

10          b.   Wiring around the safety switches and rendering them ineffective;

11          c.   Failing to include additional safety switches or monitoring devices in the
12               Compressor Unit that could have prevented the Fire;

13          d.   Failing to properly design and install the Compressor Unit so a fire would
                 not occur;

14          e.   Failing to use reasonable care when designing, manufacturing, installing,
15               commissioning, and or servicing the Plant, including but not limited to the
16               Compressor Unit;

            f.   Failing to provide adequate warnings/instructions as to the use,
17               maintenance, operation, and service of the Plant, including but not limited
                 to the Compressor Unit;

18          g.   Improperly delegating, hiring, and/or supervising the workmanship and
19               safety of the services delegated and/or subcontracted to another entity; and

20          h.   Any other acts or omissions that may become known during the course of
                 litigation.

21   29.   As a direct and proximate result of Generon's negligence and/or gross negligence,

22   the Fire occurred and caused extensive damage to Signal Peak's property and resulted in

23   significant extra expense.

24                                                                      Page 4 of 16

30. Damages from the Fire totaled $2,355,271.00.

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Generon in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post-judgment interest and any other relief this Court deems just and proper.

## COUNT II – BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES (GENERON)

31. Plaintiff restates and re-alleges all paragraphs above.

32. Generon designed, manufactured, sold, installed, commissioned and/or serviced inspected the Plant, including but not limited to the Compressor Unit.

33. Generon impliedly and/or expressly warranted that the Plant, including but not limited to the Compressor Unit, would be fit for the ordinary purpose the Plant was to be used, that the Plant would be fit for Signal Peak's particular purposes, that the Plant would be of fair average quality, that the Plant would be free from defects, and that it would design, manufacture and install the Plant with reasonable care.

34. Generon breached its express and/or implied warranties through the following acts and/or omissions:

    a. Failing to install the Compressor Unit with the oil pressure and temperature safety switches on the correct setting;

    b. Wiring around the safety switches and rendering them ineffective;

    c. Failing to include additional safety switches or monitoring devices in the Compressor Unit that could have prevented the Fire;

    d. Failing to properly design and install the Compressor Unit so a fire would not occur;

    e. Failing to use reasonable care when designing, manufacturing, installing, commissioning, and or servicing the Plant, including but not limited to the Compressor Unit;

COMPLAINT AND DEMAND FOR TRIAL BY JURY

f.  Failing to provide adequate warnings/instructions as to the use, maintenance, operation, and service of the Plant, including but not limited to the Compressor Unit;

g.  Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

h.  Any other acts or omissions that may become known during the course of litigation.

35.  As a direct and proximate result of Generon's breach of its express and/or implied warranties, the Fire occurred and caused extensive damage to Signal Peak's property and resulted in significant extra expense.

36.  Damages from the Fire totaled $2,355,271.00.

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Generon in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post- judgment interest and any other relief this Court deems just and proper.

## COUNT III – BREACH OF CONTRACT (GENERON)

37.  Plaintiff restates and re-alleges all paragraphs above.

38.  Signal Peak contracted with Generon whereby Generon agreed to design, manufacture, sell, supply, install, and commission the Plant, including but not limited to the Compressor Unit.

39.  Generon breached its contractual obligations through the following actions and/or omissions, including but not limited to:

a.  Failing to install the Compressor Unit with the oil pressure and temperature safety switches on the correct setting;

b.  Wiring around the safety switches and rendering them ineffective;

c.  Failing to include additional safety switches or monitoring devices in the Compressor Unit that could have prevented the Fire;

Page 6 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

d. Failing to properly design and install the Compressor Unit so a fire would not occur;

e. Failing to use reasonable care when designing, manufacturing, installing, commissioning, and or servicing the Plant, including but not limited to the Compressor Unit;

f. Failing to provide adequate warnings/instructions as to the use, maintenance, operation, and service of the Plant, including but not limited to the Compressor Unit;

g. Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

h. Any other acts or omissions that may become known during the course of litigation.

40. As a direct and proximate result of Generon's breach of contract, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

41. Damages from the Fire totaled $2,355,271.00.

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Generon in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post- judgment interest and any other relief this Court deems just and proper.

## COUNT IV – STRICT PRODUCTS LIABILITY (GENERON)

42. Plaintiff restates and re-alleges all paragraphs above.

43. At all pertinent times herein, Generon was in the business of manufacturing, assembling, designing, producing, inspecting, selling, and/or otherwise placing into the stream of containerized nitrogen generating plants, including compressor units.

44. Generon, in whole or in part, manufactured, assembled, designed, produced, inspected, and/or sold the Plant, including but not limited to the Compressor Unit.

COMPLAINT AND DEMAND FOR TRIAL BY JURY

45.   At the time the Plant, including but not limited to the Compressor Unit, left the control of Generon, a defect existed that rendered the Plant defective in that it was dangerous to an extent beyond that anticipated by the ordinary user.

46.   The Plant, including but not limited to the Compressor Unit, was defective in manufacture, design and/or warning/instruction as:

   a.   Generon failed to install/manufacture the Compressor Unit with the oil pressure and temperature safety switches on the correct setting;

   b.   Generon wired around the safety switches and rendering them ineffective;

   c.   Generon failed to include additional safety switches or monitoring devices in the Compressor Unit that could have prevented the Fire;

   d.   Generon failed to properly design and install/manufacture the Compressor Unit so a fire would not occur;

   e.   Generon failed to provide adequate warnings/instructions as to the use, maintenance, operation, and service of the Plant, including but not limited to the Compressor Unit;

   f.   Generon failed to use reasonable care when designing, manufacturing, installing, commissioning, and or servicing the Plant, including the Compressor Unit;

   g.   Any other evidence of manufacturing, design and/or warning/instruction defects that may become known during the course of litigation.

47.   As a direct and proximate result of the defective condition of the Plant, including but not limited to the Compressor Unit, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

48.   Damages from the Fire totaled $2,355,271.00.

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Generon in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post- judgment interest and any other relief this Court deems just and proper.

COMPLAINT AND DEMAND FOR TRIAL BY JURY

## COUNT V – NEGLIGENCE (SULLAIR)

49.    Plaintiff restates and re-alleges all paragraphs above.

50.    At all times relevant herein Sullair had a duty to exercise reasonable care when designing, manufacturing, installing, and/or commissioning the Sullair components in the Compressor Unit, including but not limited to the oil/air separator, so as to avoid damage to Signal Peak's property.

51.    Sullair breached its duty through the following acts and/or omissions constituting negligence and/or gross negligence, including but not limited to:

    a.    Failing to design and manufacture the subject oil/air separator to allow for adequate grounding to prevent sparking or ignition;

    b.    Failing to provide adequate warnings and instructions as to the use, maintenance, and service of the subject oil/air separator;

    d.    Failing to properly design and manufacture the subject oil/air separator so a fire would not occur;

    e.    Failing to use reasonable care when designing, manufacturing, providing warnings/instructions and/or installing the subject oil/air separator and other components in the Compressor Unit;

    f.    Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

    g.    Any other acts or omissions that may become known during the course of litigation.

52.    As a direct and proximate result of Sullair's negligence, the Fire occurred and caused extensive damage to Signal Peak's property and resulted in significant extra expense.

53.    Damages from the Fire totaled $2,355,271.00

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Sullair in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post-judgment interest and any other relief this Court deems just and proper.

Page 9 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

## COUNT VI – BREACH OF EXPRESS
## AND/OR IMPLIED WARRANTIES (SULLAIR)

54.   Plaintiff restates and re-alleges all paragraphs above.

55.   Sullair designed and manufactured components of the Plant that were incorporated into the Compressor Unit, including but not limited to the subject oil/air separator.

56.   Sullair impliedly and/or expressly warranted that its components, including but not limited to the subject oil/air separator, would be fit for the ordinary purpose such components are used, that such components would be fit for Signal Peak's particular purposes, that such components were of fair average quality and that the components would be free from defects.

57.   Sullair breached its express and/or implied warranties through the following acts and/or omissions:

   a.   Failing to design and manufacture the subject oil/air separator to allow for adequate grounding to prevent sparking or ignition;

   b.   Failing to provide adequate warnings and instructions as to the use, maintenance, and service of the subject oil/air separator;

   d.   Failing to properly design and manufacture the subject oil/air separator so a fire would not occur;

   e.   Failing to use reasonable care when designing, manufacturing, providing warnings/instructions and/or installing the subject oil/air separator and other components in the Compressor Unit;

   f.   Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

   g.   Any other acts or omissions that may become known during the course of litigation.

58.   As a direct and proximate result of Sullair's breach of its express and/or implied warranties, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1    59.    Damages from the Fire totaled $2,355,271.00

2        **WHEREFORE,** Plaintiff respectfully request this Court award it a judgment against

3    Sullair in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and

4    post- judgment interest and any other relief this Court deems just and proper.

5            **COUNT VII – STRICT PRODUCTS LIABILITY (SULLAIR)**

6        60.    Plaintiff restates and re-alleges all paragraphs above.

7        61.    At all pertinent times herein, Sullair was in the business of manufacturing,

8    assembling, designing, producing, inspecting, selling, and/or otherwise placing into the stream

9    of commerce components that were incorporated into the Compressor Unit, including but not

10   limited to the subject oil/air separator.

11       62.    Sullair, in whole or in part, manufactured, assembled, designed, produced,

12   inspected, an/or sold the subject components, including but not limited to the subject oil/air

13   separator, and/or placed the components into the stream of commerce.

14       63.    At the time the components, including but not limited to the subject oil/air

15   separator, left the control of Sullair, a defect existed that rendered the components defective in

16   that they were dangerous to an extent beyond that anticipated by the ordinary user.

17       64.    The components, including but not limited to the subject oil/air separator were

18   defective in manufacture, design and/or warning/instruction as:

19           a.    Sullair failed to design and manufacture the subject oil/air separator to
                  allow for adequate grounding to prevent sparking or ignition;

20
             b.    Sullair failed to provide adequate warnings and instructions as to the use,
21                maintenance, and service of the subject oil/air separator;

22           d.    Sullair failed to properly design and manufacture the subject oil/air
                  separator so a fire would not occur;

23
             e.    Sullair failed to use reasonable care when designing, manufacturing,

24

Page 11 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

providing warnings/instructions and/or installing the subject oil/air separator and other components in the Compressor Unit;

g.  Any other evidence of manufacturing, design and/or warning/instruction defects that may become known during the course of litigation.

65.  As a direct and proximate result of the defective condition of the components, including but not limited to the subject oil/air separator, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

66.  Damages from the Fire totaled $2,355,271.00

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Sullair in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post-judgment interest and any other relief this Court deems just and proper.

## COUNT VIII – NEGLIGENCE (POWER SERVICE)

67.  Plaintiff restates and re-alleges all paragraphs above.

68.  At all times relevant herein Power Service had a duty to exercise reasonable care when servicing, inspecting, and/or maintaining the Plant, including but not limited to the Compressor Unit, so as to avoid damage to Signal Peak's property.

69.  Power Service breached its duty through the following acts and/or omissions constituting negligence, including but not limited to:

a.  Failing to use reasonable care when performing service, inspection and/or maintenance work on the Plant, including but not limited to the Compressor Unit;

b.  Failing to warn Signal Peak of the dangerous condition and safety hazard posed by the Compressor Unit;

c.  Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

d.  Any other acts or omissions that may become known during the course of litigation.

Page 12 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

70.     As a direct and proximate result of Power Service's negligence, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

71.     Damages from the Fire totaled $2,355,271.00

WHEREFORE, Plaintiff respectfully request this Court award it a judgment against Power Service in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre- and post- judgment interest and any other relief this Court deems just and proper.

### COUNT IX – BREACH OF CONTRACT (POWER SERVICE)

72.     Plaintiff restates and re-alleges all paragraphs above.

73.     Signal Peak contracted with Power Service, whereby Power Service agreed to provide service, inspection and/or maintenance work on the Plant, including but not limited to the Compressor unit.

74.     Power Service breached its contractual duties through the following acts and/or omissions:

   a.   Failing to use reasonable care when performing service, inspection and/or maintenance work on the Plant, including but not limited to the Compressor Unit;

   b.   Failing to warn Signal Peak of the dangerous condition and safety hazard posed by the Compressor Unit;

   c.   Improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity; and

   d.   Any other acts or omissions that may become known during the course of litigation.

75.     As a direct and proximate result of Power Service's breach of contract, the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense.

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1   76.   Damages from the Fire totaled $2,355,271.00

2   **WHEREFORE**, Plaintiff respectfully request this Court award it a judgment against

3   Power Service in an amount to be proven at trial, together with costs, attorney's fees, expenses,

4   pre- and post- judgment interest and any other relief this Court deems just and proper.

5   <u>**COUNT X – BREACH OF EXPRESS AND/OR**</u>
    <u>**IMPLIED WARRANTIES (POWER SERVICE)**</u>

6

7   77.   Plaintiff restates and re-alleges all paragraphs above.

8   78.   Signal Peak contracted with Power Service, whereby Power Service agreed to

9   provide service, inspection and/or maintenance work on the Plant, including but not limited to

10  the Compressor Unit, and impliedly and/or expressly warranted that it would exercise reasonable

11  care in performing its duties so as to avoid damage to Signal Peak's property.

12  79.   Power Service breached its contractual duties through the following acts and/or

13  omissions:

14      a.   Failing to use reasonable care when performing service, inspection and/or
             maintenance work on the Plant, including but not limited to the
             Compressor Unit;

15      b.   Failing to warn Signal Peak of the dangerous condition and safety hazard
             posed by the Compressor Unit;

16

17      c.   Improperly delegating, hiring, and/or supervising the workmanship and
             safety of the services delegated and/or subcontracted to another entity; and

18

19      d.   Any other acts or omissions that may become known during the course of
             litigation.

20  80.   As a direct and proximate result of Power Service's breach of its express and/or

21  implied warranties, the Fire occurred and caused extensive damage to Signal Peak property and

22  resulted in significant extra expense.

23  81.   Damages from the Fire totaled $2,355,271.00

24                                                      Page 14 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1  **WHEREFORE,** Plaintiff respectfully request this Court award it a judgment against

2  Power Service in an amount to be proven at trial, together with costs, attorney's fees, expenses,

3  pre- and post- judgment interest and any other relief this Court deems just and proper.

4  ## COUNT XI – NEGLIGENCE (DOES)

5  82.  Plaintiff restates and re-alleges all paragraphs above.

6  33.  Upon information and belief, John Does 1-10 are individuals and/or companies,

7  including subcontractors and manufacturers, who participated in and/or provided products used

8  in the construction, manufacture, installation, maintenance, service, commissioning, and/or

9  inspection of the Plant, including but not limited to the Compressor Unit.

10  84.  Upon information and belief, Does 1-10 had duties of reasonable care in regard to

11  participating in or providing products for the construction, manufacture, installation,

12  maintenance, service, commissioning, and/or inspection of the Plant, including but not limited to

13  the Compressor Unit.

14  85.  Upon information and belief, Does 1-10 breached their duties by failing to

15  adequately perform construction, manufacture, installation, maintenance, service,

16  commissioning, and/or inspection services for the Plant, including but not limited to the

17  Compressor Unit, as well as failed to provide adequate products for the same.

18  86.  As a direct and proximate result of the actions and/or omissions of Does 1-10,

19  Fire occurred and caused extensive damage to Signal Peak property and resulted in significant

20  extra expense.

21  87.  Damages from the Fire totaled $2,355,271.00

22  **WHEREFORE,** Plaintiff respectfully request this Court award it a judgment against

23  Does 1-10 in an amount to be proven at trial, together with costs, attorney's fees, expenses, pre-

24

Page 15 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

1 | and post-judgment interest and any other relief this Court deems just and proper.

2 | ### DEMAND FOR TRIAL BY JURY

3 | Plaintiff hereby demands a trial by jury on all issues so triable.

4 | DATED this 15 day of August, 2016.

5 |

6 | Glenn W. Mattar #13228
Denenberg Tuffley, PLLC
28411 Northwestern Hwy.

7 | Suite 600
Southfield, MI 48034

8 | Phone: (248) 549-3900
Fax:    (248) 593-5808

9 | E-mail: gmattar@dt-law.com

10 | And

11 | Jack Slavik #5962
Cozen O'Connor

12 | 999 Third Avenue, Suite 1900
Seattle, WA 98104

13 | Phone:   (206) 373-7238
Fax:     (866) 229-5685

14 | Email: jslavik@cozen.com

15 | *Attorneys for Plaintiff*

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 | Page 16 of 16

COMPLAINT AND DEMAND FOR TRIAL BY JURY

Denenberg Tuffley, PLLC
One Northwestern Plaza
28411 Northwestern Hwy., Ste. 600
Southfield MI 48034

CERTIFIED MAIL



91 7199 9991 7036 9951 5021



UNITED STATES POSTAGE
PITNEY BOWES
02 1P        $ 005.89°
0000803465      APR 18 2017
MAILED FROM ZIP CODE 48034

E-Receipt
Requested

Kevin A. Keeling
Keeling Law, LLC
3310 Katy Freeway, Suite 100
Houston TX 77007

77007$3603 C048

 **CRUM & FORSTER**
A FAIRFAX COMPANY

**Mark Yavinsky**
**Executive Specialist**, Environmental, Construction Defect and Surety Claims

**Crum & Forster**
500 Colonial Center Parkway
Suite 250
Roswell, GA 30376
T  770-810-2588
E  mark.yavinsky@cfins.com

## VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND ELECTRONIC MAIL

January 13, 2016

Mr. E.J. Devine
Chief Financial Officer
Generon IGS, Inc.
16250 Tomball Parkway
Houston, Texas 77088

| | | |
|---|---|---|
| Re: | Named Insured: | Generon IGS, Inc. |
| | Policy No.: | EPK-103197 |
| | Policy Period: | February 15, 2014 – February 15, 2015 |
| | Claimant: | Signal Peak Energy, LLC |
| | Our Claim No.: | NJU00577582 |
| | Date of Loss: | November 24, 2014 |

Dear Mr. Devine:

United States Fire Insurance Company ("U.S. Fire") is handling this claim on behalf of Crum & Forster Specialty Insurance Company ("C&F Specialty"). We are responding to notice that Generon IGS, Inc. ("Generon") has been sued and served with a lawsuit filed by Signal Peak Energy, LLC ("Signal") for damages arising out of a fire at Signal's mine in Roundup, Montana. The lawsuit is styled *Signal Peak Energy, LLC v. Generon IGS, Inc., et al.*, Cause No. DV-16-43 (In Montana's Fourteenth Judicial District Court, Musselshell County). This correspondence supplements any prior correspondence that Generon may have received on this matter from C&F Specialty. Please direct all future communications to my attention.

The purpose of this letter is to memorialize C&F Specialty's coverage position in this matter. Based upon a review of the factual allegations in Signal's Complaint, it appears that the alleged property damage is not covered under the C&F Specialty Policy referred to above. Accordingly, C&F Specialty will not be providing Generon with a defense in this matter. However, please

Crum & Forster is part of Fairfax Financial Holdings Limited.
CoverX and CoverXSpecialty are trademarks of CoverX Corporation.
C&F and Crum & Forster are registered trademarks of United States Fire Insurance Company.


**EXHIBIT**
tabbies
**3**



**CRUM & FORSTER**
A FAIRFAX COMPANY

forward any amended pleadings to us for review, as those amended pleadings may affect our coverage analysis.

## A SUMMARY OF PLAINTIFF'S FACTUAL ALLEGATIONS

The following is a summary of Signal's factual allegations taken from the Original Complaint. By citing Plaintiff's factual allegations, C&F Specialty takes no position as to the veracity of those allegations. Signal alleges that it owns a coal mine in Roundup, Montana. Signal contracted with Generon to install a nitrogen-generating plant ("the Plant") in the mine. Generon installed the Plant in the mine between August 2012 and April 2013. The Plant consists of multiple components, including a nitrogen production unit and compressor units.

The Plant had been idle for three weeks prior to November 24, 2014. On November 24, 2014, at approximately 9:30 a.m., a Signal Peak employee turned on the Plant. Approximately two hours later, smoke was discovered coming from one of the Plant's compressor units (C9) ("the Compressor Unit"). Upon further inspection, a fire was discovered within the Compressor Unit, and that the fire had spread to a nitrogen production unit and the motor control center. The fire was extinguished shortly thereafter.

However, the fire caused extensive damage to the Compressor Unit, the nitrogen production unit, and the motor control center. Subsequent expert investigations determined that the fire originated in the oil/air separator in the Compressor Unit. The investigation also concluded that Generon improperly installed the Compressor Unit. Specifically, Generon installed the Compressor Unit's oil pressure switch and temperature switch with the incorrect settings. The incorrect settings caused the Compressor Unit to shut down shortly after startup during Generon's commissioning process. Rather than correct the settings, Signal alleges that Generon employees wired around them, rendering them ineffective. Signal alleges that wiring around these safety devices contributed to the fire.

Signal has sued Generon; Sullair, LLC, the company that manufactured the oil/air separator; and Power Service, Inc., the company that maintained and serviced the Plant. Signal alleges damages totaling $2,355,271, which includes the cost of renting a temporary nitrogen generator while repairs to the Plant were ongoing. Signal's causes of action against Generon are for negligence, breach of express and implied warranties, breach of contract, and strict liability.

## A SUMMARY OF THE C&F SPECIALTY POLICY

C&F Specialty issued Policy No. EPK-103197 ("the C&F Specialty Policy") to Generon IGS, Inc. The C&F Specialty Policy incepted on February 15, 2014 and expired on February 15, 2015. The Policy contains multiple coverage parts; however, for purposes of this incident, the "Commercial General Liability Occurrence Coverage Part" is the relevant coverage part. The Policy provides limits of $1,000,000 each accident, subject to a $2,000,000 products-completed



operations hazard aggregate limit. The C&F Specialty Policy is also subject to a $10,000 "each occurrence" deductible for bodily injury and property damage liability combined.

## A SUMMARY OF C&F SPECIALTY'S COVERAGE POSITION

Based upon a review of the facts alleged in Signal's Original Complaint, and a comparison of those facts with the terms and conditions of the C&F Specialty Policy, please be advised that C&F Specialty has determined that it has no present duty to defend or indemnify Generon with regard to Signal's claim. Although C&F Specialty relies on the entire contents of the Policy in support of its coverage position, C&F Specialty directs your attention to the following terms and conditions:

1.      As discussed above, the relevant coverage is contained in the "Commercial General Liability Occurrence Coverage Part" [EN0021-0211]. Paragraph 1 of Insuring Agreement A – Bodily Injury and Property Damage - states in relevant part as follows:

SECTION I - INSURING AGREEMENTS

**1.      Insuring Agreement A - Bodily Injury And Property Damage**

a.      We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies. We may, at our discretion, investigate any "occurrence" and settle any "claim" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I - Defense or Section II - Defense Expenses within the Common Provisions.

b.      This insurance applies to "bodily injury" and "property damage" only if all of the following conditions are met:

(1)      Before the "policy period", no insured had knowledge of any "occurrence" that could reasonably give rise to a "claim" under this Policy;

(2)      Neither the "claim" for that "bodily injury" or "property damage", nor the "occurrence" resulting in that "bodily injury" or "property damage" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;



**CRUM & FORSTER**
A FAIRFAX COMPANY

(3)    No fact, incident or circumstance involving an "occurrence" or offense that reasonably would have resulted in a "claim" for that "bodily injury" or "property damage" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4)    That "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(5)    That "bodily injury" or "property damage" first occurs during the "policy period"; and

(6)    A claim for "damages" for that "bodily injury" or "property damage" is made against any insured and reported to us in accordance with the provisions set forth in Section VI Common Conditions, 5. Duties In the Event of A Claim or Suit within the Common Provisions.

Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "occurrence" in relevant part as follows:

26.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "property damage" in relevant part as follows:

33.    "Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that causes it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Signal alleges that Generon employees wired around the oil pressure and temperature safety switches on the Compressor Unit, thus rendering them ineffective. C&F Specialty reserves the right to deny coverage to the extent it is determined that the fire was not the result of an "occurrence."



2.      Paragraph 2.d of Section II – Additional Exclusions – of the Commercial General Liability Occurrence Coverage Part – states in relevant part as follows:

> 2.      The following additional exclusions apply to Insuring Agreement A – Bodily Injury And Property Damage in addition to those contained within the Common Provisions:
>
> Insuring Agreement A does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit" for:
>
> \*          \*          \*
>
> **d.      Damage to Your Product**
>
> "Property damage" to "your product", or any part of it.

Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "your product" in relevant part as follows:

> **38.**      "Your product":
>
> **a.**      Means:
>
> >   **(1)**      Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:
> >
> > >      **(a)**      You;
> > >
> > >      **(b)**      Others trading under your name;
> > >
> > >      **(c)**      A person or organization whose business or assets you have acquired; and
> >
> >   **(2)**      Containers (other than vehicles), materials, parts of equipment furnished in connection with such goods or products.
>
> **b.**      includes:



1.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

2.    The providing of or failure to provide warnings or instructions.

c.    Does not include vending machines or other property rented to or located for the use of others but not sold.

Signal has alleged that the Plant and its components were supplied by Generon. In Count IV of the Complaint, Signal alleges that Generon, in whole or in part, manufactured, assembled, designed, produced, inspected and/or sold the Plant, including but not limited to the Compressor Unit. In Count Two of the Complaint, Signal alleged that Generon made and breached express and implied warranties regarding the Plant and failed to provide adequate warnings and instructions as to the use, maintenance, operation and service of the Plant. Signal has not alleged that there was damage to property other than the Plant. Accordingly, as the alleged damages are for the cost of repairing Generon's product, including the cost of renting a temporary nitrogen generator while the Plant was being repaired, these damages are not covered under the C&F Specialty Policy.

3.    Paragraph 2.e of Section II – Additional Exclusions – of the Commercial General Liability Occurrence Coverage Part – as amended by the "Amendment to Damage to Your Work Exclusion Endorsement" [EN0346-0313] states in relevant part as follows:

2.    The following additional exclusions apply to Insuring Agreement A – Bodily Injury And Property Damage in addition to those contained within the Common Provisions:

Insuring Agreement A does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit" for:

\*        \*        \*

e.    **Damage to Your Work**

"Property damage" to "your work" or any part of it and included in the "products-completed operations hazard".

However, this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.



Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "products-completed operations hazard" in relevant part as follows:

31.    "Products-completed operations hazard":

    a.    With respect to the Commercial General Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work"; or

    b.    With respect to the Contractors Pollution Liability Coverage Part, includes all "bodily injury" and "property damage" occurring away from premises you own or rent and caused by "pollution conditions" arising out of "your product" or "your work";

Except:

    (1)    Products that are still in your physical possession; or

    (2)    Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a)    When all of the work called for in your contract has been completed.

        (b)    When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c)    When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    c.    Does not include "bodily injury" or "property damage" arising out of:



**CRUM & FORSTER**
A FAIRFAX COMPANY

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials;

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the Policy Aggregate limit.

Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "your work" in relevant part as follows:

39. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

Signal has alleged that Generon installed and commissioned the Plant and its various components at the mine. Signal has not alleged that Generon used subcontractors to perform the installation and commissioning work. Signal has not alleged that the fire caused damage to property other than the Plant. Accordingly, as the alleged damages are for the cost of repairing Generon's own work, including the cost of renting a temporary nitrogen generator while the Plant was being repaired, these damages are not covered under the C&F Specialty Policy.



Although the basis set forth above provide a sufficient basis to support C&F Specialty's disclaimer of coverage, C&F Specialty reserves the right to deny coverage on these additional bases:

4.      Paragraph 2 of Section V – COMMON EXCLUSIONS – of the Common Provisions Form [EN0020-1212] states in relevant part as follows:

**SECTION V – COMMON EXCLUSIONS**

The following exclusions apply to all Coverage Parts attached to this Policy except where specifically noted:

This Policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

*       *       *

2.      **Contractual Liability**

Based upon or arising out of any liability for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for "damages":

a.      That the insured would have in absence of the contract or agreement; or

b.      Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured shall be deemed to be "damages" because of "bodily injury" or "property damage", and not "defense expenses" if:

(1)     Liability to such party for, or for the cost of, that party's defense has also been assumed by the insured in the same "insured contract"; and



**CRUM & FORSTER**
A FAIRFAX COMPANY

> **(2)** Such attorney's fees and litigation expenses are: (i) for defense of that party against a "suit"; and (ii) recovered in a "suit" by that party against the insured.

Signal has sued Generon for breach of express and implied warranties, as well as breach of contract. C&F Specialty reserves the right to deny coverage to Generon to the extent that Generon is found to have assumed obligations in its contract with Signal that are broader than those imposed by law and that its liability, if any, to Signal is based upon a determination that Generon breached those duties.

5.      Paragraph 1.c of Section II – Additional Exclusions – of the Commercial General Liability Occurrence Coverage Part – as amended by the "Amendment to Damage to Your Work Exclusion Endorsement" [EN0346-0313] states in relevant part as follows:

**SECTION II – ADDITIONAL EXCLUSIONS**

> **1.**     The following additional exclusions apply to Insuring Agreement A – Bodily Injury And Property Damage and Insuring Agreement B – Personal and Advertising Injury in addition to those contained within the Common Provisions:
>
> This Policy does not apply to "damages", "defense expenses", "cleanup costs" or any loss, cost or expense, or any "claim" or "suit":
>
> \*          \*          \*
>
> **c.**     **Professional Services**
>
> Based upon or arising out of any insured's rendering or failure to render "professional services."

Section VII – Common Definitions – of the Common Provisions Form [EN0020-1212] defines "professional services" in relevant part as follows:

> **32.**     "Professional services" means those functions performed for others by you or by others on your behalf that are related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager.

Signal has alleged, among other things, that Generon failed to use reasonable care in designing the Plant so that a fire would not occur. We understand that Generon designed and engineered the Plant for Signal. C&F Specialty reserves the right to deny coverage to Generon for its



**CRUM & FORSTER**
A FAIRFAX COMPANY

liability, if any, to Signal on this basis if it is determined that the fire and related damage arose out of Generon's rendering or failure to render its professional services.

## SUMMARY AND CONCLUSION

Based upon the facts alleged in Signal's Original Complaint, and the terms and conditions of the Policy, C&F Specialty concludes that it has no present duty to defend Generon. C&F Specialty's coverage position is based upon its investigation to date. Nothing in this letter is to be construed as a waiver by C&F Specialty of any policy terms, conditions, exclusions or limitations not expressed in this letter or as a waiver, relinquishment or other limitation of its rights. If you have any other information you believe impacts C&F Specialty's coverage determination, please provide it to the undersigned immediately for consideration.

This letter quotes the Policy in part. However, please refer back to the Policy itself for the complete and precise language of the Policy. The language cited in this letter is not meant to change, supplement, add or subtract from the policy terms. The language in the Policy itself is controlling.

C&F Specialty specifically reserves the right to amend its coverage position, either reserving additional rights or declining coverage, both under any of the terms, conditions, exclusions, and other provisions in this letter and any terms, conditions, exclusions, or other provisions that are not discussed in this letter. The position set forth in this letter may not be exhaustive. Other reasons for non-coverage may come to light in the future. C&F Specialty reserves the right to rely upon other terms or conditions of its Policy that are appropriate to deny coverage or reserve rights in light of any additional information developed. Accordingly, none of the acts of C&F Specialty's agents, attorneys or employees are to be construed by you as a waiver or estoppel against C&F Specialty. Further, no conduct of C&F Specialty is to be construed as a waiver or surrender of the Policy limitations, exclusions, conditions or agreements, all of which are specifically reserved.

To the extent that you have any other information or documents that you believe may be relevant to C&F Specialty's understanding and complete knowledge of this matter, please send it to us as soon as reasonably possible.

Should you have any questions or comments concerning any of the foregoing, please do not hesitate to contact me.

Sincerely,

Mark Yavinsky



Executive Specialist
Environmental, Construction Defect and Surety Claims



**KEELING LAW, LLC**

Kenneth A. Keeling
KenK@keelinglaw.com
713-579-3024

February 13, 2017

Crum & Forster
500 Colonial Center Parkway
Suite 250
Roswell, GA 30376

Attn: Mark Yavinsk, Executive Specialist, Environmental,
Construction Defect and Surety Claims

Re:   Named Insured:      Generon IGS, Inc.
      Policy No.:         EPK-103197
      Policy Period:      February 15, 2014 – February 15, 2015
      Claimant:           Signal Peak Energy, LLC
      Your Claim No.:     NJU00577582
      Date of Loss:       November 24, 2014

Dear Mr. Yavinsky:

This letter responds to your letter dated January 13, 2016[1] transmitted to Mr. E.J. Devine, Chief Financial Officer of Generon IGS, Inc. (the "Disclaimer"). The Disclaimer refers to notice that Generon IGS, Inc. ("Generon") has been sued and served with a lawsuit filed by Signal Peak Energy, LLC ("Signal") for damages arising out of a fire at Signal's mine in Roundup, Montana. The lawsuit is styled *Signal Peak Energy, LLC v. Generon IGS, Inc., et al.*, Cause No. DV-16-43 (In Montana's Fourteenth Judicial District Court, Musselshell County) (the "Lawsuit"). This firm represents Generon as to the issues set forth in this response to the Disclaimer. Please direct future communications to our office, but feel free to copy Generon.

Please note that the Complaint has been filed but that Generon has not yet been served with process.

---

[1] From context, 2017 was the intended year.

**EXHIBIT**
tabbies
**4**

### Plaintiff's Factual Allegations

The Complaint includes allegations as follows.

Signal Peak owned a coal mine located in Roundup, Montana.[2]  Generon installed and commissioned the various components of the Plant in various stages from August, 2012 through April 2013, which included nitrogen generating and compressor units (among other components).[3]  When a Signal Peak employee turned on the Plant (that had been idle for three weeks) on November 24, 2014, he discovered smoke escaping from the C9 Compressor Unit and discovered a fire within the Compressor Unit.[4] Upon further inspection, it was discovered that the fire had spread to a nitrogen production unit (NPU2) and the motor control center.[5]

Subsequent expert investigations revealed the Fire originated in the oil/air separator in the Compressor Unit.  The oil/air separator was manufactured by Defendant Sullair. Generon improperly installed the Compressor Unit's oil pressure switch and temperature switch (safety devices) with the incorrect setting. The failure of the switches to be installed correctly caused and/or contributed to the damages.[6]

At paragraphs 29, 35, 40 and 47, Signal Peak alleges "the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense."

The Complaint alleges causes of action against Generon for negligence, gross negligence, breach of express and implied warranties, breach of contract and strict products liability. The Complaint further alleges causes of action against:
   . Sullair for negligence, breach of express and implied warranties and strict liability,
   . Power Service for negligence, breach of contract, and breach of express and implied warranties, and
   . John Does 1-10 for negligence.

### C&F Specialty's Summary of Coverage

As understood, C&F Specialty asserts that damages are not covered by Policy EPK-103197 (the "Policy") as:

---

[2] Complaint, ¶ 8.
[3] Complaint, ¶ 10.  Please note with regard to this allegation that Generon will contest the allegation.  The Plant was not installed by Generon.  Generon provided commissioning services to the extent requested by Signal Peak.
[4] Complaint, ¶¶ 11-13.
[5] Complaint, ¶ 13.
[6] Complaint, ¶¶ 18-25.

. the alleged damages are for the cost of repairing Generon's product, including the cost of renting a temporary nitrogen generator while the Plant was being repaired,[7] and

. the alleged damages are for the cost of repairing Generon's own work;[8]

As understood, C&F Specialty reserves rights to deny coverage:

. to the extent it is determined that the fire was not the result of an "occurrence";[9]

. to the extent that Generon is found to have assumed obligations in its contract with Signal that are imposed by law and that its liability, if any, to Signal is based upon a determination that Generon breached its duties,[10] and

. if it is determined that the fire and related damage arose out of Generon's rendering or failure to render its professional services.[11]

The Disclaimer alleges that C&F Specialty has no present duty to defend Generon based on the facts alleged in Signal's Original Complaint.[12]  Generon's review of the Disclaimer indicates that C&F Specialty's Disclaimer relies on enumerated exclusions rather than a determination that indemnity is not owed except to the extent identified in the enumerated policy exclusions.


## Duty to Defend

The insurer's duty to defend is triggered if the plaintiff alleges facts that would give rise to any claim against the insured that is covered by the policy. *Don's Building Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W. 3d 20, 31 (Tex. 2008). This rule is often called the "complaint allegation rule" or the "eight corners rule" as the duty to defend depends on the allegations of complaint and the terms of the policy.

In determining whether the insurer has a duty to defend, the court is required to resolve in favor of the insured any doubts about whether allegations of the petition potentially state a cause of action within the coverage of the insurance policy. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). In contrast to the duty to indemnify, which arises only if the facts actually established in the underlying suit amount to a covered claim, the duty to defend arises if a plaintiff's factual allegations, read together with the insurance policy at issue, potentially support a covered claim. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church,* 197 S.W.3d 305, 310 (Tex. 2006); *see also Burlington N. & Santa Fe Ry. v. Nat'l Union Fire Ins. Co.,* 334 S.W.3d 217, 219 (Tex.2011). The allegations should be considered in light of the policy provisions, without reference to their truth or falsity, to what the parties know or believe the true facts to be, or to a legal determination of those facts. *Argonaut S.W. Ins. Co. v. Maupin*, 500 S.W. 2d 633, 635

---

[7] Disclaimer, pg. 6.
[8] Disclaimer, pg. 8.
[9] Disclaimer, pg. 4.
[10] Disclaimer, pg. 10.
[11] Disclaimer, pg. 11
[12] Disclaimer, pg. 11.

(Tex. 1973). When the allegations are not clearly either within the policy coverage or outside of it, the insurer is obligated to defend if there is a potential case within the policy coverage. *Republic Vanguard Ins. Co. v. Mize*, 292 S.W. 2d, 214, 219-221 (Tex. App. – Amarillo 2009, no pet.).

The duty to defend is not affected by facts ascertained before suit, developed during litigation, or by the ultimate outcome of the suit. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 829 (Tex.1997). "Even if the allegations are groundless, false, or fraudulent, the insurer is obligated to defend." *Zurich American Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 491 (Tex. 2008). Further, "[i]f a complaint potentially includes a covered claim, the insurer must defend the entire suit." *Id.*

An insurer must defend its insured against suit as long as the allegations potentially give rise to at least one claim covered by the insurance policy, regardless of the number of claims potentially not covered  *See Utica Nat'l Ins. Co. v. Am. Indem. Co.,* 141 S.W.3d 198, 201-02 (Tex. 2004)

### "Your Product" Exclusion – Alleged Damages
### (Ref. Paragraph 2. of the Disclaimer)

The Complaint alleges at least the following elements concerning Signal Peak property:

- "At all times relevant herein, Signal Peak owned a coal mine"[13]

- "The Mine has a containerized nitrogen generating plant"[14]

- "the Fire occurred and caused extensive damage to Signal Peak property and resulted in significant extra expense."[15]  Such allegation at paragraph 29 follows an allegation at paragraph 27 that "Generon had a duty to exercise reasonable care when designing, manufacturing, installing commissioning, inspecting and or servicing the Plant, including the Compressor Unit, so as to avoid damage to Signal Peak's property."[16]

The Complaint alleges the fire originated in the oil/air separator in the Compressor Unit[17] and spread to a nitrogen production unit (NPU2) and the motor control center.[18]

The Complaint defines the Mine[19], the Plant[20], and the Compressor Unit.[21]

---

[13] Complaint ¶ 8.
[14] Complaint ¶ 9.
[15] Complaint ¶ ¶ 29, 35, 40, 47.
[16] Complaint ¶ 27..
[17] Complaint, ¶ 18.
[18] Complaint, ¶ 13.
[19] Complaint, ¶ 8.
[20] Complaint, ¶ 9.
[21] Complaint, ¶ 12.

4

The Disclaimer alleges that the damages alleged are for the cost of repairing Generon's product and for renting a temporary nitrogen generating Plant while the Plant was being repaired. The Disclaimer statement assumes the Complaint alleges damages that are <u>limited to</u> Generon product including rental of a temporary nitrogen unit. The Disclaimer's restriction of the allegations of the Complaint is not justified.

The Complaint could have asserted damage solely to the Plant or the Compressor Unit, particularly in view of allegations that Generon "installed and commissioned the various components of the Plant".[22] The Complaint describes damage to the Compressor Unit, the nitrogen production unit, and the motor control center and alleges extra expenses in renting a temporary nitrogen generator when repairs to the plant were ongoing. The Complaint does not allege that damages were <u>limited to</u> Generon's product and rental cost during repair. Instead, the Complaint alleges damages to a broader category of property, namely Signal Peak property and extra expense.

Each of the allegations of damage by Signal Peak are readily susceptible to an interpretation that the damage is to a broad category of damage, including the Mine and any other property of Signal Peak. Any doubt is to be resolved in favor of the insured. Generon respectfully demands that C&F Specialty withdraw its refusal to defend Generon as defense is required pursuant to the terms of the Policy in relation to the allegations of the Complaint.

### "Your Product" Exclusion – Allegations as to "Your Product" (Ref. Paragraph 2. of the Disclaimer)

The Disclaimer assumes that the Plant designed and installed is a "product" for purposes of the "Your Product" exclusion. Under the Policy, "your product" is defined to include "Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of . . ." [by Generon].

In *CU Lloyd's of Texas v. Main Street Homes, Inc.,,* 79 S.W. 3d 687 (2002) (Civ. App. – Austin) Lloyds' asserted, among other things, that Lloyd's had no duty to defend a building contractor for damage to a residence as the definition of "your product" did not extend to "goods or products . . . manufactured, sold, distributed or disposed of . . ." [by the contractor]. *Id.,* at 697.

The court summarily disposed of such argument with regard to the duty to defend, as follows:

> Main Street responds that the definition of "your product" does not apply to a building and its components. In support of its argument, Main Street relies on *Mid-United Contractors, Inc. v. Providence Lloyds Insurance Co.,* which interpreted the term as "not apply[ing] to the construction of

---

[22] Complaint, ¶ 10.

5

> [a] building because in ordinary language buildings are constructed or
> erected, not manufactured, and because any ambiguity in the policy
> language must be construed against the insurer and in favor of the
> insured." 754 S.W.2d 824, 826 (Tex.App.-Fort Worth 1988, writ
> denied). We agree with the Second Court of Appeals' analysis.

*Id.,* at 697.

Where, as here, the complaint alleges damage to "real property" the exclusion cannot
apply because it excludes coverage only for damage to goods or products, "other than
real property", E*ssex Ins. Co. v. Bloom South Flooring Corp.,* 562 F.3d 399, 409, (1st
Cir. 2009), (citing *CU Lloyds,* supra).

The Complaint alleges at least the following elements concerning Signal Peak property:

-   "At all times relevant herein, Signal Peak owned a coal mine"[23]

-   "The Mine has a containerized nitrogen generating plant"[24]

-   "the Fire occurred and caused extensive damage to Signal Peak property and
    resulted in significant extra expense."[25]  Such allegation at paragraph 29 follows
    an allegation at paragraph "Generon had a duty to exercise reasonable care when
    designing, manufacturing, installing commissioning, inspecting and or servicing
    the Plant, including the Compressor Unit, so as to avoid damage to Signal Peak's
    property."

The Complaint alleges that Generon installed the nitrogen generating Plant in various
stages from August, 2012 through April 2013 and that the Plant included nitrogen
generating and compressor units among other components.[26]

Mineral property, such as a coal mine, is real property in Texas. *See* Texas Property Tax
Code, Sect. 1.04. Mineral property is real property in Montana. *See,* e.g. *Bergum v.
Musselshell County*, 367 P.3d 353 (Montana Supreme Court 2016).

Signal Peak asserts a general claim for damages to Signal Peak property.  The Complaint
identifies the coal mine as Signal Peak property.  Signal Peak could have alleged
damages that relate solely to the Plant, the Compressor Unit and/or repairs thereto, but
instead alleges damages to "Signal Peak property."

Each of the allegations of damage by Signal Peak are readily susceptible to an
interpretation that the damage is to a broad category of property, including the Mine and
any other property of Signal Peak. Generon respectfully demands that C&F Specialty

---

[23] Complaint ¶ 8.
[24] Complaint ¶ 9.
[25] Complaint ¶ ¶ 29, 35, 40, 47.
[26] Complaint, ¶¶ 9, 10.

withdraw its refusal to defend Generon as defense is required pursuant to the terms of the Policy in relation to the allegations of the Complaint.

## "Your Work" Exclusion
### (Reference Disclaimer paragraph 3).

As indicated in the Disclaimer, the property damage to your work exclusion includes an exception, as follows:  "However, this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The Disclaimer states at page 8 that Signal has not alleged that Generon used subcontractors to perform installation and commissioning work.

The Complaint alleges, among other things, that Generon breached duties or warranties by improperly delegating, hiring, and/or supervising the workmanship and safety of the services delegated and/or subcontracted to another entity.[27]

Other allegations of the Complaint are consistent with an allegation of installation of Plant components by others:

- Upon information and belief, John Does 1-10 are individuals and/or companies, including subcontractors and manufacturers, who participated in and/or provided products used in the construction, manufacture, installation, maintenance, service, commissioning and/or inspection of the nitrogen generating plant, including but not limited to the subject compressor unit.[28]
- The plant was supplied by Generon and installed/commissioned in various stages from August, 2012 through April 2013.[29]
- Subsequent expert investigations revealed the Fire originated in the oil/air separator in the Compressor Unit.[30]  The oil/air separator was manufactured by Defendant Sullair.[31]
- Sullair breached its duty through the following acts and/or omissions constituting negligence and/or gross negligence, including but not limited to . . .  Failing to use reasonable care when designing, manufacturing . . . and/or installing the subject oil/air separator and other components in the Compressor Unit.[32]
- Does 1-10 breached their duties by failing to adequately perform construction, manufacture, installation  . . . and/or inspection services for the Plant, including but not limited to the Compressor Unit.[33]

---

[27] Complaint, ¶ 28, 34.
[28] Complaint, ¶ 5
[29] Complaint, ¶ 9
[30] Complaint, ¶ 18.
[31] Complaint, ¶ 19.
[32] Complaint, ¶ 51.
[33] Complaint, ¶ 85

Accordingly, Signal Peak asserts that Generon installed various components of the Plant and that Generon breached duties or warranties by improperly delegating, hiring, and/or supervising subcontractors who installed various components of the Plant. Signal Peak identifies a specific subcontractor, Sullair, and asserts on information and belief the existence of others, namely Does 1-10. Such allegations by Signal Peak are readily susceptible to an interpretation that Generon subcontracted some or all of the installation work, thus giving rise to the exception from the completed-hazards exclusion for damage arising from work performed on Generon's behalf by a subcontractor.

Accordingly, Generon respectfully demands that C&F Specialty withdraw its refusal to defend Generon as defense is required pursuant to the terms of the Policy in relation to the allegations of the Complaint.

### Duty to Indemnify

The insurer's duty ultimate duty to indemnify depends on facts as proven. Duty to defend and duty to indemnify are separate and distinct duties that are not dependent on each other. Because the duty to indemnify turns on the facts as established, the insurer may have a duty to indemnify even though the allegations of the complaint did not give rise to the duty to defend. See *D. R. Horton-Texas, LLC v. Market Int'l Ins. Co.*, 53 Tex. Sup. Ct. 1, 170,172, 300 S.W.3d 240 (Tex. 2009); *Utica Nat'l Is. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004).

The Signal Peak Complaint alleges:
. wrongful conduct of Generon including, among other things, negligence;
. work performed or potentially performed by subcontractors, namely Sullair and Does 1-10, and
. general damages to Signal Peak property.

The Signal Peak Complaint fails to identify:
. modifications to the Plant that changed its structure and function after alleged installation by Generon;
. Plant installation by Signal Peak, and
. Damage to equipment installed by Signal Peak to modify the structure and function of Plant components.

The foregoing matters and other facts will necessarily be resolved through pending discovery. In view of the allegations of the Complaint as hereinbefore outlined with regard to the duty to defend, Generon demands that C&F Specialty indemnify Generon unless and until facts are ultimately established that relieve C&F Specialty of an obligation to indemnify Generon under the terms of the Policy. Generon reserves all rights in relation to C&F Specialty's disclaimer of indemnity.

8

**Summary**

The allegations of the Complaint are reasonably susceptible to an interpretation of alleged damages that are not limited to the "your product" exclusion of the Policy. The allegations of the Complaint are reasonably susceptible to an interpretation that damages are subject to the subcontractor exception to the completed-hazards exclusion of the Policy. The allegations of the Complaint set forth causes of action against Generon for, among other things, negligence, gross negligence and strict liability.

Generon has not addressed aspects of the Disclaimer that are described as reservations of rights by C&F Specialty. Generon reserves all rights under the Policy and at law.

Generon respectfully demands that C&F Specialty defend and indemnify Generon.

Sincerely,

Kenneth A. Keeling

Copy by electronic transmission to:
Mark Yavinsky - mark.yavinsky@cfins.com
E J Devine – edevine@generon.com

9

# THOMPSON
## COE

Thompson, Coe, Cousins & Irons, L.L.P.
Attorneys and Counselors

Brian S. Martin
Direct Dial: (713) 403-8282
bmartin@thompsoncoe.com

Austin
Dallas
Houston
Los Angeles
New Orleans
Saint Paul

**EXHIBIT**

tabbies

**5**

February 23, 2017

Kenneth Keeling, Esq.
Keeling Law Firm
3310 Katy Freeway, Suite 100
Houston, Texas 77007

**VIA CERTIFIED MAIL / RRR**

Re:   *Signal Peak Energy, LLC v. Generon IGS, Inc., et al.*; Cause No. DV-16-43
      (In the Fourteenth District Court of Montana, Musselshell County)

Dear Mr. Keeling:

Please be advised that our firm has been retained as coverage counsel on behalf of Crum & Forster Specialty Insurance Company ("C&F Specialty") with regard to the above-referenced matter. Please direct all future correspondence to my attention. We are writing in response to your letter, dated February 13, 2017 and addressed to Mark Yavinsky at Crum & Forster.

We have reviewed the matters set forth in your letter. The facts concerning Generon's installation and commissioning of its nitrogen-generating plant at Signal Peak's mine, the fire in the plant, and Signal Peak's subsequent investigation into the cause of the fire, are summarized in Paragraphs 8 through 25 of the Complaint. As alleged, the fire damaged the compressor unit, the nitrogen production unit, and the motor control center – all of which are components of the plant. Signal Peak did not allege any facts indicating that the fire caused damage to the mine itself or any other property belonging to Signal Peak other than the plant.

Specifically regarding the "Damage to Your Product" exclusion, it is correct that the definition of "your product" specifically excludes real property. However, Signal Peak's complaint does not allege any facts indicating that Generon's nitrogen-generating plant constitutes real property. Further, with regard to the "Damage to Your Work" Exclusion, Signal Peak has not alleged that Generon used subcontractors to install or commission the plant. In Paragraph 10, Signal Peak alleges that "Generon installed and commissioned the various components of the Plant, which included nitrogen generating and compressor units (among other components)." In Paragraphs 21 through 25, Signal Peak alleges how Generon employees improperly installed the compressor unit. There is no allegation that Sullair, as the manufacturer of the oil/air separator incorporated in the Compressor Unit, was Generon's subcontractor. Likewise, there is no allegation that Power Service, which maintained and serviced the plant, was Generon's subcontractor.

2659838v1
05060.823

One Riverway  |  Suite 1400  |  Houston, TX 77056  |  (713) 403-8210  |  Fax: (713) 403-8299

February 22, 2017
Page 2

As the Texas Supreme Court has explained in determining an insurer's duty to defend, "[i]n reviewing the underlying pleadings, the court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged." *National Union Fire Ins. Co. v. Merchant Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (1997) (per curiam). Courts are not required to "(1) read facts into the pleadings, (2) look outside the pleadings, or (3) imagine factual scenarios which might trigger coverage." *Test Masters Educational Services, Inc. v. State Farm Lloyds*, 791 F.3d 561, 564 (5th Cir. 2015). Your analysis would ask a court to read facts into the pleadings or to imagine factual scenarios which might trigger coverage.

Based upon Signal Peak's current pleadings, please be advised that C&F Specialty reiterates its position that it has no present duty to defend Generon against the claims asserted by Signal Peak in the above-referenced lawsuit. However, C&F Specialty will review any amended pleadings that Signal Peak may file or any additional information that Generon wishes to submit pertaining to this matter. Please be advised that C&F Specialty reserves all of its rights in this matter.

Please contact me if you have any questions concerning C&F Specialty's coverage position in this matter.

Sincerely,

Brian S. Martin

 **CRUM & FORSTER**
A member of the Crum & Forster Enterprise

**Joan Erickson**
Executive Specialist

**Crum & Forster**
305 Madison Avenue, Morristown, NJ 07962
Direct: (973) 490-6490
Fax: (877) 622-6204
Email: joan.erickson@cfins.com

April 6, 2015

**Via Certified Mail – Return Receipt Requested**

Ed Devine
Generon IGS Inc
16250 Tomball Parkway
Houston TX 77086.

    Re:    Insured:    Generon IGS Inc
             Date of Loss:    11/24/2014
             Policies:    EPK-103197
             Our File #:    NJU00577582

Dear Mr. Devine,

       I am writing on behalf of United States Fire Insurance Company, ("U.S. Fire") the claim administrators for Crum & Forster Specialty Insurance Company (C&F), to formally acknowledge receipt of a claim for fire damage suffered by Signal Peak Coal Mine on 11/24/2014. It is alleged that the cause of the fire may have been your generator, as the fire originated inside a Generon containerized nitrogen generator that was designed and installed by Generon two years earlier.

       U.S. Fire is responding to this matter under policy EPK-103197 effective February 14, 2014 to February 15, 2015. The policy provides Commercial General Liability Coverage with a $1,000,000 limit for each occurrence, and $2,000,000 in the general aggregate.

       As set forth more fully below, based upon its investigation to date and the facts giving rise to this claim, U.S. Fire respectfully disclaims coverage to Generon IGS Inc based upon the exclusion as outlined below.

<u>**COVERAGE PROFILE**</u>

       C&F issued a commercial general liability policy to Generon. As noted above, the policy was issued effective 02/14/14 – 02/14/15 and has a $1,000,000 limit per occurrence and $2,000,000 in the general aggregate.

       The C&F policy contains the following relevant insuring agreements:

**SECTION I – INSURING AGREEMENTS**



**CRUM & FORSTER**
A member of the Crum & Forster Enterprise

1. **Insuring Agreement A – Bodily Injury and Property Damage**

a.    We will pay, in excess of the Deductible shown in the Declarations, those sums that the insured becomes legally obligated to pay as "damages" for "bodily injury" or "property damage" to which this insurance applies. We may, at our own discretion, investigate any "occurrence" and settle any "claims" or "suit" that may result. But the amount we will pay for "damages" is limited as described in Section IV-Limits of Insurance and Deductible within the Common Provisions.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section I - Defense or Section II – Defense Expenses within the Common Provisions.

\*       \*       \*

The C&F policy contains the following relevant exclusions under Section II:

**SECTION II – ADDITIONAL EXCLUSIONS**

1.    The following additional exclusions apply to the Insuring Agreement A - Bodily Injury and Property Damage and Insuring Agreement B – Personal and Advertising Injury in addition to those contained in the Common Provisions:

This insurance does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit":

e.    **Damage To Your Product**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

The C&F policy contains the following relevant definitions with respect to Coverage A:

9.    "Damages" means the monetary amount of any judgment, award or settlement that an insured becomes legally obligated to pay as a result of a "claim" or "suit". "Damages" does not include "cleanup costs", equitable or non-pecuniary relief, disgorgement of profits, sanctions, fines or penalties.

33.    "Property damage" means:

2

**CRUM & FORSTER**
A member of the Crum & Forster Enterprise

a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it; or

b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

38. "Your Product":

a. Means:

   (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a) You;
      (b) Others trading under your name; or
      (c) A person or organization whose business or assets you have acquired; and

   (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:
   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
   (2) The providing or or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.


**COVERAGE POSITION**

Based on U.S. Fire's investigation of this matter and review of the information provided, U.S. Fire respectfully disclaims coverage of the fire damage to the generator and the container. If there is other damage not contained to the generator or container, we would be willing to review that damage for coverage.

This letter is based on information currently available. If you are aware of any information that might affect this analysis we ask that you provide it to us. We will review the information promptly.

No action undertaken by U.S. Fire in investigating the facts in connection with this claim shall be construed in any way as waiving any right or operating as an estoppel to assert any right which U.S Fire has under the law or the Policies, nor shall any such action be deemed in any way to be an admission of liability or an admission of coverage under the U.S. Fire Policy. This

3


**CRUM & FORSTER**
A member of the Crum & Forster Enterprise

correspondence is not intended, nor shall it be construed as an exhaustive listing of the policy terms, conditions, definitions or exclusions that might apply. While U.S. Fire has tried to identify and to address all of the coverage considerations that it feels are related to the above-referenced matter, the foregoing specificity is not intended, nor should it be construed as an estoppel, or waiver of any further right or basis which U.S. Fire may have to disclaim coverage, and expressly reserves all rights and defenses in this regard. Moreover, there may be other terms and conditions of the U.S. Fire Policies which, although not specifically mentioned in this letter, may apply to above-referenced claim. The U.S. Fire Policies, in their entirety, are incorporated by reference as if it had been stated in full and U.S. Fire reserves the rights under the U.S. Fire Policies and applicable law to cite additional policy provisions as may be appropriate. Neither this correspondence nor any subsequent communication should be deemed or construed as an admission of coverage under these Policies, or as a waiver of any right or defense to coverage available under such policies or at law or in equity. Moreover, if you are aware of any additional information or authorities that would require re-evaluation of U.S. Fire's position, we would ask that you please provide it to us immediately.


Please be further advised that if you disagree with U.S. Fire's coverage position, you may request reconsideration of that decision, which is referred to as an internal appeal. An internal appeal must be submitted in writing to the undersigned claim representative at the address listed on this letter. Following receipt of your written request, it will be submitted to U.S. Fire's Internal Appeals Panel for review. The Internal Appeals Panel will review your written appeal request within ten (10) days of receipt in our offices. The Internal Appeals Panel decision will be sent to you within three (3) business days following completion of the review process.

Should you have any questions please contact me.

Sincerely,


Joan Erickson, Executive Specialist
305 Madison Avenue
Morristown, NJ 07960-6117
Phone: 973-490-6490
FAX: 877-622-6203
Joan.Erickson@cfins.com

4



### KEELING LAW, LLC

Kenneth A. Keeling
KenK@keelinglaw.com
713-579-3024

March 7, 2017

Mr. Brian S. Martin
Thompson, Coe, Cousins & Irons, LLP
One Riverway, Suite 1400
Houston, Texas 77056

Re:  *Signal Peak Energy, LLC v. Generon IGS, Inc., et al.;* Cause No. DV-16-43;
In the Fourteenth District Court of Montana, Musselshell County.

| | |
|---|---|
| Named Insured: | Generon IGS, Inc. |
| Policy No.: | EPK-103197 |
| Policy Period: | February 15, 2014 – February 15, 2015 |
| Claimant: | Signal Peak Energy, LLC |
| C&F Claim No.: | NJU00577582 |
| Date of Loss: | November 24, 2014 |

Dear Mr. Yavinsky:

This letter supplements my letter addressed to Crum & Forster to the attention of Mr.
Mark Yavinsky dated February 13, 2017 (the "Generon Initial Response"), in response to
a Crum & Forster letter dated January 13, 2016[1] transmitted to Mr. E.J. Devine, Chief
Financial Officer of Generon IGS, Inc. (the "Disclaimer").   The statements of the
Generon Initial Response are adopted herein and incorporated herein by reference.

On or about April 13, 2016, Mr. Glenn Mattar of the firm Denenberg Tuffley, PLLC and
Mr. Jack Slavik of the firm Cozen O'Conner sent a formal demand letter to Katherine
Huso, counsel for Generon requesting payment of damages asserted in the Lawsuit ()the
"Formal Demand").   A copy of the Formal Demand is attached as Exhibit A.   The third
page of the Formal Demand sets forth an itemization of alleged damages in the fire loss at
the Signal Peak coal mine on November 24, 2014.   The letter does not identify the
claimants.   From prior correspondence, which can be provided if needed for your
analysis, it is apparent that at least some of the various parties assert subrogation claims.



EXHIBIT
6

---

[1] From context, 2017 was the intended year.

The damages identified in the Damage Summary include:

| CEI- Motor Control Unit (Electrical) and a CED | $ 64,340.00 |
| CED – Switchgear (Electrical) | $ 35,250.00 |
| Power Service Co – Compass Control Replacement | $  1,169.53 |

Generon did not manufacture, sell, handle, distribute, or dispose of any of the foregoing property. The foregoing property, at a minimum, is not "your product" within the meaning of the "your property" exclusion of the Policy. In addition, the Extra Expense section of the Damage Summary inherently includes extra expense for loss of use of the switchgear and motor control center.

The Complaint alleges damage to the motor control center at paragraph 15. C&F Forster's assertion that the motor control center is a component that was manufactured, sold, handled, distributed or disposed of by Generon is mistaken.

The Complaint does not specifically identify damage to the switchgear. However, the total damages described in the Formal Demand and Damage Summary are $2,355,271.00. The same amount of total damages is alleged in the Complaint at Paragraph 17.

As set forth in the Generon Initial Response, the Complaint alleges at paragraphs 29, 35, 40 and 47 damage to Signal Peak property. Such damage includes, at minimum, the motor control unit and the switchgear.

Generon respectfully reiterates its demand that C&F Specialty withdraw its refusal to defend Generon as defense is required pursuant to the terms of the Policy in relation to the allegations of the Complaint. Generon respectively reiterates its demand that C&F Specialty indemnify Generon unless and until facts are ultimately established that relieve C&F Specialty of an obligation to indemnify Generon, in whole or in part, under the terms of the Policy. Generon reserves all rights.

Sincerely,

Kenneth A. Keeling

Copy by electronic transmission to:
Brian S. Martin – bmartin@thompsoncoe.com
Adam Busser – abuser@generon.com
E J Devine – edevine@generon.com

2


**denenbergtuffley**

Glenn W. Mattar
Direct Dial: 248.203.2768
Email: gmattar@dt-law.com

Jack Slavik
Direct Dial: 206-373-7238
jslavik@cozen.com

April 13, 2016

**FORMAL DEMAND**

*Via Certified Mail and*
*Email (letter only): KHuso@mkmfirm.com*
Katherine Huso
Matovich, Keller & Murphy, PC
Western Security Bank Building, Suite 225
2812 First Avenue North
P.O. Box 1098
Billings, Montana 59103-1098

|  | | |
|---|---|---|
| RE: | Insured: | **Global Mining Holding Company/Signal Peak Energy, LLC** |
| | Your Client: | **Generon** |
| | Our Clients: | **Various** |
| | Date of Loss: | **11/24/2014** |
| | DT File No.: | **210-803** |

Dear Ms. Huso:

As you may recall, Global Mining Holding Company/Signal Peak Energy, LLC suffered a fire loss **at** its coal mine located at 100 Portal Drive in Roundup, Montana (the "Mine") on November 24, 2014 (the "Fire" or the "Loss"). Denenberg Tuffley, PLLC and Cozen O'Conner represent various parties interested in recovery of damages involved in that Loss.

As you are aware, your client, Generon, sold and installed/commissioned a Generon containerized nitrogen generating system for the Mine on or around August, 2012. Investigations revealed that the Fire originated in the compressor unit for the containerized nitrogen generating system. Specifically, investigations revealed the Fire likely originated within the oil separator for the compressor unit.

Further investigations revealed that Generon improperly installed the subject compressor unit. Specifically, investigations revealed Generon had the compressor unit's oil pressure switch and temperature switch (safety devices) on the wrong setting. Rather than setting these switches to the correct setting, Generon personnel simply wired ("jumped") around them, thereby rendering them totally ineffective.

Damages from the fire totaled $2,355,271.00. <u>**As our investigation has revealed that Generon is responsible for this Loss, please consider this letter as a formal demand for reimbursement of $2,355,271.00**</u>. A damage summary and supporting documentation is enclosed for your reference.

---

**Michigan Office**

One Northwestern Plaza
28411 Northwestern Hwy, Suite 600
Southfield, MI 48034

T: 248.549.3900 / F: 248.593.5808

**California Office**

Constellation Place
10250 Constellation Blvd., Suite 2320
Los Angeles, CA 90067

T: 310.356.4683 / F: 310.284.9089

www.denenbergtuffley.com


**EXHIBIT**
**A**

April 13, 2016
Page 2


If you are interested in resolving this matter without the need for litigation, we request that you contact the undersigned within twenty-one (21) days.

If you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,


**DENENBERG TUFFLEY, PLLC**

*Glenn W. Mattar*

Glenn W. Mattar


**COZEN O'CONNER**

*Jack Slavik*

Jack Slavik


GWM/JS/sm

## DAMAGE SUMMARY
## SIGNAL PEAK ENERGY/GLOBAL MINING HOLDING COMPANY

**Insured:**         **Global Mining Holdings/Signal Peak Energy**
**Date of Loss:**    **November 24, 2014**
**Loss Location:**   **100 Portal Drive**
                     **Roundup, Montana 59072**

| EQUIPMENT (Exhibit A): | AMOUNT |
|---|---|
| Generon IGS – NIGen/Compressor Replacement | $1,000,251.40* |
| CEI – Motor Control Unit (Electrical) | $    64,340.00 |
| CED – Switchgear (Electrical) | $    35,250.00 |
| Total Logistics – Freight for Generon Parts | $      3,850.00 |
| Modern Machinery – Compressor Oil | $      4,155.55 |
| Power Service Co – Compass Control Replacement | $      1,169.53 |
| Crescent Electrical – Generator Connection Parts | $      1,346.87* |

**Total Equipment Claim:**                        **$1,110,363.00***

| EXTRA EXPENSE (Exhibit B): | |
|---|---|
| Weatherford – Temporary Generator | $ 195,732.93 |
| Global Nitrogen – Temporary Ni Gen Service Pkg. | $ 980,000.00 |
| Tractor & Equipment – Temporary Light Tower | $      9,860.00 |
| G.M. Petroleum – Diesel for Temporary Unit | $    45,610.83* |
| Meadow Lark Services – Loading Equipment | $    12,782.50 |
| McCleary – Propane | $      1,135.02 |

**Total EE Claim:**                               **$1,245,121.00***

    Less: Salvage                                 ($        213.00)

**Total Damages:**                                **$2,355,271.00**

*Agreed upon amount

# THOMPSON COE

Thompson, Coe, Cousins & Irons, L.L.P.
Attorneys and Counselors

Brian S. Martin
Direct Dial: (713) 403-8282
bmartin@thompsoncoe.com

Austin
Dallas
Houston
Los Angeles
New Orleans
Saint Paul

March 23, 2017

Kenneth Keeling, Esq.
Keeling Law Firm
3310 Katy Freeway, Suite 100
Houston, Texas 77007

**VIA CERTIFIED MAIL / RRR**

Re: *Signal Peak Energy, LLC v. Generon IGS, Inc., et al.*; Cause No. DV-16-43
(In the Fourteenth District Court of Montana, Musselshell County)

Dear Mr. Keeling:

We are writing in response to your letter, dated March 7, 2017, concerning the aforementioned lawsuit against Generon. With regard to the present duty of Crum & Forster Specialty Insurance Company ("Crum & Forster Specialty") to defend Generon, all of the information included in your letter is, at best, extrinsic evidence that does not affect the duty to defend. An insurer's duty to defend and its duty to indemnify its policyholder are separate and distinct duties. *D.R. Horton – Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740 (Tex. 2009). Please be advised that Crum & Forster Specialty reiterates its position that the factual allegations in the Plaintiff's Original Complaint do not give rise to a duty to defend Generon under the Crum & Forster Specialty Policy, for the reasons explained in Crum & Forster Specialty's disclaimer letter.

Please let us know if you wish to discuss this matter further.

Sincerely,

*/s/ Brian S. Martin*

Brian S. Martin

EXHIBIT
7

2659838v1
05060.823

One Riverway | Suite 1400 | Houston, TX 77056 | (713) 403-8210 | Fax: (713) 403-8299



LEGAL DEPARTMENT

RECEIVED

Commissioner of Securities and Insurance
Office of State Auditor
840 Helena Avenue
Helena, MT 59601

Crum & Forster Specialty Insurance Company
Attn: Legal, Sonia Konopi
PO Box 1973
Morristown, NJ 07962

7016 0910 0002 1479 0979



CERTIFIED MAIL

FIRST CLASS



U.S. POSTAGE